UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

2023 - 1018

---

THE BOEING COMPANY,

*Plaintiff-Appellant*,

v.

UNITED STATES,

*Defendant-Appellee*.

---

Appeal from the United States Court of Federal Claims
in Case No. 1:17-cv-01969-PEC, Judge Patricia E. Campbell-Smith

---

# OPENING BRIEF OF APPELLANT THE BOEING COMPANY

---

Jade Totman
THE BOEING COMPANY
929 Long Bridge Drive
Arlington, VA 22202

Scott M. McCaleb
Jon W. Burd
Gary S. Ward
George E. Petel
Jennifer Eve Retener
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

December 5, 2022

*Counsel for Appellant*
*The Boeing Company*

## CERTIFICATE OF INTEREST

1. The full name of every entity represented in the case by the counsel filing the certificate.

- The Boeing Company

2. For each entity, the name of every real party in interest, if that entity is not the real party in interest.

- None/Not Applicable

3. For each entity, that entity's parent corporation(s) and every publicly held corporation that owns ten percent (10%) or more of its stock.

- None/Not Applicable

4. The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court.

- Charles J. Cooper, Cooper & Kirk, PLLC
- Michael W. Kirk, Cooper & Kirk, PLLC
- John D. Ohlendorf, Cooper & Kirk, PLLC
- Howard C. Nielson, Jr., Cooper & Kirk, PLLC
- Suzette W. Derrevere, The Boeing Company
- Seth H. Locke, Perkins Coie LLP

5. See Statement of Related Cases.

/s/ Scott M. McCaleb
Scott M. McCaleb
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

December 5, 2022

*Counsel for Appellant*
*The Boeing Company*

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........ ix

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 6

STATEMENT OF THE ISSUES ........ 7

STATEMENT OF THE CASE ........ 7

I. Statutory and Regulatory Framework ........ 7

A. The Contract Disputes Act ........ 8

B. The Tucker Act ........ 9

C. The Cost Accounting Standards Statute ........ 10

D. The Federal Acquisition Regulation ........ 12

II. Factual Background ........ 14

III. Proceedings in the Court of Federal Claims and Before This Court ........ 17

A. The Court of Federal Claims' Initial Decision ........ 17

B. The Federal Circuit's Reversal and Remand ........ 19

C. The Court of Federal Claims' Instant Decision ........ 21

SUMMARY OF THE ARGUMENT ........ 23

ARGUMENT ........ 26

I. Standard of Review ........ 26

II. The Court of Federal Claims has jurisdiction to hear each count in Boeing's complaint. ........ 26

A. The Court of Federal Claims has broad jurisdiction to resolve any claims that relate to a procurement contract. .......... 27

B. The Court of Federal Claims' characterization of Boeing's arguments—as challenges to FAR 30.606(a)(3)(ii)—is irrelevant to jurisdiction. .......... 31

i. *Texas Health* confirms that the Court of Federal Claims has jurisdiction when the dispute implicates a contract with the Government. .......... 31

ii. The Court of Federal Claims' reasons for narrowing *Texas Health* to disputes involving a single contract with no prospective consequences conflict with *Texas Health* and other relevant authorities. .......... 34

C. Nothing in Administrative Procedure Act jurisprudence limits the Court of Federal Claims' jurisdiction. .......... 39

III. The Court of Federal Claims has jurisdiction over Boeing's illegal exaction count (Count IV), and nothing bars it from adjudicating it on the merits. .......... 43

A. This Court has already held that the Court of Federal Claims has jurisdiction over Boeing's illegal exaction count, which now is the law of the case. .......... 44

B. The Federal Circuit's earlier holding that the Court of Federal Claims has jurisdiction is correct. .......... 47

i. The Court of Federal Claims has jurisdiction under Section 1491(a)(2) because Boeing's illegal exaction claim relates to a contract and all procedural requirements have been satisfied. .......... 47

ii. The Contract Disputes Act cannot extinguish the Court of Federal Claims' jurisdiction to hear Boeing's illegal exaction claim under Section 1491(a)(1). ........................................................ 49

CONCLUSION ........................................................................................................ 51

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS ........................................................................................................ 52

# TABLE OF AUTHORITIES

## Cases

*Aerolineas Argentinas v. United States*,
77 F.3d 1564 (Fed. Cir. 1996) ....................................................9, 50

*ArcelorMittal France v. AK Steel Corp.*,
786 F.3d 885 (Fed. Cir. 2015) ........................................................45

*Boeing Co.*,
ASBCA No. 57549, 13 BCA ¶ 35,427 ....................................12, 14, 39

*Boeing Co. v. United States*,
680 F.2d 132 (Ct. Cl. 1982)..........................................................37

*Boeing Co. v. United States*,
968 F.3d 1371 (Fed. Cir. 2020) ...................................................*passim*

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)...................................................................3, 22, 40

*Brownlee v. DynCorp*,
349 F.3d 1343 (Fed. Cir. 2003) .......................................................37

*Consolidated Edison Co. of NewYork, Inc. v. United States Department of Energy*,
247 F.3d 1378 (Fed. Cir. 2001) .......................................................38

*Dalton v. Sherwood Van Lines, Inc.*,
50 F.3d 1014 (Fed. Cir. 1995) .....................................................*passim*

*Engineered Demolition, Inc. v. United States*,
60 Fed. Cl. 822 (2004)....................................................................37

*GHS Health Maintenance Organization v. United States*,
76 Fed. Cl. 339 (2007), *aff'd,* 536 F.3d 1293 (Fed. Cir. 2008)..........................35

*GHS Health Maintenance Organization v. United States*,
536 F.3d 1293 (Fed. Cir. 2008) ...................................................35, 36

*Katz v.* Cisneros,
16 F.3d 1204 (Fed. Cir. 1994) ..................................................3, 22, 40

*La Gloria Oil & Gas Co. v. United States*,
56 Fed. Cl. 211 (2003), *abrogated on other grounds sub nom. Tesoro Hawaii Corp. v. United States,* 405 F.3d 1339 (Fed. Cir. 2005) .......... 37

*Land Shark Shredding, LLC v. United States*,
842 F. App'x 589 (Fed. Cir. 2021) .......... 41

*M. Maropakis Carpentry, Inc. v. United States*,
609 F.3d 1323 (Fed. Cir. 2010) .......... 16

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003) .......... 42

*Navajo Refining Co. v. United States*,
58 Fed. Cl. 200 (2003) .......... 37

*NI Industries, Inc. v. United States*,
841 F.2d 1104 (Fed. Cir. 1988) .......... 36

*Ohio v. United States*,
150 Fed. Cl. 173 (2020) .......... 50

*Ology Bioservices, Inc.*,
ASBCA No. 62633, 2021 WL 2311903 .......... 37

*Sikorsky Aircraft Corp. v. United States*,
773 F.3d 1315 (Fed. Cir. 2014) .......... 38

*Smith International, Inc. v. Hughes Tool Co.*,
759 F.2d 1572 (Fed. Cir. 1985) .......... 45, 46

*Southfork Systems, Inc. v. United States*,
141 F.3d 1124 (Fed. Cir. 1998) .......... 42

*Sparks v. United States*,
36 Fed. Cl. 488 (1996) .......... 50

*Stockton East Water District v. United States*,
583 F.3d 1344 (Fed. Cir. 2009), *remanded on reh'g on other grounds,* 638 F.3d 781 (Fed. Cir. 2011) .......... 50

*Suburban Mortage Associates Inc. v. United States Department of Housing*, 480 F.3d 1116 (Fed. Cir. 2007) ....................42, 43

*Texas Health Choice, L.C. v. Office of Personnel Management*, 400 F.3d 895 (Fed. Cir. 2005) ....................*passim*

*Todd Construction, L.P. v. United States*, 656 F.3d 1306 (Fed. Cir. 2011) ....................*passim*

*United Communities, LLC v. United States*, 154 Fed. Cl. 676 (2021) ....................50

*United States v. Grumman Aerospace Corp.*, 927 F.2d 575 (Fed. Cir. 1991) ....................37

**Statutes**

5 U.S.C. § 704 ....................18, 40

28 U.S.C. § 1295 ....................6

28 U.S.C. § 1491 ....................*passim*

41 U.S.C. § 1501 ....................1

41 U.S.C. § 1502 ....................*passim*

41 U.S.C. § 1503 ....................*passim*

41 U.S.C. § 7102 ....................27

41 U.S.C. § 7103 ....................*passim*

41 U.S.C. § 7104 ....................*passim*

Pub. L. No. 95-563, 92 Stat. 2383 (Nov. 1, 1978) ....................9

**Regulations**

70 Fed. Reg. 11743 (Mar. 9, 2005) ....................13

FAR 2.101 ....................13

FAR 30.001 ....................13

FAR 30.606 ........ *passim*

FAR 33.211 ........ 16

FAR 52.230-2........ 29

48 C.F.R. § 9903.201-7........ 13

**Rules**

Fed. R. App. P. 4 ........ 7

**Other Authorities**

Daniel Seiden, *US Accounting Win Over Boeing Not 'Bullet Proof,' Attorney Says,* Bloomberg Law (Sept. 28, 2022), https://news.bloomberglaw.com/federal-contracting/us-accounting-win-over-boeing-not-bullet-proof-attorney-says ........ 5

Dhananjay Manthripragada, *COFC Dismissal Of Boeing's Challenge To The Application Of FAR 30.606 To Its Contracts Yet Again Leaves Unresolved The Issue Of Combining The Cost Impact Of Multiple Changes In Cost Accounting Practice*, 64 Gov't Contractor ¶ 325 (Nov. 9, 2022) ........ 6

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Boeing identifies the following appeal from the same civil action that was previously before this Court:

- *The Boeing Company v. United States*, No. 19-2148, decided August 10, 2020 by Circuit Judges Moore, Taranto, and Chen at 968 F.3d 1371. A copy of this decision will also be included in the Joint Appendix at Appx1565.

Pursuant to Federal Circuit Rule 47.5(b), Boeing identifies the following cases pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal:

- *The Boeing Company v. United States*, No. 17-1981C (Fed. Cl.)
- *The Boeing Company v. United States*, No. 17-1983C (Fed. Cl.)
- *The Boeing Company*, ASBCA No. 58030
- *The Boeing Company*, ASBCA No. 58593
- *The Boeing Company*, ASBCA No. 58594
- *The Boeing Company*, ASBCA No. 58660
- *The Boeing Company*, ASBCA No. 59212
- *The Boeing Company*, ASBCA No. 59220
- *The Boeing Company*, ASBCA No. 59813
- *The Boeing Company*, ASBCA No. 60376
- *The Boeing Company*, ASBCA No. 60403

- *The Boeing Company*, ASBCA No. 60522
- *The Boeing Company*, ASBCA No. 60736

## INTRODUCTION

This appeal comes before this Court following the *sua sponte* dismissal of the entire action by the Court of Federal Claims (COFC) on what we understand to be jurisdictional grounds. In dismissing the action, the COFC departed from the clear jurisdictional authorities in the Tucker Act, 28 U.S.C. § 1491; the Contract Disputes Act (CDA), 41 U.S.C. Chapter 71; and the Cost Accounting Standards (CAS) statute, 41 U.S.C. §§ 1501 *et seq*. The COFC's decision also contravenes clear and controlling Federal Circuit precedent and the law of the case established by this Court's earlier decision in a prior appeal. It even contradicts the COFC's prior holdings in these proceedings and repudiates the Government's own concession that the COFC has jurisdiction over Boeing's contract claims. Accordingly, the Court should reverse and remand.

Boeing's complaint seeks judicial review by the COFC of a contracting officer's final decision, issued pursuant to the CDA, asserting a $1 million Government claim against Boeing under one of Boeing's procurement contracts. In pertinent part, Boeing's arguments have challenged the validity and application of Federal Acquisition Regulation (FAR) 30.606(a)(3)(ii), a regulation that purports to interpret the CAS statute and upon which the Government relied in asserting a "contract price adjustment" under the CAS statute that is the basis for its claim against Boeing. Boeing contends that the Government's claim breaches the contract

and constitutes an illegal exaction because FAR 30.606(a)(3)(ii) is invalid, and the Government's application of it would lead to an improper windfall. After the Government asserted its claim, Boeing submitted its own claim to the contracting officer (CO) seeking relief under its contract (which was denied), and then Boeing timely filed its complaint seeking *de novo* review by the COFC.

The COFC's jurisdiction over the counts in Boeing's complaint seeking contract relief (Counts I-III) is plainly established by the CDA, the Tucker Act, and the CAS statute. Where the parties fail to agree on a "contract price adjustment," the CAS statute mandates that "the disagreement will constitute a dispute under [the CDA]" and provides that the Administrative Procedure Act (APA) shall not apply. 41 U.S.C. §§ 1502(g), 1503(a). The CDA states that "[e]ach claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." *Id.* § 7103(a)(3). If the contractor disputes the contracting officer's written final decision, it may "bring an action directly on the claim in the [COFC], notwithstanding any contract provision, regulation, or rule of law to the contrary," which the COFC reviews *de novo*. *Id.* § 7104(b)(1). The Tucker Act confers broad jurisdiction on the COFC "to render judgment upon any claim by or against, or dispute with, a contractor arising under" the CDA, including a dispute involving "compliance with cost accounting standards." 28 U.S.C. § 1491(a)(2).

Here, there is no dispute that the Government asserted its "contract price adjustment" against Boeing in a CDA claim; that Boeing subsequently submitted its own CDA claim to the CO, which was denied; or that Boeing timely filed its complaint in the COFC. The COFC, nonetheless, dismissed Boeing's contract claims because it determined that Boeing's contentions "are, at base, challenges to the validity of a regulation," FAR 30.606(a)(3)(ii). Appx5. The COFC concluded that Boeing's claim was "not a contract case," but rather one seeking "declaratory judgment and other equitable relief" that could affect multiple contracts and future conduct by the Government, which the COFC concluded was beyond its jurisdiction. Appx5-6. Relying primarily on two cases (*Bowen v. Massachusetts*, 487 U.S. 879 (1988), and *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994)) involving challenges under the APA, the COFC held that the "weight of precedent thus dictates that the court lacks jurisdiction to determine the validity of FAR 30.606 in this case," and that it "declines to extend its jurisdictional reach" to Boeing's CDA claims. Appx6-8.

The COFC's holding is wrong. The Government's claim against Boeing and Boeing's affirmative claim seeking contractual relief both arise under the CDA. The CDA and the Tucker Act therefore expressly confer jurisdiction for the COFC to conduct a *de novo* review of the CO's decisions regarding Boeing's complaint—and the CAS statute, for good measure, precludes the application of the APA to this

dispute. Moreover, Federal Circuit precedent establishes that Boeing's challenge to the "validity" of FAR 30.606(a)(3)(ii) in connection with its CDA claim is squarely within the COFC's jurisdiction under 28 U.S.C. § 1491(a)(2). *See Texas Health Choice, L.C. v. Off. of Pers. Mgmt.*, 400 F.3d 895, 900 (Fed. Cir. 2005). The Federal Circuit and COFC have repeatedly exercised jurisdiction over similar CDA claims that challenge the validity of a regulation (including in *Texas Health* and its progeny), even when the resolution of the case on its merits might affect other cases and conduct by the Government.

By contrast, the *Bowen* and *Katz* decisions on which the COFC relied do not apply to the jurisdictional issues at hand. Both involved challenges under the APA, which does not apply to disputes over contract price adjustments under the CAS statute, and neither case involved the CDA or any procurement contract between the plaintiff and the Government. Consequently, neither case implicates the COFC's jurisdiction under Section 1491(a)(2) of the Tucker Act, nor should they be construed to narrow that jurisdiction.

The COFC's rationale for dismissing Boeing's illegal exaction claim (Count IV) also appears to be jurisdictional. Although the COFC asserted that it "has jurisdiction to hear [Boeing's] illegal exaction claim," it nevertheless concluded Count IV "is barred in this case" and that the COFC "lacks the authority" to consider it. Appx8. The COFC relied on *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014

(Fed. Cir. 1995), in which the Federal Circuit addressed whether the Armed Services Board of Contract Appeals had CDA jurisdiction over a unique type of government contract that was deemed to be outside the scope of the CDA. Based on *Dalton*, the COFC appears to have concluded that the CDA divests the COFC of jurisdiction over Count IV.

The COFC's holding is incorrect for three reasons. First, this Court already considered the illegal exaction claim and determined the trial court has jurisdiction to hear it; the law of the case compels the same outcome here. Second, Boeing first raised its illegal exaction argument through a certified CDA claim it presented to the contracting officer, which was denied. Accordingly, the COFC has jurisdiction over Count IV under the CDA and Section 1491(a)(2) of the Tucker Act. Third, even if the illegal exaction claim falls outside the scope of the CDA, the COFC still has jurisdiction under Section 1491(a)(1) of the Tucker Act.

Ultimately, the jurisdictional issues presented in this action are simple and straightforward, but they are profoundly important to the government contracts community.[1] The COFC's decision, if affirmed, would undermine the

[1] *See, e.g.*, Daniel Seiden, *US Accounting Win Over Boeing Not 'Bullet Proof,' Attorney Says*, Bloomberg Law (Sept. 28, 2022), https://news.bloomberglaw.com/federal-contracting/us-accounting-win-over-boeing-not-bullet-proof-attorney-says (noting that the COFC's decision, which "had been on everybody's radar" was a "big letdown for the federal contracting community" and questioning whether "the hopelessly unfair approach of FAR

comprehensive dispute resolution scheme Congress created in the CDA, which is intended to ensure the uniform interpretation of government contracts. At the same time, it would insulate Government procurement functions from judicial review in a manner that would defy Congressional intent. This is the second time this case has come before this Court on a meritless jurisdictional issue identified by the COFC, while the parties remain without a decision on the merits of the underlying legal and contractual issues that are of significant interest to the federal procurement community.

For all of these reasons, and those that follow, the Federal Circuit should reverse the COFC's decision below and remand for further proceedings.

## JURISDICTIONAL STATEMENT

This case comes on appeal from a final decision of the COFC. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). The COFC issued its decision on September 21, 2022, and final judgment was entered for the Government

---

30.606 will continue to be used by the government to disadvantage contractors"); *see also* Dhananjay Manthripragada, *COFC Dismissal Of Boeing's Challenge To The Application Of FAR 30.606 To Its Contracts Yet Again Leaves Unresolved The Issue Of Combining The Cost Impact Of Multiple Changes In Cost Accounting Practice*, 64 Gov't Contractor ¶ 325 (Nov. 9, 2022) (analyzing the substantive question on appeal, which presents a "long-pending, substantive question of significant importance to the Government and contractors alike").

the same day. Appx9. Boeing timely filed a notice of appeal on September 30, 2022. *See* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

This case presents two issues of critical importance to the Government contracting community:

1. Whether the COFC erred in concluding that it lacked jurisdiction over Boeing's action challenging a Contracting Officer's Final Decision, which asserted a Government claim for a contract price adjustment of $1,064,773 under a procurement contract subject to the Contract Disputes Act?

2. Whether the COFC erred in dismissing Boeing's illegal exaction count (Count IV)—which Boeing presented to the Contracting Officer in a CDA claim that was "deemed denied" and over which this Court previously held the COFC enjoyed jurisdiction—based on the trial court's view that Count IV was "barred" by the CAS statute and *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014 (Fed. Cir. 1995)?

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Framework

This case principally implicates three statutes—the CDA, the Tucker Act, and the CAS statute—and one particular FAR provision, FAR 30.606(a)(3)(ii). We address below the relevant portions of each.

### A. The Contract Disputes Act

The CDA provides a "comprehensive" framework for addressing and resolving all government contract performance and payment disputes—indeed, any claim "relating to a contract." *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1311 (Fed. Cir. 2011) (citing *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1268 (Fed. Cir. 1999)). A dispute under the CDA may be initiated by either the contractor or the Government. In pertinent part, the CDA states that "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision," and "shall be in writing," 41 U.S.C. § 7103(a)(1)-(2), and also that any "claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer," *id.* § 7103(a)(3).

A decision by a CO—whether to affirmatively assert a government claim or to address a contractor's claim—"shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights" under the CDA to seek judicial review. *Id.* § 7103(a), (d)-(e). If the CO fails to issue a decision on a contractor's claim, that failure—*i.e.*, a "deemed denial"—is "deemed to be a decision by the [CO] denying the claim and authorizes an appeal or action on the claim as otherwise provided" in the CDA. *Id.* § 7103(f)(5).

A CO's decision can be appealed by a contractor to the cognizant board of contract appeals. *Id.* § 7104(a). Alternatively, the contractor can "bring an action directly on the claim in the [COFC], notwithstanding any contract provision, regulation, or rule of law to the contrary." *Id.* § 7104(b)(1). An action on the claim in the COFC "shall proceed de novo." *Id.* § 7104(b)(4).

### B. The Tucker Act

The Tucker Act defines the jurisdiction of the COFC. *See* 28 U.S.C. § 1491. Both prongs of Section 1491(a)—paragraphs (a)(1) and (a)(2)—apply here. Section 1491(a)(1) grants to the COFC jurisdiction "to render judgment upon any claim against the United States ***founded either upon the Constitution, or any Act of Congress, or any regulation*** of an executive department, or upon any express or implied contract with the United States." *Id.* § 1491(a)(1).[2] A "Tucker Act claim" authorized under this subsection "may be made for recovery of monies that the government has required to be paid contrary to law"—*e.g.*, an illegal exaction claim. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996).

Section 1491(a)(2), as amended by the CDA, *see* Pub. L. No. 95-563, § 14, 92 Stat. 2383, 2390-91 (Nov. 1, 1978), confers jurisdiction on the COFC over ***any*** claims under the CDA, including those involving the cost accounting standards:

---

[2] All emphases in this brief are added, unless noted otherwise.

> The Court of Federal Claims shall have jurisdiction to render judgment upon ***any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41***, including a dispute concerning termination of a contract, rights in tangible or intangible property, ***compliance with cost accounting standards***, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

28 U.S.C. § 1491(a)(2).

### C. The Cost Accounting Standards Statute

The CAS Board was established in 1988 to "regularize cost-accounting practices relevant to," *inter alia*, cost-reimbursement government contracts. *Boeing Co. v. United States*, 968 F.3d 1371, 1374 (Fed. Cir. 2020). The CAS Board has "exclusive authority" over cost accounting standards, which govern the contract before this Court:

> The Cost Accounting Standards Board has ***exclusive authority to prescribe, amend, and rescind cost accounting standards***, and ***interpretations of the standards***, designed to achieve uniformity and consistency in the cost accounting standards governing measurement, assignment, and allocation of costs to contracts with the Federal Government.

41 U.S.C. § 1502(a)(1).

The CAS statute mandates that the CAS Board prescribe regulations that require contractors to "disclose in writing their cost accounting practices" in a disclosure statement, *id.* § 1502(f)(1), and in the event of a change to those practices, to "agree to a contract price adjustment" for increased costs paid to the contractor by the Government, *id.* § 1502(f)(2):

> **(f) Implementing Regulations.**—The Board shall prescribe regulations for the implementation of cost accounting standards prescribed or interpreted under this section. The regulations shall be incorporated into the Federal Acquisition Regulation and shall require contractors and subcontractors as a condition of contracting with the Federal Government to—
>
> > (1) disclose in writing their cost accounting practices, including methods of distinguishing direct costs from indirect costs and the basis used for allocating indirect costs; and
> >
> > (2) agree to a ***contract price adjustment***, with interest, for any increased costs paid to the contractor or subcontractor by the Federal Government because of a change in the contractor's or subcontractor's cost accounting practices . . . .

*Id.* § 1502(f).

As for the amount of any "contract price adjustment," the CAS statute prohibits the Government from receiving a windfall by providing that the Government may not recover any more than the "***aggregate increased cost*** to the Federal Government, ***as defined by the Board***":

> **(b) AMOUNT OF ADJUSTMENT.—**
>
> A contract price adjustment undertaken under section 1502(f)(2) of this title shall be made, where applicable, on relevant contracts between the Federal Government and the contractor that are subject to the cost accounting standards so as to protect the Federal Government from ***payment, in the aggregate, of increased costs***, ***as defined by the Cost Accounting Standards Board***. The Federal Government may not recover costs greater than the ***aggregate increased cost*** to the Federal Government, ***as defined by the Board***, on the relevant contracts subject to the price adjustment unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Federal Government.

*Id.* § 1503(b).

Any disagreement over a contract price adjustment prescribed by the CAS statute shall constitute a dispute under the CDA: "If the Federal Government and a contractor or subcontractor fail to agree on a contract price adjustment, including whether the contractor or subcontractor has complied with the applicable cost accounting standards, the ***disagreement will constitute a dispute under chapter 71 of this title***." *Id.* § 1503(a). In addition, Congress mandated that any functions exercised under the CAS standards are not subject to the judicial review provisions of the APA. *See id.* § 1502(g) ("Functions exercised under this chapter are ***not subject to*** sections . . . ***701 to 706 of title 5***."); *see also Boeing*, 968 F.3d at 1381 (noting the "statutory exclusion of APA coverage" under the CAS statute).

**D. The Federal Acquisition Regulation**

As explained above, the CAS statute permits the Government to recover only the "aggregate increased cost" paid by the Government when a contractor voluntarily changes its cost accounting practices, and it vests in the CAS Board the authority to promulgate any rule defining such "aggregate increased cost." *See* 41 U.S.C. § 1503(b); *see also* § 1502(f). Before 2005, "aggregate increased cost" was interpreted to include the total, net impact of all changed accounting practices that a contractor implements simultaneously. *Boeing Co.*, ASBCA No. 57549, 13 BCA ¶ 35,427 (¶ 7). In 2005, however, the FAR Council issued a new FAR provision,

FAR 30.606(a)(3)(ii), stating that the cognizant Federal agency official (the CFAO, which here is the CO[3]) "shall not combine the cost impacts . . . unless all of the cost impacts are increased costs to [the] Government." FAR 30.606(a)(3)(ii). In comments accompanying the final rule, the FAR Council asserted—for the first time—the following explanation:

> [C]ombining the cost-impacts of unilateral changes . . . must be precluded if any of the individual changes . . . involved results in decreased costs in the aggregate. When there are two or more unilateral changes . . . some with increased costs and others with decreased costs, combining the cost impacts of those changes does not comply with the statutory requirement that the Government recover the increased costs in the aggregate for each unilateral change[]. There is no statutory provision that permits offsetting the cost-impact of one unilateral change[] with the cost-impact of any other unilateral change[].

70 Fed. Reg. 11743, 11749 (Mar. 9, 2005); Appx609.

The Government has since interpreted FAR 30.606(a)(3)(ii) to bar its pre-2005 practice. Now, when a contractor voluntarily changes multiple cost accounting practices at the same time, the Government evaluates whether a contract price adjustment is necessary using two steps: (1) the CO calculates the impact from each of the discrete "changes"; and (2) the CO nets the cost impacts of only the changes that ***increase*** costs to the Government, excluding the cost impacts of any such

---

[3] The FAR requires the Government to coordinate and assign a "cognizant Federal agency official" to act on behalf of all Federal agencies on certain matters. FAR 2.101; 48 C.F.R. § 9903.201-7. The CFAO, or Cognizant Federal Agency Official, is the CO assigned by the cognizant Federal agency. FAR 30.001.

discrete change(s) that ***decrease*** costs to the Government. *Boeing Co.*, ASBCA No. 57549, *supra* (¶ 8) (explaining that, under FAR 30.606(a)(3)(ii), cost impacts that decrease costs to the Government "cannot be netted against" discrete changes that ***increase*** the costs). Under this interpretation, the Government recovers all ***increased*** costs, while still retaining the benefit of all ***decreased*** costs resulting from the revised accounting practices, which can result, as here, in a windfall to the Government.

In the event the Government and the contractor cannot agree "on the amount of the cost impact or the contract adjustments," the CO must "issue a final decision in accordance with 33.211 and unilaterally adjust the contract(s)." FAR 30.606(c)(6)(ii).[4]

## II. Factual Background

The Government initiated this dispute after Boeing voluntarily and simultaneously changed eight of its disclosed cost accounting practices, effective January 1, 2011. Appx19. Boeing estimated that the net effect of its changed practices would be to cause the Government's costs to ***decrease*** by $1,489,000 because Boeing would be allocating fewer costs to flexibly priced contracts with the Government (for example, cost reimbursement contracts) than if Boeing had

[4] FAR 33.211 governs the issuance of a final CO decision under the CDA.

continued to apply its previous cost accounting practices. Appx20. The Government did not dispute that the changed practices would yield nearly $1.5 million in overall savings to the Government.

Notwithstanding the CAS statute's provision barring the Government from recovering "costs greater than the aggregate increased costs to the Federal Government," 41 U.S.C. § 1503(b), the Government demanded that Boeing pay the Government $1,064,773 in a contract price adjustment, Appx46. That amount corresponds to increased costs (plus interest) that the Government might have experienced had Boeing changed only two of the eight cost accounting practices at issue (*i.e.*, the ones increasing costs to the Government).

On December 21, 2016 the CO issued a final decision under the CDA asserting a claim against Boeing for $1,064,773:

> This is my contracting officer's final decision ("Final Decision") asserting a Government claim for $1,064,773, pursuant to the Contract Disputes Act (Title 41 U.S.C.), FAR 52.233-1, FAR 52.230-2 and FAR 52.230-6. The Boeing Company (Boeing) is indebted to the United States Government as a result of increased costs paid on US Government contracts under FAR 30.603-2(a), due to Boeing's having made unilateral cost accounting practice changes, as defined in FAR Part 30 and CAS 302-2 . . . . The Government claim and demand, which totals $1,064,773, is comprised of $940,007 in increased costs and, in accordance with 41 U.S.C. 1502(f)(2) and FAR 52.230-2(a)(5), $124,766 in accrued compound interest as of December 31, 2016.

Appx58. Consistent with the requirement in 41 U.S.C. § 7103(e) and FAR 33.211, the Final Decision also advised Boeing of its right to pursue an action on the claim directly with the COFC:

> This is the Final Decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals . . . .
>
> * * *
>
> Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims . . . within 12 months of the date you receive this decision.

Appx63-64 (quoting FAR 33.211(a)(4)(v)). Boeing entered an installment agreement, under which it began paying $8,900 per month. Appx46.

As a protective measure, Boeing opposed the Government's claim by submitting, under the CDA, ***a certified claim of its own***.[5] Appx47. In that claim, Boeing requested that the CO issue a decision on four grounds:

- "[A] final decision interpreting the affected contracts . . . as allowing offsetting . . . and thus affirming that the Government is not entitled to the equitable adjustment of $1,064,773, as claimed by the December 21 COFD." Appx55.

- "In the alternative, Boeing requests reformation of its affected contracts with the Government to comply with Section 1503(b)'s directive permitting offsetting." Appx56.

---

[5] *See, e.g.*, *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1331 (Fed. Cir. 2010) (requiring contractors to assert certain defenses to a government claim in a certified contractor claim).

- "[A] final decision finding that the December 21 COFD's demand of $1,064,773 breaches the Government's obligations to Boeing under each of the affected contracts." *Id.*
- "[A] final decision holding that the Government's demand that Boeing pay a $1,064,773 price adjustment, contrary to the instructions of Section 1503, also amounts to an ***illegal exaction*** of that amount." *Id.*

The Contracting Officer responded that she viewed Boeing's claim as a request for reconsideration of her final decision, which she declined. *Id.*

## III. Proceedings in the Court of Federal Claims and Before This Court

This appeal marks the second time the COFC has dismissed this case on grounds unrelated to its merits. The discussion below highlights aspects of the prior proceedings that are salient to the jurisdictional issues at hand.

### A. The Court of Federal Claims' Initial Decision

Boeing timely brought this action in the COFC. Appx18. In its complaint, Boeing asserted Counts I-IV, which mirrored the four grounds in its affirmative claim. *Compare* Appx55-56, *with* Appx48-52. Boeing also sought compensatory damages for payments it made pursuant to the government's claim ($71,276, plus recurring $8,900 monthly installments). Appx52. Boeing's complaint cited 28 U.S.C. § 1491(a)(2), and, alternatively, 28 U.S.C. § 1491(a)(1), as the bases for the court's jurisdiction. Appx24-25. In a Joint Preliminary Status Report, the parties ***agreed*** that the COFC had jurisdiction over the action, Appx85, and they proposed to file "dispositive cross-motions" that would "fully resolve the case," Appx86. The

parties also agreed that "this case is the best vehicle for the resolution" of this legal issue, which has recurred in several related cases in which the Government asserted a claim against Boeing based on FAR 30.606(a)(3)(ii).[6] *Id.*

By the time the parties completed briefing on these cross-motions, however, the Government asserted two challenges to the court's jurisdiction. Appx1064. First, the Government argued that the COFC lacked jurisdiction over Count IV (illegal exaction) because the CAS statute "is not, by itself, sufficiently money-mandating." Appx1066. The COFC agreed and dismissed Boeing's illegal exaction count. Appx1068. Second, the Government argued that the court lacked jurisdiction to hear Boeing's remaining counts (Counts I-III) because "Boeing should have brought its challenge to FAR 30.606 under the Administrative Procedure Act (APA), 5 U.S.C. §§ 702-704 (2012), in a district court action." Appx1068.

At that time, the COFC ***rejected*** the Government's APA argument. *Id.* The court explained, "[t]his suit challenges a contracting officer's final decision on a government claim" and the Government's "subsequent rejection of Boeing's related claim." Appx1060. The COFC also noted that the Government "does not argue that the current suit [even] could, and [thus] should, have been brought . . . in a district

---

[6] Boeing has two other related appeals before the COFC and 11 before the Armed Services Board of Contract Appeals, all of which are stayed pending resolution of the merits of this lead case.

court under the APA." Appx1068. In short, the COFC found the Government's jurisdictional argument "unpersuasive" insofar as it "focused on actions Boeing could have taken [suing under the APA], but did not." Appx1069.

Despite confirming its jurisdiction over the case, the COFC did not address the underlying merits because it granted judgment for the Government on the affirmative defense of waiver. *Id.* The COFC found that the conflict between FAR 30.606(a)(3)(ii) and the CAS statute was a patent ambiguity. Appx1070-1071. It then held that "[b]ecause Boeing did not seek clarification, before award, of the conflict it saw between the CAS statute, the CAS clause[,] and FAR 30.606, its contract claims are foreclosed as a matter of law." Appx1072.

### B. The Federal Circuit's Reversal and Remand

This Court reversed. It first held that, because it would have been futile for Boeing to have pursued any such pre-award objection with the CO, Boeing did not waive its challenge to the application of FAR 30.606(a)(3)(ii). *Boeing*, 968 F.3d at 1377-80. Notably, the Government also invited this Court to conclude that Boeing could have pursued relief beyond the CO, including through a district court action under the APA. *Id.* at 1380-82. But this Court demurred, identifying "evident reasons to doubt" whether such relief would have been available and stressing that the CAS statute routes this specific type of challenge to the CDA, rather than to the APA:

> The CAS statute expressly provides that judicial resolution of disputes over "contract price adjustment[s]" shall take place under the Contract Disputes Act (CDA). ***That description fits Boeing's challenge***: Boeing and the government disagree about the proper contract price adjustment to reflect Boeing's post-contract-formation 2011 changes in its cost accounting practices. . . .
>
> The CAS statute specifically addresses the APA. In 41 U.S.C. § 1502(g), the statute declares that "[f]unctions exercised under this chapter are not subject to sections 551, 553 to 559, and 701 to 706 of title 5," thereby ***excluding coverage under the APA's judicial review provisions***, codified at 5 U.S.C. §§ 701–706. The government has not explained how a pre-formation APA action to contest the lawfulness of FAR 30.606 as to a contract price adjustment would fall outside that statutory exclusion of APA coverage.

*Id.* at 1381 (citations omitted).

This Court next held that "Boeing has established jurisdiction for its illegal exaction claim," rejecting the Government's argument that the CAS statute was not sufficiently money-mandating. *Id.* at 1382-84. This Court held that, "to establish Tucker Act jurisdiction for an illegal exaction claim, a party that has paid money over to the government and seeks its return must make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation." *Id.* at 1383. It then highlighted that Boeing alleged that the Government had already exacted money in direct violation of 41 U.S.C. § 1503(b), which was sufficient to allege an illegal exaction: "Whatever its ultimate merits, ***this allegation suffices for jurisdiction*** to adjudicate the illegal exaction claim." *Id.*

### C. The Court of Federal Claims' Instant Decision

On remand, the parties "agree[d] that the case is ripe for adjudication on the merits," Appx1591, and they cross-moved for summary judgment. After receiving the parties' final briefs, however, the COFC *sua sponte* issued an order explaining that it "has concluded that it must reconsider the jurisdictional arguments first raised by defendant in its motion to dismiss, but not reiterated in the motions now before the court." Appx2321. It then explained that "it appears to the court that plaintiff's claims are, in substance, predicated on its position that [FAR 30.606(a)(3)(ii)] is invalid." *Id.* The court then asked "the parties to address the source of this court's authority—or lack thereof—to review the validity of FAR 30.606(a)(3)(ii)." Appx2321-2322.

The ***Government*** responded that "***the Court possesses jurisdiction to review Boeing's contract claim*** under the [CDA]," advising that "the presence of arguments regarding the validity of FAR 30.606(a)(3)(ii) ***does not require dismissal*** of Boeing's CDA cause of action." Appx2326-2327, Appx2332. Separately, however, the Government requested leave to file yet another motion to dismiss Count IV, arguing that "the Court does not possess subject-matter jurisdiction to consider the illegal exaction claim asserted therein under the [CDA]." Appx2334. The COFC granted this motion for leave, Appx2346-2347, but it subsequently denied the Government's motion to dismiss, Appx2429-2431, recognizing it was bound by "the

clear, affirmative statements from the Circuit" determining the COFC's jurisdiction over Boeing's illegal exaction claim. Appx2431.

A few months later, however, the COFC concluded that it lacked any jurisdiction over this case. Appx1-9. The court divided Boeing's counts into two groups: (1) contract claims (Counts I through III); and (2) illegal exaction claim (Count IV). Appx2. For the contract claims, the COFC construed "the gravamen of plaintiff's complaint" to be "a challenge to the validity of FAR 30.606." Appx5. The COFC then concluded that it lacked jurisdiction over Boeing's claims because it interpreted *Bowen*, 487 U.S. at 905, and *Katz*, 16 F.3d at 1207, to establish a "general prohibition on [the COFC] hearing challenges to a regulation's validity." Appx7. Accordingly, the COFC dismissed Counts I-III.

As to the illegal exaction claim, the COFC recounted the Federal Circuit's earlier decision, and allowed that "the court thus has jurisdiction to hear plaintiff's illegal exaction claim." Appx8. Yet, the COFC subsequently stated that Boeing's illegal exaction claim "must be brought under the CDA," that it "lacks authority to consider [Boeing's] illegal exaction claim," and that an illegal exaction claim is "barred in this case." *Id.* In reaching this conclusion, the COFC relied on *Dalton*, *id.* (citing *Dalton*, 50 F.3d at 1017), which dismissed an appeal for ***lack of jurisdiction***, *Dalton*, 50 F.3d at 1021. The COFC concluded that Boeing "cannot

make a showing sufficient to establish its ability to bring an illegal exaction claim in this case," and it dismissed Count IV. Appx9. This appeal follows.

## SUMMARY OF THE ARGUMENT

The Federal Circuit should reverse and remand because the COFC plainly has jurisdiction over this case. Under Section 1491(a)(2) of the Tucker Act, the COFC has jurisdiction over "any claim by or against, or dispute with, a contractor arising under [the CDA]." 28 U.S.C. § 1491(a)(2) (citing 41 U.S.C. § 7104(b)(1)). And, under the CDA, a claim includes any "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." *Todd. Constr.*, 656 F.3d at 1311 (citing FAR 2.101). The plain language of this definition clearly encompasses Boeing's contract claims ***and*** its illegal exaction claim—a claim that ***also***, as this Court already held, is properly asserted under the Section 1491(a)(1) of the Tucker Act. Moreover, under the CAS statute, disagreements over contract price adjustments are committed to the CDA (and resultantly to Section 1491(a)(2) of the Tucker Act): "If the Federal Government and a contractor . . . fail to agree on a contract price adjustment . . . the disagreement will constitute a dispute under [the CDA]." 41 U.S.C. § 1503(a) (citing chapter 71 of U.S.C. Title 41). As this Court confirmed in

Boeing's prior appeal, "that description fits Boeing's challenge." *Boeing*, 968 F.3d at 1381.

The procedural predicates for the COFC's CDA jurisdiction have indisputably been satisfied. First, the CO issued a written decision asserting the Government's claim against Boeing for $1,064,773. Second, Boeing submitted its own claim to the CO as a protective measure, seeking contract relief and articulating its reasons for opposing that Government claim, which the CO denied. Because Boeing disagreed with the outcome of those claims, Boeing timely brought this "action directly on the claim in the United States Court of Federal Claims." 41 U.S.C. § 7104(b)(1).

Rather than examine its clear jurisdiction over this action, as explicitly provided for in the Tucker Act and the CDA, the COFC focused on inapposite decisions interpreting the APA. Nothing in the APA, however, or in the cases on which the court relied, limits the COFC's jurisdiction to "render judgment upon any claim by or against . . . a contractor arising under [the CDA]." 28 U.S.C. § 1491(a)(2). Indeed, this Court has highlighted the "statutory exclusion of APA coverage" for CDA disputes that arise under the CAS statute. *Boeing*, 968 F.3d at 1381. The COFC also ignored controlling Federal Circuit precedent establishing that the court's characterization of Boeing's claim as a challenge to the "validity" of FAR 30.606(a)(3)(ii) "is of no consequence to the question of jurisdiction because

the complaint relates to a dispute implicating a contract with the Government." *Texas Health*, 400 F.3d at 900. The COFC indisputably enjoys jurisdiction over Boeing's action.

The COFC also erred when it separately dismissed Boeing's illegal exaction count (Count IV) for the second time. Although the court stated that it "has jurisdiction to hear plaintiff's illegal exaction claim," Appx8, its rationale for dismissing Count IV and the authority it cited relate ***solely*** to jurisdiction, Appx8-9. Determining—incorrectly—that Boeing had brought its illegal exaction claim without regard for the CDA, the COFC held that it "lacked authority" to consider the claim because the CDA is the exclusive mechanism for dispute resolution under the contract. Appx8.

This was error for three reasons. First, this Court's prior holding that "Boeing has established jurisdiction for its illegal exaction claim" is the law of the case and must be followed here. *Boeing*, 968 F.3d at 1383. Second, even if Boeing's illegal exaction claim "must be brought under the CDA," Appx8, Boeing did, in fact, submit its illegal exaction claim to the CO as part of its certified CDA claim. 28 U.S.C. § 1491(a)(2); Appx56. Thus, the COFC has jurisdiction. Third, if the CDA does not apply to Boeing's illegal exaction claim, then the COFC ***still*** would enjoy jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), and the CDA would not

"bar" the claim. In short, even if Boeing's illegal exaction claim were outside of the CDA, it would not be "barred" by it.

## ARGUMENT

### I. Standard of Review

This Court reviews *de novo* the COFC's legal conclusions, which is what are at issue here. *See Todd Constr.*, 656 F.3d at 1310. For Counts I through III, the COFC concluded that it "lacks jurisdiction." Appx8. For Count IV, the COFC similarly concluded that it "lacks authority to consider [Boeing's] illegal exaction claim," and that Boeing's claim "is barred in this case." *Id.*

### II. The Court of Federal Claims has jurisdiction to hear each count in Boeing's complaint.

The COFC erred in dismissing Boeing's complaint because it plainly has jurisdiction to resolve the parties' dispute over the CO's final decision assessing a contract price adjustment. Indeed, the final decision itself acknowledges that it is issued under the CDA and includes the mandatory statement that Boeing can challenge the Government's claim by bringing an action on the claim directly in the COFC, which Boeing did. The CAS statute expressly requires that contract price adjustment disputes such as this one be addressed under the CDA, which (along with the Tucker Act) confers jurisdiction on the COFC. The CAS statute, moreover, expressly states that functions exercised under the CAS statute are not subject to

judicial review under the APA. Nothing in the APA or the decisions interpreting it limits the COFC's jurisdiction.

### A. The Court of Federal Claims has broad jurisdiction to resolve any claims that relate to a procurement contract.

In 1978, Congress passed the CDA, which (among other things) amended the Tucker Act to grant the COFC jurisdiction to render judgment upon "any claim by or against, or dispute with, a contractor arising under [the CDA]." 28 U.S.C. § 1491(a)(2) (citing 41 U.S.C. § 7104(b)(1)). Congress intended the CDA to confer "comprehensive jurisdiction" and thus chose "expansive, not restrictive, language" to define its scope. *Todd Constr.*, 656 F.3d at 1311 (citing *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1268 (Fed. Cir. 1999)).

The CDA applies to any express or implied contract with an executive agency for the procurement of property, services, or construction. 41 U.S.C. § 7102(a). A "claim" under the CDA includes, in pertinent part, any "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or ***relating to*** the contract." *Todd. Constr.*, 656 F.3d at 1311 (citing FAR 2.101). Such a demand or assertion "relat[es] to" a contract as long as it bears some connection to either "the terms or performance of a government contract." *Id.* at 1312-13 (citing *Applied Cos. v. United States*, 144 F.3d 1470, 1478 (Fed. Cir. 1998)).

The CDA's procedural requirements are straightforward. When the Government asserts a claim against a contractor, the claim must "be the subject of a written decision by the contracting officer." 41 U.S.C. § 7103(a)(3). Likewise, when the contractor asserts a claim against the Government, it must do so in writing,[7] *id.* § 7103(b)(1), and the CO must issue a written decision on a contractor's claim, *id.* § 7103(d).[8]

If a contractor disagrees with the CO's decision (on either a government claim against the contractor or the denial of a contractor's claim against the government), the CDA provides two options: to appeal to a cognizant board of contract appeals, or to "bring an action directly on the claim in the United States Court of Federal Claims." *Id.* § 7104(b)(1). The CDA broadly provides that the right to bring an action in the COFC applies "notwithstanding any contract provision, regulation, or rule of law to the contrary," and it requires *de novo* review. *Id.* § 7103(b)(4).

As both parties agreed below, and even the COFC recognized in its ***first*** decision, the COFC has jurisdiction because Boeing's suit against the Government

---

[7] A claim seeking more than $100,000 must be certified by the contractor. § 7103(b)(1).

[8] If the CO fails to issue a decision on a contractor's claim, the claim is "deemed denied," § 7103(f)(5), and the contractor may proceed as if the contracting officer issued a written decision denying it, *Texas Health*, 400 F.3d at 899-900 (citing previous codification of § 7103(f)(5)).

satisfies each of these criteria. Appx85; Appx1069. Indeed, Boeing's action satisfies these criteria in two independent ways.

First, this case arises out of a ***Government claim*** against Boeing under the CDA. *See* 41 U.S.C. § 7103(a)(3). The CO issued, "pursuant to the Contract Disputes Act," a written "final decision" asserting that Boeing owed the Government $1,064,773 under Contract No. N00019-09-C-0019.[9] Appx58-59; 41 U.S.C. § 7103(d). That contract is subject to the CDA, Appx1906 (incorporating FAR 52.233-1, Disputes), and it incorporates FAR 52.230-2, Appx1906, which requires the parties to "negotiate an equitable adjustment" when they "agree to a change to a cost accounting practice," FAR 52.230-2(a)(4)(iii).

The CO calculated the demand amount by relying on FAR 30.606(a)(3)(ii), Appx60, which instructs that she may "not combine the cost impacts" associated with the different accounting practices Boeing had changed "unless all of the cost impacts are increased costs to the Government," FAR 30.606(a)(3)(ii). Because Boeing disagrees with the Government's claim, including the validity and the application of FAR 30.606(a)(3)(ii) to Boeing's contract, Boeing brought this COFC action for *de novo* review, as the CDA contemplates. 41 U.S.C. § 7104(b). The COFC therefore has jurisdiction.

---

[9] Although the accounting practices affected multiple contracts, the CO asserted this claim under only Contract No. N00019-09-C-0019, as FAR 30.606(a)(2) permits.

As an alternative, protective measure, Boeing also submitted its own certified claim under the CDA, which satisfied the CDA's procedural requirements, as well. *See* 41 U.S.C. § 7103(a)(1). Boeing articulated the same four grounds for relief that it would later incorporate into Counts I-IV of its complaint in the COFC. *Compare* Appx55-56, *with* Appx48-52. Although the CO characterized Boeing's claim as a request for reconsideration of the Government's claim rather than an independent CDA claim, Appx55-56, any dispute over that characterization is immaterial to the court's jurisdiction.

If, as the CO concluded, Boeing's claim merely recited the same operative facts that the CO already considered in asserting the Government's claim, then Boeing's claim was unnecessary, and the Government's claim establishes jurisdiction over this action. If, however, Boeing's claim exceeded the scope of the Government's claim, the CO had to issue a final decision. 41 U.S.C. § 7103(d). It does not matter whether the CO's response constitutes a written final decision or a deemed denial: either suffices for Boeing to bring this action in the COFC. *Id.* §§ 7103(f)(5), 7104(b)(1).

At bottom, because the claims relate to at least one government contract subject to the CDA and the parties have satisfied the CDA's procedural requirements, the COFC has jurisdiction. 28 U.S.C. § 1491(a)(2).

### B. The Court of Federal Claims' characterization of Boeing's arguments—as challenges to FAR 30.606(a)(3)(ii)—is irrelevant to jurisdiction.

In questioning its jurisdiction, the COFC stated that Boeing's claims "are premised on its allegation that the agency applied a regulation [FAR 30.606] that 'violates the CAS statute and was illegally promulgated.'" Appx5 (citation omitted). But characterizing Boeing's claim as disputing the validity and application of FAR 30.606(a)(3)(ii) does not affect the court's jurisdiction. Both the Government's claim and Boeing's claim sought relief under the contract, as contemplated by the CDA. This Court concluded almost two decades ago that a claim seeking to invalidate a regulation does not implicate jurisdiction as long as the underlying dispute involves a contract with the Government. *Texas Health*, 400 F.3d at 900. And, the Court has continued to review the validity of regulations in other CDA disputes.

#### i. *Texas Health* confirms that the Court of Federal Claims has jurisdiction when the dispute implicates a contract with the Government.

In *Texas Health*, the Federal Circuit held that even if a complaint, "literally read, sought only to invalidate [a regulation]," it still "is of no consequence to the question of jurisdiction" if "the complaint relates to a dispute implicating a contract with the Government." *Id.* The Federal Circuit reached this conclusion because "the CDA clearly and comprehensively defines the procedures for all contractual disputes

between the United States and private contractors." *Id.* (quoting *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993)). Any contrary conclusions, as here, "are misplaced in light of the dispute resolution scheme for contract-related disputes against the Government set forth in the CDA." *Id.*

*Texas Health* is indistinguishable from this case. Like this case, *Texas Health* involved a dispute related to a contract governed by the CDA. *Id.* Like this case, the dispute in *Texas Health* turned on a FAR provision—48 C.F.R. § 1652.216-216-70(b), a regulation in the Office of Personnel Management's FAR Supplement known as the "Final Year Regulation"—that purported to authorize a contract price adjustment, and upon which the Government in *Texas Health* relied to reduce the contract price by $622,246. *Id.* Like Boeing, Texas Health opposed the price adjustment, contending that the Government's rationale for effecting the adjustment—the Final Year Regulation—was invalid. *Id.* When Texas Health refused to pay, the Government collected by reducing its next payment to the contractor. *Id.* Finally, like Boeing, Texas Health challenged the Government's reduced payment by submitting a claim to the CO under the CDA.

The only difference between these cases comes from what happened next. After Texas Health submitted its CDA claim, it pursued the path that the COFC suggests Boeing should have taken here: it brought suit in a federal district court. *Id.* at 900. Texas Health initially elected a district court because, like the COFC

here, it construed its claim to be an APA challenge to the regulation. *Id.* Texas Health even styled its complaint as seeking "only to invalidate the Final Year Regulation, as opposed to recover the $622,246." *Id.* Nevertheless, the Government disagreed with Texas Health's forum selection and moved to transfer the district court action, arguing "that the Court of Federal Claims has ***exclusive jurisdiction*** over Texas Health's ***challenge to the validity of the Final Year Regulation*** because the underlying [health care services] contract ***is governed by the CDA***." *Id.* at 898.

On review, the Federal Circuit held that the COFC had jurisdiction over the suit for the same simple reason that applies here: the suit involved a dispute related to a government contract subject to the CDA. *Id.* at 900. The Court analyzed how "the CDA operates in tandem with the Tucker Act [28 U.S.C. § 1491(a)(2)] to confer jurisdiction . . . on the Court of Federal Claims" over "***all claims***" under the CDA "relating to a contract." *Id.* at 899-900. Indeed, it held that the COFC is "the ***exclusive trial court*** for hearing disputes over government contracts that fall under the CDA." *Id.* (quoting *Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1572-73 (Fed. Cir. 1995)). It did not matter that Texas Health was challenging the validity of a regulation, because the dispute related to a procurement contract with the Government:

> That Texas Health's complaint, literally read, sought only to ***invalidate the Final Year Regulation***, as opposed to recover the $622,246 reconciliation amount, is of ***no consequence to the question of jurisdiction*** because the complaint relates to a dispute implicating a

> contract with the Government. Indeed, Texas Health's complaint expressly mentions its FEHBA contract with the Government and the deemed denial of its claim before the contracting officer.

*Id*. at 900.

The same rationale applies here. Boeing's complaint relates to a contract with the Government subject to the CDA; stems from a final decision issued under the CDA (both the CO's claim against Boeing and the CO's deemed denial of Boeing's claim); and seeks compensatory damages and other contract relief. In assessing the COFC's jurisdiction, it does not matter whether or how Boeing challenges the regulation on which the Government based its claim. As in *Texas Health*, the court has jurisdiction because the COFC is the "exclusive trial court for hearing disputes over government contracts that fall under the CDA." *Id.* at 899 (quoting *Quality Tooling*, 47 F.3d at 1572-73). The COFC's conclusion to the contrary failed to adhere to this binding precedent.

**ii. The Court of Federal Claims' reasons for narrowing *Texas Health* to disputes involving a single contract with no prospective consequences conflict with *Texas Health* and other relevant authorities.**

The COFC attempted to distinguish *Texas Health*, stating that "the regulatory interpretation issue [there] was narrow, applied only to a single contract between plaintiff and defendant, and did not apply prospectively to future actions." Appx7. The court's rationale is wrong for at least three reasons.

First, the "regulatory interpretation issue" in *Texas Health* was ***not*** a discrete dispute affecting only a single contractor and a single contract. In fact, the subsequent case history confirms that the validity of the "Final Year Regulation" at issue in *Texas Health* was a common dispute that affected all of the contracts that OPM had with insurers under the Federal Employee Health Benefits Program (FEHBP). The "Final Year Regulation," was a "mandatory clause" that was "[i]ncluded in all FEHBP contracts," and OPM had running disputes with multiple FEHBP contractors over the Final Year Regulation's validity and contractual applicability. *See GHS Health Maint. Org. v. United States*, 76 Fed. Cl. 339, 341 (2007), *aff'd,* 536 F.3d 1293 (Fed. Cir. 2008). Hence, after the Federal Circuit decided *Texas Health*, the COFC consolidated similar suits from three contractors, all challenging the Final Year Regulation. *Id*. at 342. Each contractor alleged that the Final Year Regulation conflicted with the statute; each sought monetary damages for breach of contract; and each sought a declaratory judgment to invalidate the regulation. *Id.* And after the COFC addressed the merits and held the regulation invalid, *id.*, the Federal Circuit affirmed, holding the regulation "invalid both because it is contrary to the statute and because it is arbitrary and capricious," *GHS Health Maint. Org. v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008).

Critically, this Court in *GHS Health* emphasized the duty to invalidate a regulation that violates a statute: "Regulations that contradict and undermine

Congress' statutory scheme ***must be*** invalidated." *Id.* at 1299. Further, a natural, inevitable consequence of the Federal Circuit's decision—invalidating the Final Year Regulation—was to preclude OPM from continuing to rely on the Final Year Regulation in any of its other FEHB contracts, considering those contractors also would have been able to challenge the validity and application of the Final Year Regulation in their own contracts. Accordingly, and contrary to the COFC's characterization of *Texas Health* in the case at bar, the "regulatory interpretation issue" in *Texas Health* was not "narrow"; it did not apply "only to a single contract between plaintiff and defendant"; and it did "apply prospectively to future actions." Appx7.

Second, other cases—not just *Texas Health* and *GHS Health*—demonstrate that the COFC has jurisdiction even when a dispute turns on the validity of a rule or regulation. For example, in *NI Industries, Inc. v. United States*, the Federal Circuit reviewed, and ultimately invalidated, an Army policy labeled Standard Operating Procedure 700-2, which the court described as a "substantive rule" and "unpublished regulation." 841 F.2d 1104, 1108 (Fed. Cir. 1988). The Federal Circuit held that the Army's regulation was invalid because it did not comply with substantive rulemaking requirements (*e.g.*, notice and comment). *Id.*

Even when this Court has rejected a contractor's challenge to a regulation, it has done so on the merits, after exercising jurisdiction and reviewing the propriety

of the regulation—not by simply refusing to take jurisdiction over the regulatory challenge. *See, e.g.*, *Brownlee v. DynCorp*, 349 F.3d 1343, 1352 (Fed. Cir. 2003) (reviewing validity of FAR provision relating to legal fees, noting the court was "require[d] . . . to reach the contractor's . . . claim that the regulation is invalid"); *United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 578 (Fed. Cir. 1991) (reviewing "[w]hether the regulation [FAR 33.207] is a reasonable interpretation of the statute"); *Boeing Co. v. United States*, 680 F.2d 132, 139 (Ct. Cl. 1982) (reviewing whether CAS 403 "violates the authorizing legislation" and whether the CAS Board "failed to comply with the notice and comment requirements").[10]

Third, the COFC's reasons for narrowing *Texas Health* are not supported by the controlling statutes: the CDA, the Tucker Act, and the CAS statute. Neither the CDA nor the Tucker Act limits jurisdiction to disputes that relate solely to one contract. Indeed, cost accounting disputes typically involve indirect costs (as here),

---

[10] *Accord Engineered Demolition, Inc. v. United States*, 60 Fed. Cl. 822, 829 (2004) (holding FAR 33.201 invalid because it "fails to adhere to the interpretation of the statutory language derived from the legislative context and history"); *La Gloria Oil & Gas Co. v. United States*, 56 Fed. Cl. 211, 220-22 (2003), *abrogated on other grounds sub nom. Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005) (holding a FAR class deviation invalid because it violated the notice and comment requirements in 41 U.S.C. § 418b, now codified at 41 U.S.C. § 1707); *see also Navajo Refin. Co. v. United States*, 58 Fed. Cl. 200, 207-09 (2003) (same); *Ology Bioservices, Inc.*, ASBCA No. 62633, 2021 WL 2311903 (holding that the Office of Federal Procurement Policy exceeded its statutory authority when promulgating a cap on reimbursable compensation that applied for more than one year).

which ***by definition*** affect multiple contracts. *See, e.g.*, *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1318 (Fed. Cir. 2014) ("[I]ndirect costs are not directly related to one particular cost objective (or contract)."). And the CAS statute confirms that "judicial resolution of disputes over 'contract price adjustments' ***shall take place under the [CDA]***." *Boeing*, 968 F.3d at 1381 (citing 41 U.S.C. § 1502(a)). As this Court explained, "[t]hat description fits Boeing's challenge." *Id.* The COFC's conclusion that a claim impacting multiple contracts cannot be within the scope of the CDA finds no textual support in any statute, and it is inconsistent with the CAS statute's instruction that contract price adjustment disagreements "will constitute a dispute" under the CDA. 41 U.S.C. § 1503(a).

Nor is it relevant to the court's jurisdiction that a decision here might affect the parties' actions in the future or on other contracts. A decision by a federal court often affects future actions either because it is precedential (and therefore controls future decisions) or because it binds the parties through *res judicata* or collateral estoppel. *See, e.g.*, *Consol. Edison Co. of N.Y., Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1384-85 (Fed. Cir. 2001) ("In the face of [a judgment that it illegally exacted funds], the United States could not proceed to assess further [] payments without again illegally exacting funds. *Res judicata* principles would require immediate refund . . ."). This is particularly true in disputes like this, relating to cost accounting practices broadly applicable to more than one government contract. *See,*

*e.g.*, *Boeing Co.*, ASBCA No. 57549, *supra* (sustaining Boeing's CDA appeal challenging the Government's application of FAR 30.606(a)(3)(ii) to pre-2005 costs and remanding to the agency with instructions to address the quantum impact on multiple contracts "consistent with this decision"). At bottom, the COFC has no basis to conclude that the potential for collateral consequences should thwart Congress's assignment of jurisdiction to the COFC to resolve the instant dispute.

### C. Nothing in Administrative Procedure Act jurisprudence limits the Court of Federal Claims' jurisdiction.

In divesting itself of jurisdiction, the COFC relied on decisions interpreting the scope of a district court's jurisdiction under the APA, focusing principally on two cases that analyzed inapposite APA issues—the Supreme Court's decision in *Bowen v. Massachusetts* and the Federal Circuit's decision in *Katz v. Cisneros*. The court concluded that *Bowen* and *Katz* establish a "general prohibition on the court hearing challenges to a regulation's validity," and that *Texas Health* merely provides a narrow exception to the "general prohibition." Appx7. The COFC was mistaken for at least two reasons.

First, nothing in the APA limits the COFC's jurisdiction. The CDA makes this plain, authorizing Boeing to bring this action "notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 7104(b)(1). Congress established this primacy "to ensure national uniformity in government contract law." *Texas Health*, 400 F.3d at 899 (citation omitted). The APA itself

confirms the primacy of the CDA, noting that the APA applies only when "there is no other adequate remedy in a court." 5 U.S.C. § 704. And, to eliminate any doubt for this type of cost accounting dispute, Congress confirmed in the CAS statute that ***any*** disagreement about a contract price adjustment "will constitute a dispute under [the CDA]," 41 U.S.C. § 1503(a), and is "not subject to [the APA]," § 1502(g). Again, "[t]hat description fits Boeing's challenge," and it was one of the reasons this Court reversed the COFC's earlier waiver decision. *Boeing*, 968 F.3d at 1381 (discussing "statutory exclusion of APA coverage" under CAS statute).

Second, neither *Bowen* nor *Katz* involved a government or contractor claim under the CDA, and therefore neither discusses nor limits the jurisdiction under 28 U.S.C. § 1491(a)(2) enjoyed by the COFC. In fact, neither mentions the CDA nor even involves a contract between the litigants. In *Bowen*, the plaintiff was the Commonwealth of Massachusetts. 487 U.S. 879. The state sued to enforce the Medicaid Act, not a contract, which directly governed what the Government "shall pay" to a state. *Id.* at 900. *Bowen* is not relevant.

Further, although *Katz* involved a contract, it was not a contract between the litigants. There, the plaintiff was a developer who contracted with a "Public Housing Agenc[y]" that in turn contracted with the Government. 16 F.3d at 1205. Thus, "[a]ny express contract that might be invocable [was] between [the plaintiff] and [a third-party], ***not*** between [the plaintiff] and the United States, which is, of course,

the sine qua non of jurisdiction in the Court of Federal Claims." *Id.* at 1210 ("Absent privity between Hollywood Associates and the government, there is no case."). The *Katz* plaintiff thus had to rely solely on the federal statute and regulations as the basis for obtaining the money that it sought. *Id.* at 1208.

Here, by contrast, Boeing has a contract with the United States. Appx1904. That contract is subject to the CDA, Appx1906, which establishes "the dispute resolution scheme for contract-related disputes against the Government," *Texas Health*, 400 F.3d at 900. Any APA analysis is inapposite to the court's jurisdiction. Because neither *Bowen* nor *Katz* involves a contract subject to the CDA, neither alters this conclusion, and the COFC erred in relying on them.

Equally inapt are the other APA cases on which the COFC relied to determine it "lacks jurisdiction to determine the validity of FAR 30.606." Appx6. The COFC cited *Land Shark Shredding, LLC v. United States*, 842 F. App'x 589 (Fed. Cir. 2021), for the proposition that "[c]hallenges to the validity of a regulation governing a procurement must be brought in federal district court under the [APA]," leading the COFC to conclude it "does not have jurisdiction to review the validity of regulations pursuant to the [APA]." Appx6. As noted above, however, this Court already determined that the CAS statute excludes APA challenges, because the CAS statute "expressly provides that judicial resolution of disputes over 'contract price adjustment[s]' shall take place under the [CDA]." *Boeing*, 968 F.3d at 1381. *Land*

*Shark*, moreover, did not involve a dispute under the CDA or the COFC's jurisdiction under 28 U.S.C. § 1491(a)(2)—it was a bid protest that fell within the COFC's jurisdiction in Section 1491(b). The COFC also cited *Southfork Systems, Inc. v. United States*, 141 F.3d 1124 (Fed. Cir. 1998), another bid protest, for similar authority. Appx6. Further, the COFC cited *Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003) (*en banc*), a military pay case in which the plaintiff sought only non-monetary relief, for the truism that "[t]he [COFC] lacks APA jurisdiction." Appx6. Boeing, however, did not pursue an APA challenge nor rely on any APA jurisdiction for its complaint; Boeing's case relies on the CDA's plenary jurisdiction for a *de novo* review of contract claims by the COFC.

These same principles undermine the COFC's analysis attempting to distinguish Boeing's case and *Bowen*, on one hand, from *Suburban Mortgage Associates Inc. v. United States Department of Housing*, 480 F.3d 1116 (Fed. Cir. 2007). *See* Appx7. The principal issue in *Suburban Mortgage* was whether, in light of *Bowen*, a claim for monetary relief should have been treated as an APA challenge in district court or as a claim for monetary damages in the COFC. *Suburban Mortg.*, 480 F.3d at 1118. Because a CDA claim is committed to the COFC's jurisdiction under the Tucker Act, and the CAS statute excludes government claims for contract price adjustments from the APA, *Bowen* and cases applying *Bowen* are essentially red herrings to any jurisdictional analysis in this case. *See, e.g.*, *id.* at 1127

("[N]owhere in *Bowen* did the Court make reference to the existence of any specific contract or express agreement defining the relationship between the parties."). Moreover, *Suburban Mortgage* did not involve a CDA claim or the COFC's jurisdiction under 28 U.S.C. § 1491(a)(2), but rather the COFC's alternate jurisdiction in Section 1491(a)(1). *Id.* at 1121 n.7.

## III. The Court of Federal Claims has jurisdiction over Boeing's illegal exaction count (Count IV), and nothing bars it from adjudicating it on the merits.

The COFC also erred when it dismissed Count IV, Boeing's illegal exaction claim. This Court already has held that the COFC has jurisdiction over Boeing's illegal exaction claim. *Boeing*, 968 F.3d at 1382-84. Even though the COFC referenced that holding and stated that "[t]he court thus has jurisdiction to hear plaintiff's illegal exaction claim," Appx8, the COFC nevertheless determined that it "lacks authority"—indeed, it is "barred" from considering—Boeing's illegal exaction claim. Appx8-9. In reaching that conclusion, the court relied on *Dalton v. Sherwood*, 50 F.3d 1014, which dealt exclusively with whether the ASBCA had ***jurisdiction*** over a contractor's appeal under the CDA. The COFC thus appears to have concluded that Boeing did not properly assert its claim under the CDA or that the CDA wholly divests the COFC of jurisdiction.

The COFC's decision was incorrect for three reasons. ***First***, it violated this Court's clear holding that "Boeing has established jurisdiction for its illegal exaction

claim." *Boeing*, 968 F.3d at 1383. That holding is now the law of the case, which the COFC was not free to ignore. ***Second***, the court ignored the import of *Dalton*'s holding that the CDA "provides the exclusive mechanism for dispute resolution." Appx8. To the extent the illegal exaction claim "must be brought under the CDA," *id.*, ***Boeing did so***. Appx56. The CDA does not preclude a contractor from including an illegal exaction argument within a CDA claim that is within the court's jurisdiction. ***Third***, if an illegal exaction claim falls ***outside*** the scope of the CDA, then the CDA's procedural and jurisdictional mechanisms cannot "bar" the court from exercising jurisdiction under its separate jurisdictional authority in 28 U.S.C. § 1491(a)(1).

### A. This Court has already held that the Court of Federal Claims has jurisdiction over Boeing's illegal exaction count, which now is the law of the case.

In Boeing's earlier appeal, the Federal Circuit held that "Boeing has established jurisdiction for its illegal exaction claim." *Boeing*, 968 F.3d at 1383. Specifically, Boeing alleged that the Government's

> demand for payment of $1,064,773 [$940,007 plus $124,766] is . . . in direct violation of 41 U.S.C. § 1503(b), which requires that the Government 'may not recover costs greater than the aggregate increased cost to the Federal Government.'" J.A. 60. In short, Boeing alleged that the government has demanded and taken Boeing's money in violation of a statute. Whatever its ultimate merits, this allegation suffices for jurisdiction to adjudicate the illegal exaction claim.

*Id.* As this Court held, the COFC has jurisdiction over Boeing's illegal exaction claim, and it is not barred by any authority from adjudicating the merits of that claim.

In explaining its holding, the Federal Circuit articulated a "relatively low standard" to invoke jurisdiction over an illegal exaction claim. *Id.* Indeed, the COFC itself noted that this is a "clear, affirmative statement[] from the Circuit determining that [the COFC] has jurisdiction over the illegal exaction claim," which it had a "duty to abide by." Appx2431. Even so, the court still dismissed that claim, refusing to address the merits. Appx8-9. That was error under this Court's prior holding.

"The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *ArcelorMittal France v. AK Steel Corp.*, 786 F.3d 885, 888 (Fed. Cir. 2015) (quotations omitted). Under that doctrine, "a court may only deviate from a decision in a prior appeal if 'extraordinary circumstances' exist." *Id.* at 889. "[S]uch departures are rare." *Id.* There are no "extraordinary circumstances" present here that would justify the court's "rare" departure, and the COFC cited none. *Id.* Further, "[a]lthough the law-of-the-case doctrine 'applies only to issues that were decided in the former proceeding' . . . it 'comprehends things decided by necessary implication as well as those decided explicitly.'" *Smith Int'l, Inc. v.*

*Hughes Tool Co.*, 759 F.2d 1572, 1577 (Fed. Cir. 1985) (emphasis removed) (quoting *Morrow v. Dillard*, 580 F.2d 1284, 1290 (5th Cir. 1978)).

Here, this Court held that "Boeing has established jurisdiction for its illegal exaction claim" by alleging that the Government's claim against Boeing illegally exacted Boeing's money in contravention of the CAS statute. *Boeing*, 968 F.3d at 1383. In doing so, the Federal Circuit decided "by necessary implication" all closely related challenges to jurisdiction over the illegal exaction claim, *Smith*, 759 F.2d at 1577, including the COFC's theory that the CDA "bars" Boeing's illegal exaction claim. Indeed, as the COFC noted, the Federal Circuit "was aware that plaintiff is pursuing both [what the COFC characterized as] CDA claims and an illegal exaction claim and explicitly held that this court has jurisdiction over the latter." Appx3. In assessing both the CDA and the Tucker Act, this Court engaged in extensive analysis over which hypothetical legal challenges Boeing could have brought. *Boeing*, 968 F.3d at 1380-84. The Federal Circuit thus did not need to enumerate every possible permutation of the COFC's jurisdiction, including whether the court "has jurisdiction over plaintiff's illegal exaction claim as an alternative to a [CDA] . . . claim" or whether an illegal exaction claim can be brought independently under the CDA. Appx3.

Given its clear, comprehensive analysis, if the CDA barred Boeing's illegal exaction claim, the Federal Circuit would have said so. The law of the case establishes the COFC's jurisdiction to resolve Boeing's illegal exaction claim.

### B. The Federal Circuit's earlier holding that the Court of Federal Claims has jurisdiction is correct.

In any event, the COFC clearly has jurisdiction over the illegal exaction claim under the Tucker Act, either as amended by the CDA in Section 1491(a)(2), or in Section 1491(a)(1).

#### i. The Court of Federal Claims has jurisdiction under Section 1491(a)(2) because Boeing's illegal exaction claim relates to a contract and all procedural requirements have been satisfied.

Boeing's illegal exaction claim is not "barred" by the CDA because the claim relates to Boeing's contract, and all procedural requirements under the CDA have been satisfied. Appx9. The illegal exaction claim is therefore within the jurisdictional grant to the COFC in 28 U.S.C. § 1491(a)(2).

The CDA extends to "[e]ach claim by a contractor against the Federal Government ***relating to a contract***." 41 U.S.C. § 7103(a)(1); *see also Todd Constr.*, 656 F.3d at 1312-13. The Federal Circuit has held "that to be a claim 'relating to the contract' under the CDA, the claim 'must have some relationship to the terms or performance of a government contract.'" *Todd Constr.* 656 F.3d at 1312 (quoting *Applied Cos.*, 144 F.3d at 1478). The claim need not be based on a "contractual

theory." *Id.* at 1312-14. And, "[a] contractor's claim [under the CDA] need not be based on the contract itself (or a regulation that can be read into the contract) as long as it relates to its performance under the contract." *Id.*

Boeing's illegal exaction claim meets this threshold because it relates to the Government's unilateral imposition of a "contract price adjustment" to Boeing's contract. It thus does not matter if the duty violated by the Government is "non-contractual"—*e.g.*, a violation of Boeing's Fifth Amendment rights, the CAS statute, or rulemaking requirements. 41 U.S.C. § 7103(a)(1). In issuing the final decision asserting the "***contract*** price adjustment," the CO necessarily determined that the unilateral adjustment "relates to" Boeing's contract. *Id.* § 7103(a)(3) ("Each claim by the Federal Government against a contractor ***relating to a contract*** shall be the subject of a written decision by the [CO]."). Furthermore, Boeing satisfied the procedural requirements of the CDA by raising its illegal exaction argument in its certified claim, which the CO denied. Appx56. Put simply, Boeing raised the illegal exaction claim within the CDA framework: it "brought [the claim] under the CDA." *Id.* Boeing invoked the COFC's jurisdiction when it filed its Complaint seeking *de novo* review under 41 U.S.C. § 7104(b), including the illegal exaction argument in Boeing's claim.

The case on which the COFC primarily relies, *Dalton*, actually supports Boeing. It describes the CDA as a "***mechanism*** for dispute resolution," *Dalton*, 50

F.3d at 1017, not a divestiture of jurisdiction over constitutional claims. Moreover, *Dalton* is plainly distinguishable. *Dalton* addressed the ***jurisdictional*** issue of whether disputes between the government and common carriers under a government bill of lading were within the scope of the CDA, given that Congress established a separate administrative and remedial scheme for transportation services under government bills of lading. The Federal Circuit explained that these contracts enjoyed a "special status" and its decision was "a narrow one, limited to cases in which the government obtains transportation services from a common carrier pursuant to 49 U.S.C. § 10721 and in which the [government bill of lading] constitutes the contract between the parties." *Id.* at 1019-20. None of those limiting factors applies here, where Boeing's underlying contract was subject to the CDA and the CAS statute expressly states that any disputes regarding price adjustments shall be routed to the CDA's dispute resolution process.

**ii. The Contract Disputes Act cannot extinguish the Court of Federal Claims' jurisdiction to hear Boeing's illegal exaction claim under Section 1491(a)(1).**

In any event, even if Boeing's illegal exaction claim was not "brought under the CDA," the COFC still is not "barred" from considering the illegal exaction argument. Section 1491(a)(1) of the Tucker Act grants broad jurisdiction to the COFC over "***any*** claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department,

or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). This clause vests the court with jurisdiction to hear claims for illegal exaction. *Aerolineas Argentinas*, 77 F.3d at 1572-73.

Boeing's decision to plead illegal exaction in the alternative is of no moment. There is no authority stating that CDA claims and non-CDA claims cannot be combined in a single complaint, or that pleading a CDA claim divests the COFC of jurisdiction over a claim that is expressly contemplated under the Tucker Act. This Court has stated that a party may "alleg[e] in the same complaint two alternative theories for recovery against the Government, for example, one for breach of contract and one for a taking under the Fifth Amendment to the Constitution." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009), *remanded on reh'g on other grounds,* 638 F.3d 781 (Fed. Cir. 2011); *Ohio v. United States*, 150 Fed. Cl. 173 (2020) (holding that the Court had jurisdiction over alternative claims for breach of contract and illegal exaction). Under this rule, the COFC has heard cases pleading, in the alternative, CDA claims and takings claims. *See, e.g.*, *United Communities, LLC v. United States*, 154 Fed. Cl. 676, 680, 685 n.4 (2021); *Sparks v. United States*, 36 Fed. Cl. 488, 489, 493 (1996).

* * *

At bottom, Boeing's illegal exaction claim either relates to a contract, giving the COFC jurisdiction under the CDA, or it does not, and the court's stand-alone

jurisdiction under the Tucker Act remains unaffected. Either way, the COFC has jurisdiction and is not "barred" from considering Boeing's claim.

**CONCLUSION**

Because the COFC has jurisdiction to hear each of Boeing's counts, and nothing otherwise bars those counts, this Court should reverse the COFC's decision and remand for further proceedings.

/s/ Scott M. McCaleb
Scott M. McCaleb
Jon W. Burd
Gary S. Ward
George E. Petel
Jennifer Eve Retener
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

Jade Totman
THE BOEING COMPANY
929 Long Bridge Drive
Arlington, VA 22202
(703) 465-3039

December 5, 2022

*Counsel for Appellant*
*The Boeing Company*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally spaced typeface and includes 12,052 words.

/s/ Scott M. McCaleb
Scott M. McCaleb
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

December 5, 2022

*Counsel for Appellant*
*The Boeing Company*

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

2023 - 1018

THE BOEING COMPANY,

*Plaintiff-Appellant*,

v.

UNITED STATES,

*Defendant-Appellee*.

Appeal from the United States Court of Federal Claims
in Case No. 1:17-cv-01969-PEC, Judge Patricia E. Campbell-Smith

# ADDENDUM TO OPENING BRIEF OF APPELLANT THE BOEING COMPANY

# TABLE OF CONTENTS


| **DESCRIPTION** | **PAGE** |
|---|---|
| Opinion and Order Dismissing Case (Sept. 21, 2022) [Dkt. No. 76] | Appx1 |
| Judgement Dismissing Counts I, II and III of Plaintiff's Complaint, without Prejudice, and Count IV of the Complaint with Prejudice (Sept. 21, 2022) [Dkt. No. 77] | Appx10 |
| 70 Fed. Reg. 11743 (Mar. 9, 2005) | Appx603 |
| 28 U.S.C. § 1491 | A1 |
| 41 U.S.C. § 1501 | A5 |
| 41 U.S.C. § 1502 | A7 |
| 41 U.S.C. § 1503 | A9 |
| 41 U.S.C. § 7102 | A11 |
| 41 U.S.C. § 7103 | A12 |
| 41 U.S.C. § 7104 | A14 |
| FAR 2.101 | A15 |
| FAR 30.606 | A19 |

# In the United States Court of Federal Claims

No. 17-1969C

(E-Filed: September 21, 2022)

| | |
|---|---|
| THE BOEING COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Summary Judgment; RCFC 56; Subject Matter Jurisdiction; RCFC 12(b)(1); FAR 30.606; Cost Accounting Standards Statute; 41 U.S.C. § 1503; Illegal Exaction; Exclusive Remedy. |

Charles J. Cooper, Washington, DC, for plaintiff. Michael W. Kirk, John D. Ohlendorf, and Seth H. Locke, of counsel.[1]

Erin K. Murdock-Park,[2] Trial Attorney, with whom were Brian M. Boynton, Acting Assistant Attorney General, Robert E. Kirschman, Jr.,[3] Director, Elizabeth M. Hosford, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Arthur Taylor and Kara M. Klaas, Defense Contract Management Agency, Chantilly, VA, of counsel.

## OPINION

CAMPBELL-SMITH, Judge.

[1] The composition of plaintiff's legal team changed during the pendency of the parties' motions. On plaintiff's supplemental brief, ECF No. 71, Scott M. McCaleb, Washington, DC, appears for plaintiff, with Jon W. Burd, Gary S. Ward, George E. Petel, Suzette W. Derrevere, Jade C. Totman, and Seth H. Locke, of counsel.

[2] Daniel B. Volk, Senior Trial Counsel, appeared in lieu of Ms. Murdock-Park on defendant's supplemental brief, ECF No. 61, and supplemental reply brief, ECF No. 72.

[3] Martin F. Hockey, Jr., Acting Director, appeared in lieu of Mr. Kirschman on defendant's supplemental brief, ECF No. 61, and supplemental reply brief, ECF No. 72.

This case is before the court on cross-motions for summary judgment, brought under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). On May 29, 2019, this court dismissed plaintiff's complaint in this case, a decision that was later reversed by the United States Court of Appeals for the Federal Circuit. See ECF No. 29 (court's May 29, 2019 opinion dismissing the case); ECF No. 33 (Federal Circuit's August 10, 2020 decision, reported at Boeing Co. v. United States, 968 F.3d 1371 (Fed. Cir. 2020)). Following remand of the case to this court, the parties filed their cross-motions for summary judgment, which are now fully briefed. See ECF No. 43 (plaintiff's motion); ECF No. 43-1 (plaintiff's brief in support of its motion); ECF No. 45 (defendant's cross-motion and response); ECF No. 49 (plaintiff's response and reply); ECF No. 54 (defendant's reply); ECF No. 61 (defendant's supplemental brief); ECF No. 71 (plaintiff's supplemental response); and ECF No. 72 (defendant's supplemental reply).

The court has considered all of the parties' arguments and addresses the issues that are pertinent to the court's ruling in this opinion. For the reasons set forth below, plaintiff's motion for summary judgment is **DENIED**, and defendant's motion for summary judgment is **GRANTED**.

## I. Background

### A. Factual Background

Plaintiff contracts with the government to provide military aircraft and related services. See ECF No. 1 at 8-9 (complaint). Plaintiff filed this lawsuit to challenge the application of the cost accounting standards (CAS) statute, 41 U.S.C. §§ 1501-1506, and Federal Acquisition Regulation (FAR) 30.606(a)(3)(ii) (FAR 30.606), 48 C.F.R. § 30.606(a)(3)(ii), to its contracts with the United States and plaintiff. See id. at 1-2. Specifically, plaintiff alleges that when defendant applied FAR 30.606 to calculate the impact of changes plaintiff made to its cost accounting methods, defendant applied a regulation that "violates the CAS statute and was illegally promulgated." ECF No. 43-1 at 8; see also ECF No. 1 at 1-5. Plaintiff seeks relief regarding one representative contract, contract no. N00019-09-C-0019, see ECF No. 1 at 24, and declaratory relief that would apply to "each of the relevant contracts between [plaintiff] and the United States," id. at 35.

Plaintiff characterizes the first three counts of its complaint as claims founded on the contracts between plaintiff and defendant. See id. at 31-34. Plaintiff argues that in calculating the impact of its cost accounting methods changes in line with FAR 30.606, defendant failed to comply with the CAS statute, and has therefore "violated the CAS Statute and breached its contractual obligations." ECF No. 43-1 at 9. The fourth count of plaintiff's complaint asserts that an illegal exaction occurred when FAR 30.606 was applied to its contract, in violation of 41 U.S.C. § 1503(b). See ECF No. 1 at 34-35.

When only the representative contract is considered, plaintiff asserts that defendant's claim for $1,064,773 is invalid, and that the court should award plaintiff damages for the payments paid by plaintiff on defendant's claim, plus interest. See id. at 35.

B. Procedural History

On May 29, 2019, this court dismissed plaintiff's complaint in this case. See ECF No. 29. That decision that was reversed by the Federal Circuit. See ECF No. 33. Following remand of the case to this court, the parties filed their cross-motions for summary judgment now before the court. See ECF No. 43; ECF No. 45.

During the course of briefing the cross-motions for summary judgment, defendant sought leave to file a motion for partial dismissal requesting that the court dismiss plaintiff's claim for illegal exaction for lack of subject matter jurisdiction. See ECF No. 62. The court granted defendant's motion for leave on October 26, 2021, and defendant filed its motion on October 29, 2021. See ECF No. 64 (order granting motion for leave); ECF No. 65 (defendant's motion to dismiss). Plaintiff filed a response on December 20, 2021, see ECF No. 70, and defendant filed a reply on January 14, 2022, see ECF No. 73. On June 16, 2022, the court denied defendant's motion, noting that, while the Federal Circuit did not analyze whether this court has jurisdiction over plaintiff's illegal exaction claim as an alternative to a Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-09, claim, it was aware that plaintiff is pursuing both CDA claims and an illegal exaction claim and explicitly held that this court has jurisdiction over the latter. See ECF No. 74 at 2-3 (order denying motion to dismiss and staying further consideration of the parties' cross-motions for summary judgment); see also generally ECF No. 33. Defendant did not seek to file an interlocutory appeal of the court's ruling. See ECF No. 75 (July 13, 2022 status report).

The parties' cross-motions for summary judgment are thus ripe for review by this court.

II. Legal Standards

A. Subject Matter Jurisdiction

The Tucker Act delineates this court's jurisdiction. See 28 U.S.C. § 1491. That statute "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) (citations omitted). Specifically, the statute provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the

> Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act "waives the Government's sovereign immunity for those actions." See Fisher, 402 F.3d at 1172. Plaintiff bears the burden of establishing the court's subject matter jurisdiction by a preponderance of the evidence. See Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013). To determine whether a plaintiff has carried this burden, the court must accept "as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995)). If the court does not have jurisdiction over the matter, the court must dismiss it. See RCFC 12(h)(3).

B. Summary Judgment

According to RCFC 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted). For cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citation omitted).

A genuine dispute of material fact is one that could "affect the outcome" of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power, 16 F.3d at 1202 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial. Celotex, 477 U.S. at 324.

## III. Analysis

### A. Plaintiff's Contract Claims Are, at Base, Challenges to the Validity of a Regulation

"Regardless of the characterization of the case ascribed by [plaintiff] in its complaint, we look to the true nature of the action in determining the existence or not of jurisdiction." Katz v. Cisneros, 16 F.3d 1204, 1207 (Fed. Cir. 1994); see also Suburban Mort. Assocs., Inc. v. United States Dept. of Housing & Urban Dev., 480 F.3d 1116, 1124 (2007) (holding that to "thwart . . . forum shopping," the court "emphasize[s] that in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim"). When a plaintiff couches its claims in terms of money damages, but seeks "payments to which it alleges it is entitled pursuant to federal statute and regulations," and that payment "may flow from a decision that [an agency] has erroneously interpreted or applied its regulation," the claim is one for "declaratory judgment and other equitable relief." Katz, 16 F.3d at 1208 (citing Bowen v. Massachusetts, 487 U.S. 879, 893, 895, 900 (1988)). Put more simply, a case that "challenges the interpretation of law which controls payment . . . . is not a contract case." Id. at 1209.

Plaintiff asserts that its claims are contract claims. See ECF No. 1 at 31-34. Plaintiff's breach claims, however, are premised on its allegation that the agency applied a regulation that "violates the CAS statute and was illegally promulgated." ECF No. 43-1 at 8. Plaintiff argues that because FAR 30.606 is invalid, see id. at 28-38 (arguing that the regulation is invalid because it conflicts with the CAS statute and was promulgated without authority, meaningful explanation, or notice and comment), defendant breached its contract with plaintiff when it applied the regulation to calculate the impact of the changes plaintiff made to its cost accounting methods, see id. at 41-42. In the court's view, therefore, the gravamen of plaintiff's complaint is a challenge to the validity of FAR 30.606.

This case, then, like Katz, "challenges the interpretation of law which controls payment to [plaintiff]." Katz, 16 F.3d at 1209. Although plaintiff couches its claims in terms of breach and money damages, it seeks "payments to which it alleges it is entitled pursuant to federal statute and regulations," and its payment allegations "flow from a decision that [an agency] has erroneously interpreted or applied its regulation." Id. at 1208. As a result, plaintiff's contract claims are for "declaratory judgment and other equitable relief." Id. This is, thus, "not a contract case." Id. at 1209; see also id. ("We presume, as did the Bowen court, that once the propriety of [the agency's] interpretation of the regulation has been adjudicated it will act accordingly, and any monetary consequences will flow through the contractual scheme.").

B. The Court Lacks Jurisdiction to Determine the Validity of FAR 30.606

This court does not have jurisdiction to review the validity of regulations pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 702. See, e.g., Land Shark Shredding, LLC v. United States, 842 F. App'x 589, 593 (Fed. Cir. 2021) ("Challenges to the validity of a regulation governing a procurement must be brought in federal district court under the [APA]."); Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (en banc) ("[T]he Court of Federal Claims lacks APA jurisdiction."); Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1135 (Fed. Cir. 1998) (noting that if a plaintiff wishes to "challenge the validity of a regulation governing a procurement, the proper method of doing so is to bring an action in federal district court under the [APA]"); Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (stating that the court "lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the [APA]"); Katz, 16 F.3d at 1209 ("[N]o relief is available in the Court of Federal Claims here because the case challenges the interpretation of law . . . . It is not a contract case."). Likewise, as a rule, the court "does not have the general equitable powers of a district court to grant prospective relief." Bowen, 487 U.S. at 905.

The Federal Circuit has previously held that, under certain circumstances, the court has jurisdiction to consider challenges to regulations made in the context of a CDA claim. See Texas Health Choice, L.C. v. Office of Pers. Mgmt., 400 F.3d 895, 900 (Fed. Cir. 2005). In Texas Health, the plaintiff, a health management organization and government contractor, filed suit in the district court alleging that an agency regulation covering the last year of its contract, which was incorporated into its contract as a clause, conflicted with a provision of the Federal Employee Health Benefits Act. See id. at 897. The defendant moved to dismiss the complaint for lack of jurisdiction and separately moved to transfer the claim to this court, arguing that the contract was governed by the CDA and jurisdiction is exclusive in this court for such claims. See id. at 898.

The district court denied the motions, but the Federal Circuit concluded that "under the CDA, the Court of Federal Claims has exclusive jurisdiction over [plaintiff's] suit against [defendant] relating to the validity of the [regulation] incorporated into the . . . contract." Id. The Circuit so reasoned "because [plaintiff's] claim is related to the . . . contract," and the CDA "'exclusively governs'" government contract disputes. Id. The Federal Circuit stated that plaintiff's complaint, "literally read," only sought to invalidate the regulation, rather than requesting money damages, but that was "of no consequence to the question of jurisdiction because the complaint relates to a dispute implicating a contract with the Government." Id. at 900. A dissent in the case argued that the case was controlled by Bowen and Katz, and that transferring the case to this court would effect a transfer "to a court without either jurisdiction or the power to grant the requested relief." Id.

Plaintiff argues that this same rationale should apply here. See ECF No. 71 at 12. The court disagrees. In the court's view, Texas Health is distinguishable from this case, and the general prohibition on the court hearing challenges to a regulation's validity found in Bowen and Katz must govern.

The court finds the Federal Circuit's explanation and reasoning in Suburban Mortgage instructive in this matter. See Suburban Mort., 480 F.3d at 1126-27. In that case, the Circuit considered whether a case filed in the district court as an APA action should remain in the district court or be transferred to this court. See id. at 1118-19. The court extensively reviewed the analysis and conclusions in Bowen, and concluded that "if a money judgment will give the plaintiff essentially the remedy he seeks—then the proper forum for resolution of the dispute is not a district court under the APA but the Court of Federal Claims under the Tucker Act." Id. at 1126. Applying that conclusion, the Circuit reasoned that "unlike Bowen, this case does not involve a complex, ongoing relationship between plaintiff and the Government in which plaintiff seeks declaratory or injunctive relief to modify the Government's future obligations," and held that this court had jurisdiction to consider the claims because it could provide an adequate remedy. Id. at 1127; see id. at 1128.

In Texas Health and Suburban Mortgage, the regulatory interpretation issue was narrow, applied only to a single contract between plaintiff and defendant, and did not apply prospectively to future actions. See Suburban Mort., 480 F.3d at 1127; Texas Health, 400 F.3d at 897 (noting that plaintiff had ended the contractual relationship). Unlike both Texas Health and Suburban Mortgage, plaintiff here has multiple contracts with defendant that could be affected by the outcome of this case. See ECF No. 1 at 24 n.1 (noting that the changes plaintiff made to its cost accounting methods affected its CAS-covered contracts, but defendant calculated the cost impact on a single, representative contract); ECF No. 43-1 at 12-13 (plaintiff noting that cost accounting methods "must periodically change," and that the "central issue in this case" is how the impact is calculated when those changes occur) (capitalization removed). Were the court to resolve this case on its merits in plaintiff's favor, it would affect future conduct by defendant. This case, therefore, like Bowen, involves "a complex, ongoing relationship between plaintiff and the Government in which plaintiff seeks declaratory or injunctive relief to modify the Government's future obligations." Suburban Mort., 480 F.3d at 1127.

In Bowen, the Supreme Court of the United States noted that it is not appropriate "to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." Bowen, 487 U.S. at 905. And, it reasoned that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" Id. at

893. In the court's view, the Supreme Court's reasoning in Bowen must apply in this case. Plaintiff's requested relief, although monetary in name, would not be "an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." Id. at 905. And this court is not empowered to grant such relief. Id. ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief.").

The weight of precedent thus dictates that the court lacks jurisdiction to determine the validity of FAR 30.606 in this case. See id. The court declines to extend its jurisdictional reach to include challenges to the validity of a regulation under these circumstances and, therefore, dismisses plaintiff's alleged contract claims, counts I, II, and III, of plaintiff's complaint.

C. Plaintiff's Illegal Exaction Claim Is Barred by the Remedy Provision in the CAS Statute

In its opinion remanding this case, the Federal Circuit considered the viability of both plaintiff's CDA claims and its illegal exaction claim. See generally ECF No. 33. The Circuit specifically found that this court erred in holding that the court lacked jurisdiction over the illegal exaction claim because it was not based on a money-mandating statute. See id. at 21. More specifically, the Circuit held that no money-mandating statute is required to support an illegal exaction claim, id., and stated that plaintiff "has established jurisdiction for its illegal exaction claim," id. at 19. Stated another way, the Circuit noted that "[w]hatever its ultimate merits, [plaintiff's] allegation suffices for jurisdiction to adjudicate the illegal exaction claim." Id. at 20. The court thus has jurisdiction to hear plaintiff's illegal exaction claim.

Notwithstanding that conclusion, the court lacks the authority to consider plaintiff's illegal exaction claim because challenges to the application of the CAS statute must be made under the CDA. See 41 U.S.C. § 1503(a) (requiring that "[i]f the Federal Government and a contractor or subcontractor fail to agree on a contract price adjustment, . . . the disagreement will constitute a dispute under [the CDA]"). Plaintiff asserts that its challenge is to the application of the CAS statute, and within the scope of the CDA. See ECF No. 71 at 9 (plaintiff noting that "the instant dispute is within the scope of the CDA"); id. at 9 n.3 (quoting the FAR clause incorporated into its contract which provides that a dispute over a cost adjustment "will constitute a dispute under [the CDA]"). "When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; the [CDA] was not designed to serve as an alternative administrative remedy, available at the contractor's option." Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995). Plaintiff's claim, therefore, must be brought under the CDA—an illegal exaction claim is barred in this case.

Because plaintiff cannot make a showing sufficient to establish its ability to bring an illegal exaction claim in this case, the court dismisses the illegal exaction claim, count IV, of plaintiff's complaint. Celotex, 477 U.S. at 324.

IV. Conclusion

Accordingly, for the foregoing reasons:

(1) The clerk's office is directed to **LIFT** the **STAY** in this matter;

(2) Plaintiff's motion for summary judgment, ECF No. 43, is **DENIED**;

(3) Defendant's cross-motion for summary judgment, ECF No. 45 is **GRANTED**; and

(4) The clerk's office is directed to **ENTER** final judgment in defendant's favor **DISMISSING** counts I, II, and III of plaintiff's complaint without prejudice, and **DISMISSING** count IV of plaintiff's complaint with prejudice.

IT IS SO ORDERED.

s/Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge

# In the United States Court of Federal Claims

**No. 17-1969 C**
**Filed: September 21, 2022**

**THE BOEING COMPANY**
**Plaintiff**

**JUDGMENT**

**v.**

**THE UNITED STATES**
**Defendant**

Pursuant to the court's Opinion, filed September 21, 2022, denying plaintiff's motion for summary judgment and granting defendant's cross-motion for summary judgment,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant, and Counts I, II and III of plaintiff's complaint are dismissed without prejudice, and Count IV of the complaint is dismissed with prejudice.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



if articles, materials, or supplies of the class or kind to be acquired, either as end items or components, are not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality.

(1) *Class determinations.* (i) A nonavailability determination has been made for the articles listed in 25.104. This determination does not necessarily mean that there is no domestic source for the listed items, but that domestic sources can only meet 50 percent or less of total U.S. Government and nongovernment demand.

(ii) Before acquisition of an article on the list, the procuring agency is responsible to conduct market research appropriate to the circumstances, including seeking of domestic sources. This applies to acquisition of an article as—

(A) An end product; or

(B) A significant component (valued at more than 50 percent of the value of all the components).

(iii) The determination in paragraph (b)(1)(i) of this section does not apply if the contracting officer learns at any time before the time designated for receipt of bids in sealed bidding or final offers in negotiation that an article on the list is available domestically in sufficient and reasonably available commercial quantities of a satisfactory quality to meet the requirements of the solicitation. The contracting officer must—

(A) Ensure that the appropriate Buy American Act provision and clause are included in the solicitation (see 25.1101(a), 25.1101(b), or 25.1102);

(B) Specify in the solicitation that the article is available domestically and that offerors and contractors may not treat foreign components of the same class or kind as domestic components; and

(C) Submit a copy of supporting documentation to the appropriate council identified in 1.201–1, in accordance with agency procedures, for possible removal of the article from the list.

(2) *Individual determinations.* (i) The head of the contracting activity may make a determination that an article, material, or supply is not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of a satisfactory quality.

(ii) If the contracting officer considers that the nonavailability of an article is likely to affect future acquisitions, the contracting officer may submit a copy of the determination and supporting documentation to the appropriate council identified in 1.201–1, in accordance with agency procedures, for possible addition to the list in 25.104.

(3) A written determination is not required if all of the following conditions are present:

(i) The acquisition was conducted through use of full and open competition.

(ii) The acquisition was synopsized in accordance with 5.201.

(iii) No offer for a domestic end product was received.

* * * * *

■ 3. Amend section 25.104 in paragraph (a) by removing ''25.103(b)'' and adding ''25.103(b)(1)(i)'' in its place; and revising paragraph (b) to read as follows:

**25.104 Nonavailable articles.**

* * * * *

(b) This list will be published in the **Federal Register** for public comment no less frequently than once every five years. Unsolicited recommendations for deletions from this list may be submitted at any time and should provide sufficient data and rationale to permit evaluation (see 1.502).

**25.202 [Amended]**

■ 4. Amend section 25.202 in the last sentence of paragraph (a)(2) by removing ''25.104(b)'' and adding ''25.103(b)(1)'' in its place.

[FR Doc. 05–4088 Filed 3–8–05; 8:45 am]

BILLING CODE 6820–EP–S

---

## DEPARTMENT OF DEFENSE

## GENERAL SERVICES ADMINISTRATION

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

## 48 CFR Parts 30 and 52

**[FAC 2005–01; FAR Case 1999–025; Item VI]**

**RIN 9000–AI70**

## Federal Acquisition Regulation; Cost Accounting Standards Administration

**AGENCIES:** Department of Defense (DoD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Final rule.

**SUMMARY:** The Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) have agreed on a final rule amending the Federal Acquisition Regulation (FAR) by revising language pertaining to the Cost Accounting Standards Administration, and the related FAR contract clause, Administration of Cost Accounting Standards. In addition, a new contract clause is added, Proposal Disclosure—Cost Accounting Practice Changes. The rule describes the process for determining and resolving the cost-impact on contracts and subcontracts when a contractor makes a compliant change to a cost accounting practice or follows a noncompliant practice. To assist in understanding the changes between the current FAR rule and this final FAR rule, a matrix that summarizes the major changes is provided in Section C, Supplementary Information, below.

**DATES:** *Effective Date:* April 8, 2005.

**FOR FURTHER INFORMATION CONTACT:** The FAR Secretariat at (202) 501–4755 for information pertaining to status or publication schedules. For clarification of content, contact Mr. Richard C. Loeb, Acting Director, Office of Acquisition Policy, at (202) 208–3810. Please cite FAC 2005–01, FAR case 1999–025.

**SUPPLEMENTARY INFORMATION:**

### A. Background

DoD, GSA, and NASA published a proposed rule in the **Federal Register** at 65 FR 20854, April 18, 2000, with a request for comments by June 19, 2000. Nine respondents submitted public comments. Additional comments were also provided by the public at a series of public meetings held on August 2, September 26, and October 17, 2000. As a result of the comments received, the Councils made significant changes to the proposed FAR rule and published a second proposed FAR rule in the **Federal Register** at 68 FR 40104, July 3, 2003, with a request for comments by September 2, 2003. An additional public meeting was held on August 5, 2003.

Nine respondents submitted comments in response to the second proposed FAR rule. A discussion of these public comments are provided below. The Councils considered all comments and concluded that the proposed rule should be converted to a final rule, with changes to the proposed rule. Differences between the second proposed rule and final rule are discussed in Section B, Comments 8, 9, 12, 21, 26, 27, 28, 29, 35 and Other Changes, below.

### B. Public Comments

*Public Meeting*

1. *Comment:* Four respondents recommended holding a public working group session to address the concerns and recommendations contained in the public comments submitted in response to the proposed rule.

[redacted]

*Councils' response:* Nonconcur. With the removal of the calculation of increased cost in the aggregate from the final rule (*see* comment 26), the Councils do not believe there are any issues that warrant holding another public meeting.

*Complex and Prescriptive*

2. *Comment:* Five respondents asserted that the proposed rule is overly prescriptive. One respondent stated that the proposed rule is unnecessarily complicated and does not address the major reasons that the current process does not work. Two respondents asserted the proposed rule is so detailed and prescriptive that CFAOs will be unable to exercise good business judgment and consider the unique aspects of each contractor's business environment in settling issues. Another respondent stated that the highly prescriptive nature of this regulation will impede the expeditious and fair resolution of CAS issues. The respondent stated that CFAOs will interpret the proposed rule as significantly decreasing the flexibility regularly exercised under the current regulation. Yet another respondent asserted that the detailed requirements for a GDM are too prescriptive. This respondent stated that, in many cases, very high-level GDM's are all that is needed to determine if an impact is going to be immaterial, while in other cases, a GDM with more detail may be necessary. They stated that the GDM's require more flexibility than is provided for in the proposed amendment.

*Councils' response:* Nonconcur. The Councils do not believe that the general content of the rule is overly prescriptive. The Councils believe that the CFAO and the contractor have significant flexibility in the proposed process, including the ability to determine materiality at any time during the process, the ability to submit a GDM in whatever format that is acceptable to the CFAO, and the ability to negotiate the cost-impact by adjusting a single contract, multiple contracts, or some other suitable method. However, the Councils concur with some of the specific recommendations made in the public comments regarding revisions to the proposed language. To the extent the respondents have provided specific comments regarding the prescriptive nature of the rule, the Councils have addressed those comments and made recommended revisions as deemed appropriate.

*Define ''Cost Accumulation''*

3. *Comment:* One respondent recommended defining the term ''cost accumulation'' in FAR Part 31.001, Definitions, and clarifying the expression ''noncompliances that involve accumulating costs.''

*Councils' response:* Nonconcur. The Councils do not agree that there is confusion as to the intent of the term. The Councils believe the term ''cost accumulation'' is self-evident and clearly understood. In addition, since the CAS Board defines ''accumulating costs'' in 48 CFR 9904.401–30(a)(1), there is no need to add clarifying language regarding the expression ''noncompliances that involve accumulating costs.''

*Adequacy Determination—Cost-Impact System*

4. *Comment:* One respondent recommended that the proposed rule be revised to ''require the CFAO to make a determination, in conjunction with DCAA, regarding a contractor's cost-impact system and their ability to submit cost-impact proposals. If a contractor has the ability to identify increased or decreased cost accumulations for each affected CAS-covered contract and subcontract and can properly summarize the increased or decreased cost by contract type and Government agency, the CFAO should be required to utilize that contractors system.''

*Councils' response:* Nonconcur. The Councils are unaware of any criteria that have been established as the basis for a CFAO's determination of adequacy of a contractor's cost-impact system, unlike other systems upon which the Government makes determinations of adequacy, such as accounting or billing systems. The Councils also believe that such criteria are unnecessary. The effort necessary to establish and continuously review cost-impact systems would not be cost beneficial to the Government or the contractor. The proposed rule provides the contractor with the flexibility to submit a GDM and/or DCI proposal in any format that is acceptable to the CFAO. To the extent a contractor has a process that produces GDM and/or DCI proposals that are acceptable to the CFAO, the contractor will continue to be able to use that process under the proposed rule.

*CFAO Acting for Non-DoD Agencies*

5. *Comment:* One respondent stated that the CFAO responsibilities set forth in the proposed rule will not work at contractors who have CAS-covered contracts and subcontracts with many Government agencies. The respondent further stated that agencies outside of DoD have refused to accept final incurred expense rates that have been audited by DCAA and approved by its ACO and, therefore, it is inconceivable that agencies such as DOE or USAID will allow a CFAO to execute a bilateral modification to one of its contracts.

*Councils' response:* Nonconcur. The Councils have not changed the requirements under FAR 30.601, Responsibilities. CAS administration for all contracts and subcontracts in a business unit must be performed by a single agency. The proposed rule merely uses the term ''Cognizant Federal Agency Official (CFAO)'' instead of ''cognizant ACO.'' This does not change the responsibilities of the cognizant Federal agency.

Under FAR 42.202(d), delegation of functions pertaining to cost accounting standards cannot be rescinded by any contracting agency. Furthermore, FAR 42.703 sets forth that a single agency shall be responsible for establishing final indirect cost rates for each business unit. These rates shall be binding on all agencies and their contracting offices, unless otherwise specifically prohibited by statute. An agency shall not perform an audit of indirect cost rates when the contracting officer determines that the objectives of the audit can reasonably be met by accepting the results of an audit that was conducted by any other department or agency of the Federal Government.

*Materiality Determination—Guidelines*

6. *Comment:* One respondent recommended that the FAR Council provide guidelines for what constitutes adequate documentation in making a determination of materiality.

*Councils' response:* Nonconcur. The Councils believe that any attempt to add guidelines for what constitutes adequate documentation would be overly prescriptive, could result in submittal of unnecessary documentation, would reduce the flexibility needed to resolve cost-impacts in a timely manner, and could potentially lead to disputes. The Councils' position is consistent with the requirements at FAR 1.704, Determination and Findings (D&F). As noted at 30.601, Responsibilities, the CFAO is required to make all CAS-related required D&Fs for all CAS-covered contracts and subcontracts. FAR 1.704 requires that each D&F include necessary supporting documentation to clearly and convincingly justify the specific determination made. However, since each case must be evaluated based on its particular facts and circumstances, FAR 1.704 does not provide guidelines for what constitutes necessary supporting documentation. Similarly, since each cost-impact must be evaluated based on

[redacted]

the particular facts and circumstances, the Councils do not believe it is necessary to provide guidelines for what constitutes adequate documentation.

*Immateriality Determination—Prior to GDM*

7. *Comment:* One respondent expressed concern with the wording of the proposed rule which allows for a determination of materiality before submittal of the GDM. The respondent asked how the CFAO can make such a determination and what data would have to be provided to the CFAO for this determination.

*Councils' response:* The Councils believe there will be instances in which a determination of materiality can be made (based on the criteria at 48 CFR 9903.305) without submittal of a GDM. The data required to make such a determination would be identified by the CFAO on a case-by-case basis, depending on the particular facts and circumstances involved. The Councils note that language at 30.602(b)(1) provides the CFAO with such flexibility, something that other respondents have emphasized is needed in the cost-impact process. The Councils also note that this language was endorsed by another respondent who stated that they ''* * * support the Council's efforts to clarify the process for determining and resolving cost-impacts and believes there are favorable aspects of the proposed amendment. For example, the proposed cost-impact process begins without having to prepare a general dollar magnitude (GDM) proposal. In addition, the Cognizant Federal Agency Official (CFAO) has the ability to make materiality determinations at any time during the process.''

*Immateriality Determination—Documentation*

8. *Comment:* One respondent recommended that whenever the CFAO determines the cost-impact is immaterial, the CFAO should be required to document the criteria used in making that determination.

*Councils' response:* Concur. The Councils believe a requirement for the CFAO to document the immateriality determination is appropriate and has included the requirement at FAR 30.602(c)(2).

*Clarify ''Assertion''*

9. *Comment:* One respondent recommended modifying or removing the term ''assertion'' in the statement at contract clause FAR 52.230–6(b) that reads ''a description of any cost accounting practice change to the Disclosure Statement and any assertion that the cost-impact of the change is immaterial.'' In addition, the respondent recommended that any statement by the contractor regarding whether the cost-impact of the change is immaterial should be in writing.

*Councils' response:* Concur. To avoid potential confusion, the Councils agree that paragraph (b) of the contract clause at FAR 52.230–6 be revised to require submission of a written statement that the cost-impact is immaterial. In addition, the term ''written statement'' replaces the term ''assertion'' at FAR 30.603–1(c)(2)(ii), 30.603–2(c)(1)(ii), and 30.605(b)(2)(ii)(B).

*Time Restrictions for Contractor*

10. *Comment:* One respondent recommended that the Council reinstate existing specific time limits for the contractor to provide information regarding accounting changes and noncompliances in all paragraphs where the phrase ''by a specified date'' is used.

*Councils' response:* Nonconcur. The respondent's references to the CFAO affixing ''a specified time limit'' for contractors to submit a GDM (FAR 30.604(b)(1)(i)), revised GDM (FAR 30.604(f)(1)), or DCI (FAR 30.604(f)(2)) does not provide flexibility to the CFAO to specify a date that is commensurate with the complexity of the issue(s). Ultimately, the total time allotted a contractor is addressed by FAR 30.604(i), Remedies, which may be disputed by the contractor.

*Time Restrictions for Government*

11. *Comment:* Two respondents stated that the proposed rule does not address one of the major problems associated with the resolution of cost-impact proposals related to noncompliances and accounting changes. One respondent stated that the problem is the fact that the Government has no time restrictions for performing its responsibilities. The respondent recommended that the proposed rule require all actions related to these issues be performed within specific time frames. In addition, the respondent recommended that reasonable response times be established for Government personnel.

*Councils' response:* Nonconcur. The Councils believe a specific time requirement for CFAO action could increase disputes concerning the adequacy of contractor submissions since the time periods cannot reasonably start until an adequate submission is received. The Councils are not aware of, and the respondents did not provide, a remedy for Government failure to comply with a recommended time requirement.

*DCI in Lieu of GDM*

12. *Comment:* Two respondents stated that the submittal of a GDM requires extra analysis and is less precise than a detailed cost proposal. The respondents asserted that the databases and cost-impact calculation systems used by CAS-covered contractors can provide a DCI that is much more precise than the calculations required by a GDM.

*Councils' response:* Partially concur. The GDM proposal does not require extra analysis. Proposed FAR 30.604(d) and 30.605(d) allow the CFAO and contractor flexibility in the submittal of a GDM. For some contractors, the databases and cost-impact calculation systems they use allow for the computation of DCIs with relative ease. In such cases, it is anticipated that a contractor would submit the cost-impact calculation generated by its system as the GDM. However, the final rule has been revised at FAR 30.604(d)(3) and 30.605(d)(3) to clarify that the contractor may submit a DCI in lieu of a GDM proposal. The Councils believe that allowing, but not requiring, the submittal of a GDM gives contractors flexibility to submit proposals as complex and precise as they choose, up to and including the submittal of a full DCI.

*Cost-Impact Approximations*

13. *Comment:* Two respondents stated that the use of approximations of prices and cost accumulations are not necessary. Both respondents stated that it is easy and more cost effective to calculate DCI proposals. One respondent also stated that it does not see why a contractor should be required to calculate the increased cost in the aggregate one way for a GDM proposal and another way for the cost-impact calculation.

*Councils' response:* Nonconcur. For some contractors, the databases and cost-impact calculation systems they use allow for the computation of detailed cost-impacts with relative ease. For other contractors, this is not necessarily the case. The Councils believe that allowing the submittal of a GDM that provides a reasonable approximation of the total increase in cost accumulations, gives contractors flexibility to submit proposals as complex and precise as they choose, up to and including the submittal of a full DCI. However, since some contractors may choose to go directly to the DCI, the final rule has been revised to specifically state that the contractor may

[redacted]

submit a DCI in lieu of a GDM proposal (see comment 12).

*Representative Sample and Projections*

14. *Comment:* Two respondents stated that the use of a representative sample and the projection of that sample to determine the total increase or decrease in cost accumulations are problematic. Both respondents stated that they have had difficulties over the years in reaching agreement with the Government on what constitutes a representative sample.

*Councils' response:* Nonconcur. The Councils believe that for some contractors, the projection of representative samples is a feasible method for computing increases and decreases in cost accumulations for the purposes of the submittal of a GDM (*see* FAR 30.604(e)(2)(i) and 30.605(d)(2)(i)). For contractors that find it problematic to come to an agreement with the Government on what constitutes a representative sample, there are alternative methods for computing increases and decreases in cost accumulations in preparing for the submittal of a GDM. In addition, the final rule has been revised to permit contractors to submit a DCI in lieu of a GDM proposal (see comment 12).

*Firm-Fixed-Price Contracts*

15. *Comment:* Six respondents commented that firm-fixed-price (FFP) contracts should not be included in cost-impacts for changes in cost accounting practices. One respondent asserted that "increased costs to the Government only result from a change in contractor's cost accounting practices when the actual costs paid by the Government are more than they would have been had the contractor's practices not changed." The respondent further asserted that FFP contracts are not included in the cost-impact because the amount of costs a contractor assigns to FFP contracts due to a change in cost accounting practices has no effect on the amount ultimately paid by the Government.

*Councils' response:* Nonconcur. FFP contracts are properly included in cost-impacts for changes in cost accounting practice in the subject rule. 48 CFR 9903.306(a) does not differentiate among contract types in its definition of increased costs to the Government. Further, 48 CFR 9903.306(b) measures increased costs for FFP contracts by "the difference between the contract price agreed to and the contract price that would have been agreed to had the contractor proposed in accordance with the cost accounting practices used during contract performance." The final rule at FAR 30.604 is consistent with the requirements at 48 CFR 9903.306(a) and (b).

*Required Information*

16. *Comment:* One respondent questioned whether the benefits to be derived from the requirement at FAR 30.604(e)(3) to provide certain information when a unilateral change is involved are worth the costs to comply. The respondent's concern was based on its belief that FAR 30.606(c)(3) neither justifies why the information is needed nor discusses how the information will be used.

*Councils' response:* Nonconcur. The information required by FAR 30.604(e)(3) (the increased or decreased costs by agency, and the increased or decreased costs for fixed-price contracts and subcontracts and flexibly-priced contracts and subcontracts) is required to determine how any adjustments will be handled. Specifically, the increase or decrease by agency is needed to assure that the contracts to be adjusted and the amounts of those adjustments are fairly allocated among the executive agencies. The breakout by firm-fixed price and flexibly-priced contracts is needed since the terms "increased costs" and "decreased costs" mean different things when applied to fixed-price versus flexibly-priced contracts.

*GDM Versus DCI*

17. *Comment:* One respondent commented that over the last decade, "technology has advanced to the stage where a very accurate cost-impact proposal covering all affected pricing actions, (by contract, task, agency, contract type, etc.) is now practical. The speed and power of personal computers, combined with advances in database technology, now make it much easier to calculate precise cost-impacts in a very short time." Thus, "the debate over GDM versus DCI cost-impacts may well become moot."

*Councils' response:* Nonconcur. The Councils believe that retention of the GDM as an option available to the CFAO promotes the streamlining of the cost-impact process in many cases, such as those where the contractor does not have a sophisticated cost-impact system as envisioned by the respondent. The final rule at FAR 30.604(f)(1) provides that the CFAO may use the GDM to resolve cost-impacts without requiring the preparation of a DCI. The Councils believe that this option will result in a significant savings of resources for both the contractor and the Government.

*Contradictory Rules*

18. *Comment:* One respondent stated that proposed FAR 30.604(h) seems to apply only to Detailed Cost-impact proposals (DCIs), but the proposed language in the FAR clause at FAR 52.230–6(f) applies the principle to both General Dollar Magnitude Proposals (GDMs) and DCIs. The respondent's conclusion is that these two paragraphs of the proposed rule are contradictory.

*Councils' response:* Nonconcur. FAR 30.604(e)(1), General dollar magnitude proposal content, and FAR 30.604(g)(1), Detailed cost-impact proposal, both require computation of the cost-impact in accordance with 30.604(h), Calculating cost-impacts. Thus, the proposed rule is not contradictory.

*Cost-Impact Computations*

19. *Comment:* One respondent stated that the required cost-impact computations set forth in FAR 30.604(h) and 30.605(h) cause additional administrative burden. These requirements preclude the respondent from utilizing its Government approved cost-impact system.

*Councils' response:* Nonconcur. The proposed rule does not preclude the respondent from using its cost-impact system, provided that the system computes the cost-impact in accordance with FAR 30.604(h) and 30.605(h). It is noted that the Government does not "approve" cost-impact systems.

*Closed Contracts and Closed Years*

20. *Comment:* Four respondents commented that the cost-impact calculation should not include closed contracts or years with final negotiated overhead rates.

*Councils' response:* Nonconcur. The Councils believe that it is appropriate to include closed contracts and closed fiscal years in the cost-impact calculation. Under the CAS clause at 48 CFR 9903.201–4(a)(5), the contractor in connection with this contract shall "agree to an adjustment of the contract price or cost allowance, as appropriate, if the contractor or a subcontractor fails to comply with an applicable cost accounting standard, or to follow any cost accounting practice consistently and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States, together with interest thereon computed at the annual rate established under Section 6621(a)(2) of the Internal Revenue Code of 1986 (26 U.S.C. 6621(a)(2)) for such period, from the time the payment by the United States was made to the time the adjustment is effected."

[redacted]

The provision at 48 CFR 9903.201–4(a)(5) does not provide for the exclusion of closed contracts or closed fiscal years from the cost-impact calculation. Since the CAS Board has not excluded such contracts, the Councils believe they must be included in the cost-impact calculation. The Councils further note that this position is consistent with the treatment of closed contracts and final negotiated overhead rates for price adjustments under the Truth in Negotiations Act. Defective pricing claims are often brought after the contract is closed and closure is no barrier to Government relief. The Councils also believe this is consistent with the position historically taken by the Government on CAS.

*Cost-Impacts in Prior Years*

21. *Comment:* One respondent stated that the proposed language at FAR 30.604(h)(1) infers that all cost-impacts occur in prior periods. The cost-impact calculation for all affected contracts generally involves the ''estimated cost to complete'' that will be incurred in future periods, after the change is implemented. To clarify that the cost-impact can involve existing contracts that will be performed in the future, insert the words ''or will be'' between ''were'' and ''incurred.''

*Councils' response:* Concur. The Councils agree that the respondent's recommendation will clarify the intent of the language at FAR 30.604(h)(1). However, the Councils believe the language at FAR 30.604(h)(1), as well as 30.605(h)(1), would be better clarified by inserting the word ''are'' in place of the word ''were.''

*Change in Cost Accumulation*

22. *Comment:* Two respondents expressed concern that the proposed rule requires that a GDM and/or DCI is required for a change in cost accumulation without regard to whether costs were billed. The respondents stated that the Government cannot be harmed until an actual billing has been submitted and paid. One respondent questioned how there can be any increased or decreased costs paid by the Government related to a unilateral change if contractors are complying with the current regulations.

*Councils' response:* Nonconcur. The rule assumes that the contractor's system used to accumulate costs is also used to bill those costs. While the Government cannot be harmed until the costs are actually billed, the CFAO is required to take action to preclude the Government from paying increased costs. Thus, if action is not taken to correct the noncompliance in cost accumulation, the increased costs could ultimately be billed to the Government. Note that one of the actions that can be taken is the correction of the accumulated costs to correct the noncompliance.

*Estimated Cost To Complete—Same Level of Work*

23. *Comment:* One respondent recommended that the language regarding the two estimates to complete at FAR 30.604(h)(3) be revised to state that they should be based on contractor performance at the same level of contract work. The respondent recommended adding the words ''in cost accumulation'' and the phrase ''required to perform the same level of contract work.''

*Councils' response:* Nonconcur. The language at issue concerns the items to be included in a GDM and DCI proposal. Based on past experience, the Councils believe adding the recommended language is more likely to cause confusion and disputes rather than add clarity. In the CAS Board Announced Notice of Proposed Rulemaking on changes in cost accounting practice and in the first proposed rule on FAR Part 30, the language required that the estimates be based on a ''consistent baseline.'' In both instances, public comments were submitted that clearly showed confusion as to the intent of the proposed language and requested clarification as to what was meant by a ''consistent baseline.'' The Councils believe the revised final language at FAR 30.604(h)(3) is sufficient for the parties to understand that the purpose of using an estimate to complete is to determine the difference in cost accumulations solely as a result of the changed practice, *i.e.*, the two estimates to complete cannot use different work scopes, different anticipated wage increases, different anticipated material price increases, or any other differences that do not result from the use of a different accounting practice.

*Estimated Cost To Complete*

24. *Comment:* Four respondents stated that the proposed rule requires the contractors to use current estimates-to-complete to calculate the cost-impact of changes to cost accounting practices. Two of the respondents asserted that such estimates may be so impacted by other events occurring subsequent to the award of a contract that they do not provide a reasonable basis for measuring increased costs to the Government.

*Councils' response:* Nonconcur. Although not specifically stated, it appears that the respondents are addressing the use of current estimates to complete for determining the cost-impact on fixed-price contracts (see FAR 30.604(h)(3)). For flexibly-priced contracts, since the current estimates to complete represent the actual amount that will be reimbursed, there should be no issue regarding the use of such estimates.

The Councils do not believe it is practical to use the original cost estimates for determining the cost-impact on fixed-price contracts. The Councils believe using current estimates to complete is the only feasible method for computing the cost-impact of changes in cost accounting practice. As noted in CAS Working Group Paper 76–9, there are several serious impediments to using original cost estimates for adjusting fixed-price contracts. While the parties to a fixed-price contract have agreed to a total price, there is often no agreement as to how much of the price represents cost and how much of the price represents profit, and seldom a meeting of the minds on the amount of any individual element of cost. Further, many fixed-price contracts will have undergone numerous price changes due to engineering modifications and other changes. In such cases, tracking an individual cost element may prove virtually impossible. There is also the danger that the confusion resulting from the attempt to reconstruct the original data will provide an opportunity to re-price loss portions of contract performance that have elapsed prior to the point of the change.

*Define ''In the Aggregate''*

25. *Comment:* One respondent commented that the CAS Board should define ''in the aggregate.''

*Councils' response:* The Councils recommend the respondent address its suggestion to the CAS Board, which can then decide if any action is necessary.

*Increased Costs in the Aggregate*

26. *Comment:* Eight respondents stated that the proposed rule on increased costs in the aggregate was a violation of CAS and the statutory provision.

*Councils' response:* The comment is no longer applicable—the final rule does not include the calculation of increased cost in the aggregate. The calculations at the following proposed coverage were removed from the final rule: 30.604(h)(3), and (4)(iv)(A) through (C); and 30.605(h)(5), (6), (8)(i) and (ii), and (9).

In addition, revisions were made at the following proposed coverage as a result of the removal of the calculations: 30.604(h)(4)(i), (ii), and (iv)—now 30.604(h)(3)(i), (ii), and (iv); and

[redacted]

30.605(h)(3), (4), and (8)—now 30.605(h)(3), (4), and (6).

*Offsets Between Contract Types*

27. *Comment:* Two respondents stated that the proposed rule incorrectly disallows offsets between contract types. In addition, one respondent asserted that the Government could be provided with a ''windfall profit'' if offsets are not allowed between contract types in the case of any noncompliance or unilateral change that causes costs to shift between fixed-price contracts and subcontracts and flexibly-priced contracts and subcontracts.

*Councils' response:* The comment is no longer applicable—the final rule does not include the calculation of increased cost in the aggregate. The calculations were removed from the final rule (*see* comment 26).

*Interest Computation—Calculation*

28. *Comment:* One respondent stated that it does not understand how interest can be calculated by multiplying the difference in indirect costs by an applicable base, and that the methodology used to compute interest at FAR 30.605(d)(2)(ii)(B) makes no sense.

*Councils' response:* Concur. The Councils recognize that potential confusion could result from the language, and that the language may be overly prescriptive. The Councils have therefore revised the final rule to eliminate the discussion of interest by deleting proposed FAR 30.605(d)(2)(ii)(B) to reduce the prescriptive nature of the language.

*Interest Computation—Over and Underpayments*

29. *Comment:* One respondent stated that the proposed requirements for calculating quarterly interest payments associated with overpayments or underpayments for noncompliances are overly prescriptive.

*Councils' response:* Concur. The Councils believe it is imperative for the contractor to provide information on when any increased costs were paid, so that the CFAO can compute interest in accordance with the statutory requirements. However, the Councils recognize that more flexibility can be inserted in the process. Therefore, the Councils revised the requirements for a GDM and DCI proposal at proposed FAR 30.605(d)(3)(iii) (now 30.605(d)(4)(iii)) by adding ''for fixed-price and flexibly-priced contracts'' after the word ''underpayments'' in the first sentence, and deleting the second sentence that required total over and underpayments be broken down by quarter.

*Quarterly Data*

30. *Comment:* One respondent asserted that the ''proposed rule mandates a schedule of increased or decreased costs paid by quarter (or an analysis to demonstrate why such a schedule is necessary) by Executive agency as a required part of a general dollar magnitude cost-impact for an alleged noncompliance.'' The respondent stated that this administrative burden should be evaluated.

*Councils' response:* Nonconcur. The proposed rule at FAR 30.605(d)(3) does not require a schedule of increased or decreased costs paid by quarter by Executive agency as part of a general dollar magnitude cost-impact. The proposed rule requires that the GDM include the total overpayments and underpayments broken down by quarter, unless each of the quarterly amounts billed during the period of noncompliance were approximately equal. It does not require that such amounts also be broken down by Executive agency. It is noted that the Councils removed the requirement at proposed FAR 30.605(d)(3)(iii) that the overpayments and underpayments be broken down by quarter in the GDM proposal (*see* comment 29), as well as the requirement at proposed FAR 30.605(g)(2)(i) and (ii) concerning the computation of interest on the quarterly amounts billed.

*Task Order Contracts*

31. *Comment:* One respondent stated that one of the many situations that greatly affect the cost accumulation calculation that is not addressed in the proposal is the trend toward task order contracts that may have both fixed fee and incentive fee tasks, as well as CAS covered and non-CAS covered tasks.

*Councils' response:* Nonconcur. The Councils believe that this situation is adequately covered by the language at FAR 30.605(h)(5), and the definition of ''Affected CAS-covered contracts'' at FAR 30.001.

FAR 30.605(h)(5) requires that the computation of the cost-impact include a calculation of the total increase or decrease in contract and subcontract incentives, fees, and profits associated with the increased or decreased costs to the Government in accordance with 48 CFR 9903.306(c). Thus, if the task involves a fixed fee, the contractor would need to compute the increase or decrease in that fixed fee as a result of the change or noncompliance. Conversely, if the task involved an incentive fee, the contractor would need to compute the increase or decrease in the incentive fee as a result of the change or noncompliance.

As for the issue of CAS-covered versus non-CAS-covered tasks, a contract cannot contain both CAS-covered and non-CAS-covered tasks. In order for CAS-coverage to differ between tasks, each task would have to be a separate contract. In such cases, the definition of affected CAS-covered contracts would exclude the non-CAS covered tasks from the computation of the cost-impact.

*Cost-Impact on Incentives, Fee, and Profit*

32. *Comment:* One respondent stated that FAR 30.605(h)(5) excludes flexibly-priced contract cost ceilings or target costs for determining increased costs in the aggregate for noncompliances involving estimating costs. The respondent stated that the proposed requirement is only applied to fixed price contracts, and asserted that ''the proposed coverage ignores the cost-impact on negotiated flexibly priced contract cost ceilings or target costs that were understated or overstated due to a contractor's proposal that contained estimated costs which were based on the use of a noncompliant practice.'' The respondent recommended that FAR 30.605(h)(5) be revised to include flexibly-priced contracts in the computation of increased costs in the aggregate for estimating noncompliances. The respondent also stated that under FAR 30.606(c)(4)(ii), as proposed, fixed price contracts would only be subject to downward price adjustment if there are ''net'' increased cost to the Government and opined that flexibly-priced contracts should not be excluded from the adjustment process. The respondent believes that the proposed approach to only recover the aggregate increased cost to the Government for fixed price contracts can result in inequities.

*Councils' response:* Nonconcur. The Councils believe that flexibly-priced contracts are properly included in the computation of increased costs in the aggregate. For a noncompliance in estimating costs, the Councils do not believe the impact on negotiated flexibly-priced contract cost ceilings or target costs should be included in the computation of increased costs in the aggregate. Under a flexibly-priced contract, the Government reimburses the actual costs incurred. As a result, a noncompliance in estimating the costs does not affect the total costs the Government will ultimately reimburse on flexibly-priced contracts. However, an estimating noncompliance may have a significant impact on the amount of

[redacted]

incentives, fees or profits for flexibly-priced contracts. Thus, the final rule requires inclusion of the impact on incentives, fees, and profits in computing the increased costs in the aggregate for estimating noncompliances.

*Records Retention*

33. *Comment:* One respondent stated that problems with the current process for handling cost-impacts could be addressed by adding a requirement for contractors to retain cost proposals that were the basis for negotiating the value of the CAS-covered pricing actions.

*Councils' response:* Nonconcur. The Councils disagree that adding a specific requirement to FAR Part 30 is appropriate. FAR 4.703, Policy-Contractor Records Retention, already describes the record retention requirements for contract negotiations, administration, and audit requirements of the contracting agencies. The Councils believe these record retention requirements are adequate for purposes of CAS administration.

*Adjust Each Individual Contract*

34. *Comment:* One respondent recommended that FAR 30.606(a)(2) include an analysis of the total payments that would be made if all affected contracts were individually adjusted so that the CFAO can determine whether one or more contracts are to be adjusted, or if an alternative method can be used to resolve the impact. The respondent asked how, without such data, the CFAO can determine that the Government will not pay more, in the aggregate, than would be paid if the CFAO had adjusted all affected contracts?

*Councils' response:* Nonconcur. In an ideal world, the contractor would provide a detailed analysis of the total payments for each and every affected contract. However, the Councils recognize that this is often not feasible and, in fact, would impose a significant administrative burden on contractors, extending the cost-impact process by years. The Councils do not believe that individual contract data is necessary in every circumstance in order for the CFAO to determine increased costs in the aggregate. The final rule, therefore, provides the CFAO the flexibility to obtain data at a more macro level, if appropriate.

*Combining Certain Types of Impacts*

35. *Comment:* Two respondents stated that they believe the proposed language at FAR 30.606(a)(3) is counter productive as it contains language that will further limit the Government and the contractor from resolving some of the more complex cost-impacts. The section precludes the Government from combining cost-impacts that include: (a) Changes implemented in different fiscal years, (b) changes and noncompliances, (c) two or more noncompliances, and (d) different categories of changes.

*Councils' response:* Partially concur. The Councils believe that some language at FAR 30.606(a)(3) is necessary to protect the interests of the Government. However, the Councils also recognize that the proposed language should be revised to provide some additional flexibility to the CFAO in resolving cost-impacts. The Councils, therefore, revised the language at FAR 30.606(a)(3) to reflect the following:

(a) *Changes implemented in different fiscal years.* The Councils agree with the respondent that implementing changes in different fiscal years should not be the basis for precluding the combination of such changes. The Councils have, therefore, deleted proposed 30.606(a)(3)(i) from the final rule.

(b) *Required/desirable changes combined with unilateral changes/ noncompliances.* The actions taken to resolve a required or desirable change (negotiate an equitable adjustment) are different from the actions taken to resolve a unilateral change or a noncompliance (recover increased costs to the Government). Therefore, the Councils believe that combining cost-impacts of required/desirable changes with the cost-impacts of unilateral changes/noncompliances should be prohibited, as indicated at FAR 30.606(a)(3)(i).

(c) *Combining unilateral changes and/ or noncompliances.* When the individual cost-impact of each unilateral change and each noncompliance is increased costs in the aggregate, the Councils agree that the change and noncompliance may be combined for administrative ease in resolving cost-impacts, as indicated at FAR 30.606(a)(3)(ii). Such combinations can only be made by mutual agreement of both parties.

The Councils further believe that combining the cost-impacts of unilateral changes and/or noncompliances must be precluded if any of the individual changes or noncompliances involved results in decreased costs in the aggregate. When there are two or more unilateral changes/noncompliances, some with increased costs and others with decreased costs, combining the cost-impact of those changes does not comply with the statutory requirement that the Government recover the increased costs in the aggregate for each unilateral change/noncompliance. There is no statutory provision that permits offsetting the cost-impact of one unilateral change/noncompliance with the cost-impact of any other unilateral change/noncompliance.

(d) *Cost-impacts of a unilateral change affecting two or more segments.* The Councils recognize that, in some circumstances, a unilateral change may affect more than one segment. When such a change affects the flow of costs between segments or implements a common cost accounting practice for two or more segments, the CFAO may treat this as a single change for cost-impact purposes, as indicated at FAR 30.606(a)(3)(iii).

*Mandatory Adjustments and Disallowance of Costs*

36. *Comment:* Regarding FAR 30.606, one respondent stated that ''The proposed mandatory provisions in (c)(3)(i) and (ii) appear incompatible with the CASB provision at 48 CFR 9903.201–6(b) and the proposed permissive provision at (c)(3)(iii).'' The respondent further stated that ''The proposed provision at (c)(3)(iii) provides the CFAO 'may' adjust contract prices, including cost ceilings or target costs, provided contract prices are not increased in the aggregate.'' The respondent also stated that ''This appears predicated on the CASB regulatory provision at 48 CFR 9903.201–6(b), but the FAR proposal makes it subservient to the mandatory provisions at (c)(3)(i) and (ii) which do not sanction such adjustments.'' The respondent then stated that ''the proposed rule appears to conflict with the CAS rules, as amended on June 14, 2000,'' and cited similar inconsistencies with FAR 30.606(c)(4). The respondent recommended that FAR 30.606(c)(3)(i) and (ii), and FAR 30.606(c)(4)(i) and (ii) be deleted and make the proposed provisions at (c)(3)(iii) and (c)(4)(iii) mandatory, for consistency with CAS rules. The respondent further recommended that the parenthetical at FAR 30.605(h)(3) be deleted because it does not require the adjustment of contract cost ceilings and target prices. Finally, the respondent recommended that, after adjusting the contract ceilings and target prices, FAR 30.606(c)(3) and (c)(4) include a ''mandatory provision requiring the CFAO to disallow accumulated costs under flexibly-priced contracts, but only for the portion of estimated increased cost accumulations that remains in a cost overrun condition after contract cost ceiling adjustments, if any, are made.''

*Councils' response:* Nonconcur. In an ideal world, the CFAO would adjust all

[redacted]

contracts so each and every dollar of the cost-impact is perfectly re-allocated to each and every affected contract. This would include all contract ceilings and target prices. However, the Councils recognize that this is often not feasible and, in fact, would impose a significant administrative burden on contractors, extending the cost-impact process by years. The CAS rules recognize the need for flexibility at 48 CFR 9903.306(f), which states:

> ''Whether cost-impact is recognized by modifying a single contract, several but not all contracts, or any other suitable technique, is a contract administration matter. The Cost Accounting Standards do not in any way restrict the capacity of the parties to select the method by which the cost-impact attributable to a change in cost accounting practice is recognized.''

The Councils believe the final rule provides the CFAO the flexibility to adjust the contract cost ceilings and target prices when the CFAO deems appropriate, as provided for by the CAS rules.

*Cost Accumulation Noncompliances*

37. *Comment:* One respondent commented that the FAR Council should rethink its requirement for cost accumulation noncompliances. The respondent asserted that the only harm to the Government in such noncompliances is the application of interest to the difference between a compliant and noncompliant billing.

*Councils' response:* Nonconcur. The Councils do not agree with the respondent's assessment of the harm to the Government in the case of a noncompliance in accumulating costs. The respondent assumes that the contractor agrees to correct the noncompliance and immediately reflects the correction in subsequent billings to the Government. This may not always be the case since the Government and contractor may not agree on the nature and extent of the noncompliance and the contractor may decline to make appropriate adjustments to billed costs. In addition, the noncompliance may affect closed contracts for which there can be no corrections to billings. The calculation of the cost-impact of the accumulation noncompliance is necessary to ensure that the Government recovers the full extent of any increased costs as well as any statutorily required interest (*see* FAR 30.606(c)(5)).

*Adjustment of Final Indirect Rates*

38. *Comment:* Two respondents stated that the adjustment of final indirect rates by the CFAO is inappropriate. They stated that since ''final incurred cost rates are applicable to all Government contracts, not just CAS-covered Government contracts. Therefore, CAS issues are being forced on non CAS-covered contracts through the application of adjusted final incurred cost rates.'' One respondent also argued that the proposed rule does not reflect the position taken by the CAS Board in its second supplemental notice of proposed rulemaking, 64 FR 45700, August 20, 1999, in response to a respondent suggesting the use of the final indirect expense rate settlement process rather than contract price adjustments as a method to resolve a cost-impact. In response to that comment, the CAS Board stated ''Adjustments of indirect expense rates to settle a cost-impact action can result in the adjustment of the wrong contracts for the impact of the change in accounting practice. This method also results in the establishment of final indirect expense rates that are not consistent with a contractor's established and disclosed accounting practices for allocating indirect costs to final cost objectives.''

*Councils' response:* Nonconcur. CAS issues are not being forced on non CAS-covered contracts because the contractor must agree to any adjustment of final indirect rates. FAR 30.606(d)(1) states that the CFAO may use an alternate method to resolve the cost-impact provided the contracting parties agree on the use of that alternate method. Thus, the impact of the change or noncompliance will not affect non CAS-covered contracts unless the contractor agrees. The CAS Board recognizes the use of an alternate method such as adjusting indirect rates at 48 CFR 9903.306(f), which states ''Whether cost-impact is recognized by modifying a single contract, several but not all contracts, or any other suitable technique, is a contract administration matter. The Cost Accounting Standards rules do not in any way restrict the method by which the cost-impact attributable to a change in cost accounting practice is recognized.''

*Other Changes*

The Councils revised the clause language at FAR 52.230–6, Administration of Cost Accounting Standards, to be in accord with the changes made to the final rule as described in the Councils' responses to the public comments, above. In addition, the Councils made several editorial-type changes to the proposed language to enhance clarity and structure of the final rule.

The Councils also made a clarifying change at FAR 30.001 to the definition of ''Fixed-price contracts and subcontracts'' to exclude fixed-price contracts with economic price adjustments (EPA) based on actual costs of labor or material (described at 16.203–1(a)(2)), and included these EPA contracts in the definition of ''Flexibly-priced contracts and subcontracts.''

**C. Summary of Changes**

| Issue | Current FAR rule | Final FAR rule |
|---|---|---|
| | **Definitions** | |
| 1. ........ | No definitions for ''Affected CAS-covered contract,'' ''Fixed-price contracts,'' and ''Flexibly-priced contracts.''. | Added new definitions for ''Affected CAS-covered contract,'' ''Fixed-price contracts,'' and ''Flexibly-priced contracts'' (30.001). |
| 2. ........ | Included old CAS definitions and terminology of ''Mandatory change,'' ''Voluntary change,'' and ''Desirable change.''. | Updated definitions to match CAS definitions and terminology for ''Required change,'' ''Unilateral change,'' and ''Desirable change'' (30.001). |
| | **Responsibilities** | |
| 3. ........ | ACO is used throughout FAR section ............................................ | Changed Administrative Contracting Officer (ACO) to Cognizant Federal Agency Official (CFAO) to be consistent with current CAS. |

[redacted]

| Issue | Current FAR rule | Final FAR rule |
|---|---|---|
| | **Determinations** | |
| 4. ........ | Did not contain actions for what to do if Disclosure Statement is adequate, inadequate, compliant, or noncompliant. | Provides actions to be taken when the Disclosure Statement is adequate (30.202–7(a)(2)(i)), inadequate (30.202–7(a)(2)(ii)), compliant (30.202–7(b)(2)), or noncompliant (30.605(b)). |
| | **Materiality** | |
| 5. ........ | No discussion of materiality ............................................................ | Added new section on materiality (30.602). Permits determination of immateriality at any time in the process; references CAS section on materiality in determining whether a change/noncompliance is immaterial; and requires CFAO to document rationale for any determination that the cost impact is immaterial. |
| | **Required Changes** | |
| 6. ........ | Did not address early implementation of a required change ........... | Requires CFAO to process early implementation of a required change as a unilateral change, unless determined to be desirable (30.603–1(d)(2)). |
| | **Unilateral and Desirable Changes** | |
| 7. ........ | Did not address how a unilateral change is treated if a decision on desirability has not been made. | States that until a change is determined to be desirable, it shall be treated as a unilateral change (30.603–2(b)(2)). |
| 8. ........ | Did not provide information on how to determine whether a change is desirable. | Provides specific factors to consider in determining whether a change is desirable (30.603–2(b)(3)). |
| 9. ........ | Did not address retroactive changes .............................................. | Provides specific section on retroactive changes (30.603–2(d)). CFAO can make a change retroactive to the beginning of the fiscal year in which the change was made. |
| 10. ...... | Did not include exemption from contract price adjustments for changes related to external restructuring activities. | Includes current CAS exemption from contract price adjustments for changes related to external restructuring activities (30.603–2(e)). |
| | **Processing Changes to Disclosed or Established Cost Accounting Practices, And Processing Noncompliances** | |
| 11. ...... | No process for evaluating changes or noncompliances ................. | Includes process for evaluating changes (30.604(c)) and noncompliances (30.605). |
| 12. ...... | No separation of cost impact computation and cost impact resolution. | Separate cost impact computation (30.604(h) and 30.605(h)) from cost impact resolution (30.606). |
| 13. ...... | Required submittal of a GDM in format specified by ACO for use in determining whether cost impact is material. | Requires submittal of GDM in format specified by CFAO, provided certain basic information is included (30.604(e)(3)). GDM can be used as basis to negotiate cost impact (30.604(f)(1) and 30.605(e)(1)). Permits contractor to submit DCI proposal in lieu of GDM proposal (30.604(d)(3) and 30.605(d)(3)). |
| 14. ...... | Required DCI showing cost impact for each contract. DCI required anytime cost impact is material. | Requires DCI in format specified by CFAO, provided certain basic information is included. DCI does not need to include every contract if CFAO and contractor can agree on sample and to project results to universe (30.604(e)(2)(i) and 30.605(d)(2)(i)). DCI only required when GDM is not adequate for resolving cost impact (30.604(f)(2) and 30.605(e)(2)). |
| 15. ...... | Provided no information on what constituted increased or decreased cost. | Provides specific information on what constitutes increased and decreased cost. Does not include how to compute increased cost in the aggregate (30.604(h)(3)(iv) and 30.605(h)(6)). Also see Comment 26. |
| 16. ...... | Did not discuss equitable adjustments for required or desirable changes. | States that cost impact computation is used as basis for determining amount of equitable adjustments resulting from required or desirable changes (30.604(h)(4)). |
| | **Interest** | |
| 17. ...... | Does not address use of simple versus compound interest in determining amounts due resulting from increased cost paid on a noncompliance. | Does not address use of simple versus compound interest in determining amounts due resulting from increased cost paid on a noncompliance (30.605(g)). |
| | **Resolving Cost Impacts** | |
| 18. ...... | Requires ACO to coordinate with all PCO's whose contracts will be affected by $10,000 or more. | Requires CFAO to coordinate with all PCO's whose contracts will be affected by $100,000 or more (30.606(a)). |

[redacted]

| Issue | Current FAR rule | Final FAR rule |
|---|---|---|
| 19. ...... | Did not discuss which cost impacts could and could not be combined. | Specifies which cost impacts cannot be combined. Never combine a required change and a unilateral change; a required change and a noncompliance; a desirable change and a unilateral change; a desirable change and a noncompliance (30.606(a)(3)(i)). Never combine, unless all have increased costs, one or more unilateral changes; one or more noncompliances; unilateral changes and noncompliances (30.606(a)(3)(ii)). May treat as a single change any change affecting costs flowing between multiple segments and implementation of a common accounting practice among segments (30.606(a)(3)(iii)). |
| 20. ...... | ACO notifies PCO's of settlement, PCO's issue modifications adjusting contracts. No option other than adjusting contracts. | CFAO settles cost impact by modifying single contract, more than one contract, all contracts, or some alternate method (*e.g.*, adjusting indirect rates) (30.606(a)(2)). In adjusting indirect rates, CFAO must provide for appropriate gross-up to reflect Government participation (30.606(d)(3)(ii)) and can only make adjustments to final indirect cost rates (30.606(d)(3)(i)). |
| | **Subcontract Administration** | |
| 21. ...... | Does not provide for remedies if a subcontractor refuses to submit a required GDM or DCI proposal. | Specifies that remedies are at the prime contract level if a subcontractor refuses to submit a required GDM or DCI proposal (30.607). |
| | **Contract Clause—Administration of CAS** | |
| 22. ...... | Contract clause did not reflect process .......................................... | Contract clause incorporates process (52.230–6). |
| | **Contract Clause—Proposal Disclosure—Cost Accounting Practice Changes** | |
| 23. ...... | No provision to address how to price proposal when contract award will result in a change in accounting practice. | Added a new provision to address how to price proposal when contract award will result in a change in accounting practice (52.230–7). |

This is not a significant regulatory action and, therefore, was not subject to review under Section 6(b) of Executive Order 12866, Regulatory Planning and Review, dated September 30, 1993. This rule is not a major rule under 5 U.S.C. 804.

**D. Regulatory Flexibility Act**

The Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration certify that this final rule will not have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.*, because contracts and subcontracts with small businesses are exempt from all cost accounting standard requirements in accordance with 48 CFR 9903.201–1(b)(3).

**E. Paperwork Reduction Act**

The Paperwork Reduction Act does apply; however, these changes to the FAR do not impose additional information collection requirements to the paperwork burden previously approved under OMB Control Number 9000–0129.

**List of Subjects in 48 CFR Parts 30 and 52**

Government procurement.

Dated: February 24, 2005.

**Rodney P. Lantier,**

*Director, Contract Policy Division.*

■ Therefore, DoD, GSA, and NASA amend 48 CFR parts 30 and 52 as set forth below:

■ 1. The authority citation for 48 CFR parts 30 and 52 is revised to read as follows:

**Authority:** 40 U.S.C. 121(c); 10 U.S.C. chapter 137; and 42 U.S.C. 2473(c).

## PART 30—COST ACCOUNTING STANDARDS ADMINISTRATION

■ 2. Add section 30.001 to read as follows:

**30.001 Definitions.**

As used in this part—

*Affected CAS-covered contract or subcontract* means a contract or subcontract subject to Cost Accounting Standards (CAS) rules and regulations for which a contractor or subcontractor—

(1) Used one cost accounting practice to estimate costs and a changed cost accounting practice to accumulate and report costs under the contract or subcontract; or

(2) Used a noncompliant practice for purposes of estimating or accumulating and reporting costs under the contract or subcontract.

*Cognizant Federal agency official (CFAO)* means the contracting officer assigned by the cognizant Federal agency to administer CAS.

*Desirable change* means a unilateral change to a contractor's established or disclosed cost accounting practices that the CFAO finds is desirable and not detrimental to the Government and is, therefore, not subject to the no increased cost prohibition provisions of CAS-covered contracts and subcontracts affected by the change.

*Fixed-price contracts and subcontracts* means—

(1) Fixed-price contracts and subcontracts described at 16.202, 16.203 (except when price adjustments are based on actual costs of labor or material, described at 16.203–1(a)(2)), and 16.207;

(2) Fixed-price incentive contracts and subcontracts where the price is not adjusted based on actual costs incurred (Subpart 16.4);

(3) Orders issued under indefinite-delivery contracts and subcontracts where final payment is not based on actual costs incurred (Subpart 16.5); and

(4) The fixed-hourly rate portion of time-and-materials and labor-hours

[redacted]

contracts and subcontracts (Subpart 16.6).

*Flexibly-priced contracts and subcontracts* means—

(1) Fixed-price contracts and subcontracts described at 16.203–1(a)(2), 16.204, 16.205, and 16.206;

(2) Cost-reimbursement contracts and subcontracts (Subpart 16.3);

(3) Incentive contracts and subcontracts where the price may be adjusted based on actual costs incurred (Subpart 16.4);

(4) Orders issued under indefinite-delivery contracts and subcontracts where final payment is based on actual costs incurred (Subpart 16.5); and

(5) The materials portion of time-and-materials contracts and subcontracts (Subpart 16.6).

*Noncompliance* means a failure in estimating, accumulating, or reporting costs to—

(1) Comply with applicable CAS; or

(2) Consistently follow disclosed or established cost accounting practices.

*Required change* means—

(1) A change in cost accounting practice that a contractor is required to make in order to comply with a CAS, or a modification or interpretation thereof, that subsequently becomes applicable to an existing CAS-covered contract due to the receipt of another CAS-covered contract or subcontract; or

(2) A prospective change to a disclosed or established cost accounting practice when the CFAO determines that the former practice was in compliance with applicable CAS and the change is necessary for the contractor to remain in compliance.

*Unilateral change* means a change in cost accounting practice from one compliant practice to another compliant practice that a contractor with a CAS-covered contract(s) or subcontract(s) elects to make that has not been deemed a desirable change by the CFAO and for which the Government will pay no aggregate increased costs.

■ 3. Amend section 30.201–3 by adding paragraph (c) to read as follows:

**30.201–3 Solicitation provisions.**

* * * * *

(c) Insert the provision at FAR 52.230–7, Proposal Disclosure—Cost Accounting Practice Changes, in solicitations for contracts subject to CAS as specified in 48 CFR 9903.201 (FAR Appendix).

■ 4. Amend section 30.202–6 by revising paragraphs (b) and (d) to read as follows:

**30.202–6 Responsibilities.**

* * * * *

(b) The contracting officer shall not award a CAS-covered contract until the cognizant Federal agency official (CFAO) has made a written determination that a required Disclosure Statement is adequate unless, in order to protect the Government's interest, the agency head, on a nondelegable basis, authorizes award without obtaining submission of the required Disclosure Statement (see 48 CFR 9903.202–2). In this event, the contractor shall submit the required Disclosure Statement and the CFAO shall make a determination of adequacy as soon as possible after the award.

* * * * *

(d) The CFAO is responsible for issuing determinations of adequacy and compliance of the Disclosure Statement.

■ 5. Revise section 30.202–7 to read as follows:

**30.202–7 Determinations.**

(a) *Adequacy determination.* (1) As prescribed by 48 CFR 9903.202–6 (FAR Appendix), the auditor shall—

(i) Conduct a review of the Disclosure Statement to ascertain whether it is current, accurate, and complete; and

(ii) Report the results to the CFAO.

(2) The CFAO shall determine if the Disclosure Statement adequately describes the contractor's cost accounting practices. Also, the CFAO shall—

(i) If the Disclosure Statement is adequate, notify the contractor in writing, and provide a copy to the auditor with a copy to the contracting officer if the proposal triggers submission of a Disclosure Statement. The notice of adequacy shall state that—

(A) The disclosed practices are adequately described and the CFAO currently is not aware of any additional practices that should be disclosed;

(B) The notice is not a determination that all cost accounting practices were disclosed; and

(C) The contractor shall not consider a disclosed practice, by virtue of such disclosure, an approved practice for estimating proposals or accumulating and reporting contract and subcontract cost data; or

(ii) If the Disclosure Statement is inadequate, notify the contractor of the inadequacies and request a revised Disclosure Statement.

(3) Generally, the CFAO should furnish the contractor notification of adequacy or inadequacy within 30 days after the CFAO receives the Disclosure Statement.

(b) *Compliance determination.* (1) After the notification of adequacy, the auditor shall—

(i) Conduct a detailed compliance review to ascertain whether or not the disclosed practices comply with CAS and Part 31, as applicable; and

(ii) Advise the CFAO of the results.

(2) The CFAO shall make a determination of compliance or take action regarding a report of alleged noncompliance in accordance with 30.605(b). Such action should include requesting a revised Disclosure Statement that corrects the CAS noncompliance. Noncompliances with Part 31 shall be processed separately.

■ 6. Amend section 30.202–8 by revising paragraph (a) to read as follows:

**30.202–8 Subcontractor disclosure statements.**

(a) When the Government requires determinations of adequacy of subcontractor disclosure statements, the CFAO for the subcontractor shall provide this determination to the CFAO for the contractor or next higher-tier subcontractor. The higher-tier CFAO shall not change the determination of the lower-tier CFAO.

* * * * *

■ 7. Revise Subpart 30.6 to read as follows:

## Subpart 30.6—CAS Administration

Sec.

30.601 Responsibility.
30.602 Materiality.
30.603 Changes to disclosed or established cost accounting practices.
30.603–1 Required changes.
30.603–2 Unilateral and desirable changes.
30.604 Processing changes to disclosed or established cost accounting practices.
30.605 Processing noncompliances.
30.606 Resolving cost impacts.
30.607 Subcontract administration.

**30.601 Responsibility.**

(a) The CFAO shall perform CAS administration for all contracts and subcontracts in a business unit, even when the contracting officer retains other administration functions. The CFAO shall make all CAS-related required determinations and findings (*see* Subpart 1.7) for all CAS-covered contracts and subcontracts, including—

(1) Whether a change in cost accounting practice or noncompliance has occurred; and

(2) If a change in cost accounting practice or noncompliance has occurred, how any resulting cost impacts are resolved.

(b) Within 30 days after the award of any new contract subject to CAS, the contracting officer making the award shall request the CFAO to perform administration for CAS matters (see Subpart 42.2). For subcontract awards, the contractor awarding the subcontract must follow the procedures at 52.230–6(b).

[redacted]

**30.602 Materiality.**

(a) In determining materiality, the CFAO shall use the criteria in 48 CFR 9903.305 (FAR Appendix).

(b) A CFAO determination of materiality—

(1) May be made before or after a general dollar magnitude proposal has been submitted, depending on the particular facts and circumstances; and

(2) Shall be based on adequate documentation.

(c) When the CFAO determines the cost impact is immaterial, the CFAO shall—

(1) Make no contract adjustments and conclude the cost impact process;

(2) Document the rationale for the determination; and

(3) In the case of noncompliance issues, inform the contractor that—

(i) The noncompliance should be corrected; and

(ii) If the noncompliance is not corrected, the Government reserves the right to make appropriate contract adjustments should the cost impact become material in the future.

(d) For required, unilateral, and desirable changes, and CAS noncompliances, when the amount involved is material, the CFAO shall adjust the contract or use another suitable method (*see* 30.606).

**30.603 Changes to disclosed or established cost accounting practices.**

**30.603–1 Required changes.**

(a) *General.* Offerors shall state whether or not the award of a contract would require a change to an established cost accounting practice affecting existing contracts and subcontracts (*see* 52.230–1). The contracting officer shall notify the CFAO if the offeror states that a change in cost accounting practice would be required.

(b) *CFAO responsibilities.* Prior to making an equitable adjustment under the applicable paragraph(s) that address a required change at 52.230–2, Cost Accounting Standards; 52.230–3, Disclosure and Consistency of Cost Accounting Practices; or 52.230–5, Cost Accounting Standards—yEducational Institution, the CFAO shall determine that—

(1) The cost accounting practice change is required to comply with a CAS, or a modification or interpretation thereof, that subsequently became applicable to one or more contracts or subcontracts; or

(2) The former cost accounting practice was in compliance with applicable CAS and the change is necessary to remain in compliance.

(c) *Notice and proposal preparation.* (1) When the award of a contract would require a change to an established cost accounting practice, the provision at 52.230–7, Proposal Disclosure—Cost Accounting Practice Changes, requires the offeror to—

(i) Prepare the contract pricing proposal in response to the solicitation using the changed cost accounting practice for the period of performance for which the practice will be used; and

(ii) Submit a description of the changed cost accounting practice to the contracting officer and the CFAO as pricing support for the proposal.

(2) When a change is required to remain in compliance (for reasons other than a contract award) or to comply with a new or modified standard, the clause at 52.230–6, Administration of Cost Accounting Standards, requires the contractor to—

(i) Submit a description of the change to the CFAO not less than 60 days (or other mutually agreeable date) before implementation of the change; and

(ii) Submit rationale to support any contractor written statement that the cost impact of the change is immaterial.

(d) *Equitable adjustments for new or modified standards.* (1) Required changes made to comply with new or modified standards may require equitable adjustments, but only to those contracts awarded before the effective date of the new or modified standard (*see* 52.230–2, 52.230–3, or 52.230–5).

(2) When a contractor elects to implement a required change to comply with a new or modified standard prior to the applicability date of the standard, the CFAO shall administer the change as a unilateral change (*see* 30.603–2). Contractors shall not receive an equitable adjustment that will result in increased costs in the aggregate to the Government prior to the applicability date unless the CFAO determines that the unilateral change is a desirable change.

**30.603–2 Unilateral and desirable changes.**

(a) *Unilateral changes.* (1) The contractor may unilaterally change its disclosed or established cost accounting practices, but the Government shall not pay any increased cost, in the aggregate, as a result of the unilateral change.

(2) Prior to making any contract price or cost adjustments under the applicable paragraph(s) addressing a unilateral change at 52.230–2, 52.230–3, or 52.230–5, the CFAO shall determine that—

(i) The contemplated contract price or cost adjustments will protect the Government from the payment of the estimated increased costs, in the aggregate; and

(ii) The net effect of the contemplated adjustments will not result in the recovery of more than the increased costs to the Government, in the aggregate.

(b) *Desirable changes.* (1) Prior to taking action under the applicable paragraph(s) addressing a desirable change at 52.230–2, 52.230–3, or 52.230–5, the CFAO shall determine the change is a desirable change and not detrimental to the interests of the Government.

(2) Until the CFAO has determined a change to a cost accounting practice is a desirable change, the change is a unilateral change.

(3) Some factors to consider in determining if a change is desirable include, but are not limited to, whether—

(i) The contractor must change the cost accounting practices it uses for Government contract and subcontract costing purposes to remain in compliance with the provisions of Part 31;

(ii) The contractor is initiating management actions directly associated with the change that will result in cost savings for segments with CAS-covered contracts and subcontracts over a period for which forward pricing rates are developed or 5 years, whichever is shorter, and the cost savings are reflected in the forward pricing rates; and

(iii) Funds are available if the determination would necessitate an upward adjustment of contract cost or price.

(c) *Notice and proposal preparation.* (1) When a contractor makes a unilateral change, the clause at 52.230–6, Administration of Cost Accounting Standards, requires the contractor to—

(i) Submit a description of the change to the CFAO not less than 60 days (or other mutually agreeable date) before implementation of the change; and

(ii) Submit rationale to support any contractor written statement that the cost impact of the change is immaterial.

(2) If a contractor implements the change in cost accounting practice without submitting the notice as required in paragraph (c)(1) of this subsection, the CFAO may determine the change a failure to follow a cost accounting practice consistently and process it as a noncompliance in accordance with 30.605.

(d) *Retroactive changes.* (1) If a contractor requests that a unilateral change be retroactive, the contractor shall submit supporting rationale.

[redacted]

(2) The CFAO shall promptly evaluate the contractor's request and shall, as soon as practical, notify the contractor in writing whether the request is or is not approved.

(3) The CFAO shall not approve a date for the retroactive change that is before the beginning of the contractor's fiscal year in which the request is made.

(e) *Contractor accounting changes due to external restructuring activities.* The requirements for contract price and cost adjustments do not apply to compliant cost accounting practice changes that are directly associated with external restructuring activities that are subject to and meet the requirements of 10 U.S.C. 2325. However, the disclosure requirements in 52.230–6(b) shall be followed.

**30.604 Processing changes to disclosed or established cost accounting practices.**

(a) *Scope.* This section applies to required, unilateral, and desirable changes in cost accounting practices.

(b) *Procedures.* Upon receipt of the contractor's notification and description of the change in cost accounting practice, the CFAO, with the assistance of the auditor, should review the proposed change concurrently for adequacy and compliance. The CFAO shall—

(1) If the description of the change is both adequate and compliant, notify the contractor in writing and—

(i) For required or unilateral changes (except those requested to be determined desirable changes), request the contractor submit a general dollar magnitude (GDM) proposal by a specified date, unless the CFAO determines the cost impact is immaterial; or

(ii) For unilateral changes that the contractor requests to be determined desirable changes, inform the contractor that the request shall include supporting rationale and—

(A) For any request based on the criteria in 30.603–2(b)(3)(ii), the data necessary to demonstrate the required cost savings; or

(B) For any request other than those based on the criteria in 30.603–2(b)(3)(ii), a GDM proposal and any other data necessary for the CFAO to determine if the change is a desirable change;

(2) If the description of the change is inadequate, request a revised description of the new cost accounting practice; and

(3) If the disclosed practice is noncompliant, notify the contractor in writing that, if implemented, the CFAO will determine the cost accounting practice to be noncompliant and process it accordingly.

(c) *Evaluating requests for desirable changes.* (1) When a contractor requests a unilateral change be determined a desirable change, the CFAO shall promptly evaluate the contractor's request and, as soon as practical, notify the contractor in writing whether the change is a desirable change or the request is denied.

(2) If the CFAO determines the change is a desirable change, the CFAO shall negotiate any cost or price adjustments that may be needed to resolve the cost impact (see 30.606).

(3) If the request is denied, the change is a unilateral change and shall be processed accordingly.

(d) *General dollar magnitude proposal.* The GDM proposal—

(1) Provides information to the CFAO on the estimated overall impact of a change in cost accounting practice on affected CAS-covered contracts and subcontracts that were awarded based on the previous cost accounting practice;

(2) Assists the CFAO in determining whether individual contract price or cost adjustments are required; and

(3) The contractor may submit a detailed cost-impact (DCI) proposal in lieu of a GDM proposal provided the DCI proposal is in accordance with paragraph (g) of this section.

(e) *General dollar magnitude proposal content.* The GDM proposal—

(1) Shall calculate the cost impact in accordance with paragraph (h) of this section;

(2) May use one or more of the following methods to determine the increase or decrease in cost accumulations:

(i) A representative sample of affected CAS-covered contracts and subcontracts.

(ii) The change in indirect rates multiplied by the total estimated base computed for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(iii) Any other method that provides a reasonable approximation of the total increase or decrease in cost accumulations for all affected fixed-price and flexibly-priced contracts and subcontracts.

(3) May be in any format acceptable to the CFAO but, as a minimum, shall include the following data:

(i) A general dollar magnitude estimate of the total increase or decrease in cost accumulations by Executive agency, including any impact the change may have on contract and subcontract incentives, fees, and profits, for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(ii) For unilateral changes, the increased or decreased costs to the Government for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts; and

(4) When requested by the CFAO, shall identify all affected CAS-covered contracts and subcontracts.

(f) *General dollar magnitude proposal evaluation.* The CFAO, with the assistance of the auditor, shall promptly evaluate the GDM proposal. If the cost impact is immaterial, the CFAO shall notify the contractor in writing and conclude the cost-impact process with no contract adjustments. Otherwise, the CFAO shall—

(1) Negotiate and resolve the cost impact (see 30.606). If necessary, the CFAO may request that the contractor submit a revised GDM proposal by a specified date with specific additional data needed to resolve the cost impact (*e.g.,* an expanded sample of affected CAS-covered contracts and subcontracts or a revised method of computing the increase or decrease in cost accumulations); or

(2) Request that the contractor submit a DCI proposal by a specified date if the CFAO determines that the GDM proposal is not sufficient to resolve the cost impact.

(g) *Detailed cost-impact proposal.* The DCI proposal—

(1) Shall calculate the cost impact in accordance with paragraph (h) of this section;

(2) Shall show the estimated increase or decrease in cost accumulations for each affected CAS-covered contract and subcontract unless the CFAO and contractor agree to—

(i) Include only those affected CAS-covered contracts and subcontracts exceeding a specified amount; and

(ii) Estimate the total increase or decrease in cost accumulations for all affected CAS-covered contracts and subcontracts, using the results in paragraph (g)(2)(i) of this section;

(3) May be in any format acceptable to the CFAO but, as a minimum, shall include the requirements at paragraphs (e)(3)(i) and (ii) of this section; and

(4) When requested by the CFAO, shall identify all affected contracts and subcontracts.

(h) *Calculating cost impacts.* The cost impact calculation shall—

[redacted]

(1) Include all affected CAS-covered contracts and subcontracts regardless of their status (*i.e.,* open or closed) or the fiscal year(s) in which the costs are incurred (*i.e.,* whether or not the final indirect rates have been established);

(2) Combine the cost impact for all affected CAS-covered contracts and subcontracts for all segments if the effect of a change results in costs flowing between those segments;

(3) For unilateral changes—

(i) Determine the increased or decreased cost to the Government for flexibly-priced contracts and subcontracts as follows:

(A) When the estimated cost to complete using the changed practice exceeds the estimated cost to complete using the current practice, the difference is increased cost to the Government.

(B) When the estimated costs to complete using the changed practice is less than the estimated cost to complete using the current practice, the difference is decreased cost to the Government.

(ii) Determine the increased or decreased cost to the Government for fixed-price contracts and subcontracts as follows:

(A) When the estimated cost to complete using the changed practice is less than the estimated cost to complete using the current practice, the difference is increased cost to the Government.

(B) When the estimated cost to complete using the changed practice exceeds the estimated cost to complete using the current practice, the difference is decreased cost to the Government.

(iii) Calculate the total increase or decrease in contract and subcontract incentives, fees, and profits associated with the increased or decreased cost to the Government in accordance with 48 CFR 9903.306(c). The associated increase or decrease is based on the difference between the negotiated incentives, fees and profits and the amounts that would have been negotiated had the cost impact been known at the time the contracts and subcontracts were negotiated.

(iv) Calculate the increased cost to the Government in the aggregate.

(4) For equitable adjustments for required or desirable changes—

(i) Estimated increased cost accumulations are the basis for increasing contract prices, target prices and cost ceilings; and

(ii) Estimated decreased cost accumulations are the basis for decreasing contract prices, target prices and cost ceilings.

(i) *Remedies.* If the contractor does not submit the accounting change description or the proposals required in paragraph (d) or (g) of this section within the specified time, or any extension granted by the CFAO, the CFAO shall—

(1) With the assistance of the auditor, estimate the general dollar magnitude of the cost impact on affected CAS-covered contracts and subcontracts; and

(2) Take one or both of the following actions:

(i) Withhold an amount not to exceed 10 percent of each subsequent payment related to the contractor's CAS-covered contracts (up to the estimated general dollar magnitude of the cost impact), until the contractor furnishes the required information.

(ii) Issue a final decision in accordance with 33.211 and unilaterally adjust the contract(s) by the estimated amount of the cost impact.

**30.605 Processing noncompliances.**

(a) *General.* Prior to making any contract price or cost adjustments under the applicable paragraph(s) addressing noncompliance at 52.230–2, 52.230–3, or 52.230–5, the CFAO shall determine that—

(1) The contemplated contract price or cost adjustments will protect the Government from the payment of increased costs, in the aggregate;

(2) The net effect of the contemplated contract price or cost adjustments will not result in the recovery of more than the increased costs to the Government, in the aggregate;

(3) The net effect of any invoice adjustments made to correct an estimating noncompliance will not result in the recovery of more than the increased costs paid by the Government, in the aggregate; and

(4) The net effect of any interim and final voucher billing adjustments made to correct a cost accumulation noncompliance will not result in the recovery of more than the increased cost paid by the Government, in the aggregate.

(b) *Notice and determination.* (1) Within 15 days of receiving a report of alleged noncompliance from the auditor, the CFAO shall—

(i) Notify the auditor that the CFAO disagrees with the alleged noncompliance; or

(ii) Issue a notice of potential noncompliance to the contractor and provide a copy to the auditor.

(2) The notice of potential noncompliance shall—

(i) Notify the contractor in writing of the exact nature of the noncompliance; and

(ii) Allow the contractor 60 days or other mutually agreeable date to—

(A) Agree or submit reasons why the contractor considers the existing practices to be in compliance; and

(B) Submit rationale to support any written statement that the cost impact of the noncompliance is immaterial.

(3) The CFAO shall—

(i) If applicable, review the reasons why the contractor considers the existing practices to be compliant or the cost impact to be immaterial;

(ii) Make a determination of compliance or noncompliance consistent with 1.704; and

(iii) Notify the contractor and the auditor in writing of the determination of compliance or noncompliance and the basis for the determination.

(4) If the CFAO makes a determination of noncompliance, the CFAO shall follow the procedures in paragraphs (c) through (h) of this section, as appropriate, unless the CFAO also determines the cost impact is immaterial. If immaterial, the CFAO shall—

(i) Inform the contractor in writing that—

(A) The noncompliance should be corrected; and

(B) If the noncompliance is not corrected, the Government reserves the right to make appropriate contract adjustments should the noncompliance become material in the future; and

(ii) Conclude the cost-impact process with no contract adjustments.

(c) *Correcting noncompliances.* (1) The clause at 52.230–6 requires the contractor to submit a description of any cost accounting practice change needed to correct a noncompliance within 60 days after the earlier of—

(i) Agreement with the CFAO that there is a noncompliance; or

(ii) Notification by the CFAO of a determination of noncompliance.

(2) The CFAO, with the assistance of the auditor, should review the proposed change to correct the noncompliance concurrently for adequacy and compliance (see 30.202–7). The CFAO shall—

(i) When the description of the change is both adequate and compliant—

(A) Notify the contractor in writing;

(B) Request that the contractor submit by a specified date a general dollar magnitude (GDM) proposal, unless the CFAO determines the cost impact is immaterial; and

(C) Follow the procedures at paragraph (b)(4) of this section if the CFAO determines the cost impact is immaterial.

(ii) If the description of the change is inadequate, request a revised description of the new cost accounting practice; or

(iii) If the disclosed practice is noncompliant, notify the contractor in writing that, if implemented, the CFAO

[redacted]

will determine the cost accounting practice to be noncompliant and process it accordingly.

(d) *General dollar magnitude proposal content.* The GDM proposal—

(1) Shall calculate the cost impact in accordance with paragraph (h) of this section;

(2) May use one or more of the following methods to determine the increase or decrease in contract and subcontract price or cost accumulations, as applicable:

(i) A representative sample of affected CAS-covered contracts and subcontracts affected by the noncompliance.

(ii) When the noncompliance involves cost accumulation, the change in indirect rates multiplied by the applicable base for flexibly-priced contracts and subcontracts.

(iii) Any other method that provides a reasonable approximation of the total increase or decrease in contract and subcontract prices and cost accumulations;

(3) The contractor may submit a DCI proposal in lieu of a GDM proposal provided the DCI proposal is in accordance with paragraph (f) of this section.

(4) May be in any format acceptable to the CFAO but, as a minimum, shall include the following data:

(i) The total increase or decrease in contract and subcontract prices and cost accumulations, as applicable, by Executive agency, including any impact the noncompliance may have on contract and subcontract incentives, fees, and profits, for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(ii) The increased or decreased costs to the Government for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(iii) The total overpayments and underpayments for fixed-price and flexibly-priced contracts made by the Government during the period of noncompliance; and

(5) When requested by the CFAO, shall identify all affected CAS-covered contracts and subcontracts.

(e) *General dollar magnitude proposal evaluation.* The CFAO shall promptly evaluate the GDM proposal. If the cost impact is immaterial, the CFAO shall follow the requirements in paragraph (b)(4) of this section. Otherwise, the CFAO shall—

(1) Negotiate and resolve the cost impact (see 30.606). If necessary, the CFAO may request the contractor submit a revised GDM proposal by a specified date, with specific additional data needed to resolve the cost impact (*e.g.*, an expanded sample of affected CAS-covered contracts and subcontracts or a revised method of computing the increase or decrease in contract and subcontract price and cost accumulations); or

(2) Request that the contractor submit a DCI proposal by a specified date if the CFAO determines that the GDM proposal is not sufficient to resolve the cost impact.

(f) *Detailed cost-impact proposal.* The DCI proposal—

(1) Shall calculate the cost impact in accordance with paragraph (h) of this section.

(2) Shall show the increase or decrease in price and cost accumulations, as applicable for each affected CAS-covered contract and subcontract unless the CFAO and contractor agree to—

(i) Include only those affected CAS-covered contracts and subcontracts having—

(A) Contract and subcontract values exceeding a specified amount when the noncompliance involves estimating costs; and

(B) Incurred costs exceeding a specified amount when the noncompliance involves accumulating costs; and

(ii) Estimate the total increase or decrease in price and cost accumulations for all affected CAS-covered contracts and subcontracts using the results in paragraph (f)(2)(i) of this section;

(3) May be in any format acceptable to the CFAO but, as a minimum, shall include the information in paragraph (d)(4) of this section; and

(4) When requested by the CFAO, shall identify all affected CAS-covered contracts and subcontracts.

(g) *Interest.* The CFAO shall—

(1) Separately identify interest on any increased cost paid, in the aggregate, as a result of the noncompliance;

(2) Compute interest from the date of overpayment to the date of repayment using the rate specified in 26 U.S.C. 6621(a)(2).

(h) *Calculating cost impacts.* The cost impact calculation shall—

(1) Include all affected CAS-covered contracts and subcontracts regardless of their status (*i.e.*, open or closed) or the fiscal year in which the costs are incurred (*i.e.*, whether or not the final indirect cost rates have been established);

(2) Combine the cost impact for all affected CAS-covered contracts and subcontracts for all segments if the effect of a change results in costs flowing between those segments;

(3) For noncompliances that involve estimating costs, determine the increased or decreased cost to the Government for fixed-price contracts and subcontracts as follows:

(i) When the negotiated contract or subcontract price exceeds what the negotiated price would have been had the contractor used a compliant practice, the difference is increased cost to the Government.

(ii) When the negotiated contract or subcontract price is less than what the negotiated price would have been had the contractor used a compliant practice, the difference is decreased cost to the Government;

(4) For noncompliances that involve accumulating costs, determine the increased or decreased cost to the Government for flexibly-priced contracts and subcontracts as follows:

(i) When the costs that were accumulated under the noncompliant practice exceed the costs that would have been accumulated using a compliant practice (from the time the noncompliant practice was first implemented until the date the noncompliant practice was replaced with a compliant practice), the difference is increased cost to the Government.

(ii) When the costs that were accumulated under the noncompliant practice are less than the costs that would have been accumulated using a compliant practice (from the time the noncompliant practice was first implemented until the date the noncompliant practice was replaced with a compliant practice) the difference is decreased cost to the Government;

(5) Calculate the total increase or decrease in contract and subcontract incentives, fees, and profits associated with the increased or decreased costs to the Government in accordance with 48 CFR 9903.306(c). The associated increase or decrease is based on the difference between the negotiated incentives, fees, and profits and the amounts that would have been negotiated had the contractor used a compliant practice; and

(6) Calculate the increased cost to the Government in the aggregate.

(i) *Remedies.* If the contractor does not correct the noncompliance or submit the proposal required in paragraph (d) or (f) of this section within the specified time, or any extension granted by the CFAO, the CFAO shall follow the procedures at 30.604(i).

[redacted]

**30.606 Resolving cost impacts.**

(a) *General.* (1) The CFAO shall coordinate with the affected contracting officers before negotiating and resolving the cost impact when the estimated cost impact on any of their contracts is at least $100,000. However, the CFAO has the sole authority for negotiating and resolving the cost impact.

(2) The CFAO may resolve a cost impact attributed to a change in cost accounting practice or a noncompliance by adjusting a single contract, several but not all contracts, all contracts, or any other suitable method.

(3) In resolving the cost impact, the CFAO—

(i) Shall not combine the cost impacts of any of the following:

(A) A required change and a unilateral change.

(B) A required change and a noncompliance.

(C) A desirable change and a unilateral change.

(D) A desirable change and a noncompliance.

(ii) Shall not combine the cost impacts of any of the following unless all of the cost impacts are increased costs to Government:

(A) One or more unilateral changes.

(B) One or more noncompliances.

(C) Unilateral changes and noncompliances; and

(iii) May consider the cost impacts of a unilateral change affecting two or more segments to be a single change if—

(A) The change affects the flow of costs between segments; or

(B) Implements a common cost accounting practice for two or more segments.

(4) For desirable changes, the CFAO should consider the estimated cost impact of associated management actions on contract costs in resolving the cost impact.

(b) *Negotiations.* The CFAO shall—

(1) Negotiate and resolve the cost impact on behalf of all Government agencies; and

(2) At the conclusion of negotiations, prepare a negotiation memorandum and send copies to the auditor and affected contracting officers.

(c) *Contract adjustments.* (1) The CFAO may adjust some or all contracts with a material cost impact, subject to the provisions in paragraphs (c)(2) through (c)(6) of this section.

(2) In selecting the contract or contracts to be adjusted, the CFAO should assure, to the maximum extent practical and subject to the provisions in paragraphs (c)(3) through (c)(6) of this section, that the adjustments reflect a *pro rata* share of the cost impact based on the ratio of the cost impact of each Executive agency to the total cost impact.

(3) For unilateral changes and noncompliances, the CFAO shall—

(i) To the maximum extent practical, not adjust the price upward for fixed-price contracts;

(ii) If contract adjustments are made, preclude payment of aggregate increased costs by taking one or both of the following actions:

(A) Reduce the contract price on fixed-price contracts.

(B) Disallow costs on flexibly-priced contracts; and

(iii) The CFAO may, in consultation with the affected contracting officers, increase or decrease individual contract prices, including contract cost ceilings or target costs on flexibly-priced contracts. In such cases, the CFAO shall limit any upward contract price adjustments on affected contracts to the amount of downward price adjustments to other affected contracts, *i.e.*, the aggregate price of all contracts affected by a unilateral change shall not be increased (48 CFR 9903.201–6(b)).

(4) For noncompliances that involve estimating costs, the CFAO—

(i) Shall, to the extent practical, not adjust the price upward for fixed-price contracts;

(ii) Shall, if contract adjustments are made, preclude payment of aggregate increased costs by reducing the contract price on fixed-price contracts;

(iii) May, in consultation with the affected contracting officers, increase or decrease individual contract prices, including costs ceilings or target costs on flexibly-priced contracts. In such cases, the CFAO shall limit any upward contract price adjustments to affected contracts to the amount of downward price adjustments to other affected contracts, *i.e.*, the aggregate price of all contracts affected by a noncompliance that involves estimating costs shall not be increased (48 CFR 9903.201–6(d));

(iv) Shall require the contractor to correct the noncompliance, *i.e.*, ensure that compliant cost accounting practices will now be utilized to estimate proposed contract costs; and

(v) Shall require the contractor to adjust any invoices that were paid based on noncompliant contract prices to reflect the adjusted contract prices, after any contract price adjustments are made to resolve the noncompliance.

(5) For noncompliances that involve cost accumulation, the CFAO—

(i) Shall require the contractor to—

(A) Correct noncompliant contract cost accumulations in the contractor's cost accounting records for affected contracts to reflect compliant contract cost accumulations; and

(B) Adjust interim payment requests (public vouchers and/or progress payments) and final vouchers to reflect the difference between the costs paid using the noncompliant practice and the costs that should have been paid using the compliant practice; or

(ii) Shall adjust contract prices. In adjusting contract prices, the CFAO shall preclude payment of aggregate increased costs by disallowing costs on flexibly-priced contracts.

(A) The CFAO may, in consultation with the affected contracting officers, increase or decrease individual contract prices, including costs ceilings or target costs on flexibly-priced contracts. In such cases, the CFAO shall limit any upward contract price adjustments to affected contracts to the amount of downward price adjustments to other affected contracts, *i.e.*, the aggregate price of all contracts affected by a noncompliance that involves cost accumulation shall not be increased (48 CFR 9903.201–6(d)).

(B) Shall require the contractor to—

(*1*) Correct contract cost accumulations in the contractor's cost accounting records to reflect the contract price adjustments; and

(*2*) Adjust interim payment requests (public vouchers and/or progress payments) and final vouchers to reflect the contract price adjustments.

(6) When contract adjustments are made, the CFAO shall—

(i) Execute the bilateral modifications if the CFAO and contractor agree on the amount of the cost impact and the adjustments (see 42.302(a)(11)(iv)); or

(ii) When the CFAO and contractor do not agree on the amount of the cost impact or the contract adjustments, issue a final decision in accordance with 33.211 and unilaterally adjust the contract(s).

(d) *Alternate methods.* (1) The CFAO may use an alternate method instead of adjusting contracts to resolve the cost impact, provided the Government will not pay more, in the aggregate, than would be paid if the CFAO did not use the alternate method and the contracting parties agree on the use of that alternate method.

(2) The CFAO may not use an alternate method for contracts when application of the alternate method to contracts would result in—

(i) An under recovery of monies by the Government (*e.g.*, due to cost overruns); or

(ii) Distortions of incentive provisions and relationships between target costs, ceiling costs, and actual costs for incentive type contracts.

[redacted]

(3) When using an alternate method that excludes the costs from an indirect cost pool, the CFAO shall—

(i) Apply such exclusion only to the determination of final indirect cost rates (*see* 42.705); and

(ii) Adjust the exclusion to reflect the Government participation rate for flexibly-priced contracts and subcontracts. For example, if there are aggregate increased costs to the Government of $100,000, and the indirect cost pool where the adjustment is to be effected has a Government participation rate of 50 percent for flexibly-priced contracts and subcontracts, the contractor shall exclude $200,000 from the indirect cost pool ($100,000/50% = $200,000).

**30.607 Subcontract administration.**

When a negotiated CAS price adjustment or a determination of noncompliance is required at the subcontract level, the CFAO for the subcontractor shall furnish a copy of the negotiation memorandum or the determination to the CFAO for the contractor of the next higher-tier subcontractor. The CFAO of the contractor or the next higher-tier subcontractor shall not change the determination of the CFAO for the lower-tier subcontractor. If the subcontractor refuses to submit a GDM or DCI proposal, remedies are made at the prime contractor level.

## PART 52—SOLICITATION PROVISIONS AND CONTRACT CLAUSES

■ 8. Revise section 52.230–6 to read as follows:

**52.230–6 Administration of Cost Accounting Standards.**

As prescribed in 30.201–4(d)(1), insert the following clause:

**Administration of Cost Accounting Standards (April 2005)**

For the purpose of administering the Cost Accounting Standards (CAS) requirements under this contract, the Contractor shall take the steps outlined in paragraphs (b) through (i) and (k) through (n) of this clause:

(a) *Definitions.* As used in this clause—

*Affected CAS-covered contract or subcontract* means a contract or subcontract subject to CAS rules and regulations for which a Contractor or subcontractor—

(1) Used one cost accounting practice to estimate costs and a changed cost accounting practice to accumulate and report costs under the contract or subcontract; or

(2) Used a noncompliant practice for purposes of estimating or accumulating and reporting costs under the contract or subcontract.

*Cognizant Federal agency official (CFAO)* means the Contracting Officer assigned by the cognizant Federal agency to administer the CAS.

*Desirable change* means a compliant change to a Contractor's established or disclosed cost accounting practices that the CFAO finds is desirable and not detrimental to the Government and is, therefore, not subject to the no increased cost prohibition provisions of CAS-covered contracts and subcontracts affected by the change.

*Fixed-price contracts and subcontracts* means—

(1) Fixed-price contracts and subcontracts described at FAR 16.202, 16.203, (except when price adjustments are based on actual costs of labor or material, described at 16.203–1(a)(2)), and 16.207;

(2) Fixed-price incentive contracts and subcontracts where the price is not adjusted based on actual costs incurred (FAR Subpart 16.4);

(3) Orders issued under indefinite-delivery contracts and subcontracts where final payment is not based on actual costs incurred (FAR Subpart 16.5); and

(4) The fixed-hourly rate portion of time-and-materials and labor-hours contracts and subcontracts (FAR Subpart 16.6).

*Flexibly-priced contracts and subcontracts* means—

(1) Fixed-price contracts and subcontracts described 16.203–1(a)(2) at FAR 16.204, 16.205, and 16.206;

(2) Cost-reimbursement contracts and subcontracts (FAR Subpart 16.3);

(3) Incentive contracts and subcontracts where the price may be adjusted based on actual costs incurred (FAR Subpart 16.4);

(4) Orders issued under indefinite-delivery contracts and subcontracts where final payment is based on actual costs incurred (FAR Subpart 16.5); and

(5) The materials portion of time-and-materials contracts and subcontracts (FAR Subpart 16.6).

*Noncompliance* means a failure in estimating, accumulating, or reporting costs to—

(1) Comply with applicable CAS; or

(2) Consistently follow disclosed or established cost accounting practices.

*Required change* means—

(1) A change in cost accounting practice that a Contractor is required to make in order to comply with a CAS, or a modification or interpretation thereof, that subsequently becomes applicable to existing CAS-covered contracts or subcontracts due to the receipt of another CAS-covered contract or subcontract; or

(2) A prospective change to a disclosed or established cost accounting practice when the CFAO determines that the former practice was in compliance with applicable CAS and the change is necessary for the Contractor to remain in compliance.

*Unilateral change* means a change in cost accounting practice from one compliant practice to another compliant practice that a Contractor with a CAS-covered contract(s) or subcontract(s) elects to make that has not been deemed a desirable change by the CFAO and for which the Government will pay no aggregate increased costs.

(b) Submit to the CFAO a description of any cost accounting practice change as outlined in paragraphs (b)(1) through (3) of this clause (including revisions to the Disclosure Statement, if applicable), and any written statement that the cost impact of the change is immaterial. If a change in cost accounting practice is implemented without submitting the notice required by this paragraph, the CFAO may determine the change to be a failure to follow paragraph (a)(2) of the clause at FAR 52.230–2, Cost Accounting Standards; paragraph (a)(4) of the clause at FAR 52.230–3, Disclosure and Consistency of Cost Accounting Practices; or paragraph (a)(2) of the clause at FAR 52.230–5, Cost Accounting Standards—Educational Institution.

(1) When a description has been submitted for a change in cost accounting practice that is dependent on a contact award and that contract is subsequently awarded, notify the CFAO within 15 days after such award.

(2) For any change in cost accounting practice not covered by (b)(1) of this clause that is required in accordance with paragraphs (a)(3) and (a)(4)(i) of the clause at FAR 52.230–2; or paragraphs (a)(3), (a)(4)(i), or (a)(4)(iv) of the clause at FAR 52.230–5; submit a description of the change to the CFAO not less than 60 days (or such other date as may be mutually agreed to by the CFAO and the Contractor) before implementation of the change.

(3) For any change in cost accounting practices proposed in accordance with paragraph (a)(4)(ii) or (iii) of the clauses at FAR 52.230–2 and FAR 52.230–5; or with paragraph (a)(3) of the clause at FAR 52.230–3, submit a description of the change not less than 60 days (or such other date as may be mutually agreed to by the CFAO and the Contractor) before implementation of the change. If the change includes a proposed retroactive date submit supporting rationale.

(4) Submit a description of the change necessary to correct a failure to comply with an applicable CAS or to follow a disclosed practice (as contemplated by paragraph (a)(5) of the clause at FAR 52.230–2 and FAR 52.230–5; or by paragraph (a)(4) of the clause at FAR 52.230–3)—

(i) Within 60 days (or such other date as may be mutually agreed to by the CFAO and the Contractor) after the date of agreement with the CFAO that there is a noncompliance; or

(ii) In the event of Contractor disagreement, within 60 days after the CFAO notifies the Contractor of the determination of noncompliance.

(c) When requested by the CFAO, submit on or before a date specified by the CFAO—

(1) A general dollar magnitude (GDM) proposal in accordance with paragraph (d) or (g) of this clause. The Contractor may submit a detailed cost-impact (DCI) proposal in lieu of the requested GDM proposal provided the DCI proposal is in accordance with paragraph (e) or (h) of this clause;

(2) A detailed cost-impact (DCI) proposal in accordance with paragraph (e) or (h) of this clause;

(3) For any request for a desirable change that is based on the criteria in FAR 30.603–2(b)(3)(ii), the data necessary to demonstrate the required cost savings; and

(4) For any request for a desirable change that is based on criteria other than that in

[redacted]

FAR 30.603–2(b)(3)(ii), a GDM proposal and any other data necessary for the CFAO to determine if the change is a desirable change.

(d) For any change in cost accounting practice subject to paragraph (b)(1), (b)(2), or (b)(3) of this clause, the GDM proposal shall—

(1) Calculate the cost impact in accordance with paragraph (f) of this clause;

(2) Use one or more of the following methods to determine the increase or decrease in cost accumulations:

(i) A representative sample of affected CAS-covered contracts and subcontracts.

(ii) The change in indirect rates multiplied by the total estimated base computed for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(iii) Any other method that provides a reasonable approximation of the total increase or decrease in cost accumulations for all affected fixed-price and flexibly-priced contracts and subcontracts;

(3) Use a format acceptable to the CFAO but, as a minimum, include the following data:

(i) The estimated increase or decrease in cost accumulations by Executive agency, including any impact the change may have on contract and subcontract incentives, fees, and profits, for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(ii) For unilateral changes, the increased or decreased costs to the Government for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts; and

(4) When requested by the CFAO, identify all affected CAS-covered contracts and subcontracts.

(e) For any change in cost accounting practice subject to paragraph (b)(1), (b)(2), or (b)(3) of this clause, the DCI proposal shall—

(1) Show the calculation of the cost impact in accordance with paragraph (f) of this clause;

(2) Show the estimated increase or decrease in cost accumulations for each affected CAS-covered contract and subcontract unless the CFAO and Contractor agree to include—

(i) Only those affected CAS-covered contracts and subcontracts having an estimate to complete exceeding a specified amount; and

(ii) An estimate of the total increase or decrease in cost accumulations for all affected CAS-covered contracts and subcontracts, using the results in paragraph (e)(2)(i) of this clause;

(3) Use a format acceptable to the CFAO but, as a minimum, include the information in paragraph (d)(3) of this clause; and

(4) When requested by the CFAO, identify all affected CAS-covered contracts and subcontracts.

(f) For GDM and DCI proposals that are subject to the requirements of paragraph (d) or (e) of this clause, calculate the cost impact as follows:

(1) The cost impact calculation shall include all affected CAS-covered contracts and subcontracts regardless of their status (*i.e.*, open or closed) or the fiscal year in which the costs were incurred (*i.e.*, whether or not the final indirect rates have been established).

(2) For unilateral changes—

(i) Determine the increased or decreased cost to the Government for flexibly-priced contracts and subcontracts as follows:

(A) When the estimated cost to complete using the changed practice exceeds the estimated cost to complete using the current practice, the difference is increased cost to the Government.

(B) When the estimated cost to complete using the changed practice is less than the estimated cost to complete using the current practice, the difference is decreased cost to the Government;

(ii) Determine the increased or decreased cost to the Government for fixed-priced contracts and subcontracts as follows:

(A) When the estimated cost to complete using the changed practice is less than the estimated cost to complete using the current practice, the difference is increased cost to the Government.

(B) When the estimated cost to complete using the changed practice exceeds the estimated cost to complete using the current practice, the difference is decreased cost to the Government;

(iii) Calculate the total increase or decrease in contract and subcontract incentives, fees, and profits associated with the increased or decreased costs to the Government in accordance with 48 CFR 9903.306(c). The associated increase or decrease is based on the difference between the negotiated incentives, fees, and profits and the amounts that would have been negotiated had the cost impact been known at the time the contracts and subcontracts were negotiated; and

(iv) Calculate the increased cost to the Government in the aggregate.

(3) For equitable adjustments for required or desirable changes—

(i) Estimated increased cost accumulations are the basis for increasing contract prices, target prices and cost ceilings; and

(ii) Estimated decreased cost accumulations are the basis for decreasing contract prices, target prices and cost ceilings.

(g) For any noncompliant cost accounting practice subject to paragraph (b)(4) of this clause, prepare the GDM proposal as follows:

(1) Calculate the cost impact in accordance with paragraph (i) of this clause.

(2) Use one or more of the following methods to determine the increase or decrease in contract and subcontract prices or cost accumulations, as applicable:

(i) A representative sample of affected CAS-covered contracts and subcontracts.

(ii) When the noncompliance involves cost accumulation the change in indirect rates multiplied by the applicable base for only flexibly-priced contracts and subcontracts.

(iii) Any other method that provides a reasonable approximation of the total increase or decrease.

(3) Use a format acceptable to the CFAO but, as a minimum, include the following data:

(i) The total increase or decrease in contract and subcontract price and cost accumulations, as applicable, by Executive agency, including any impact the noncompliance may have on contract and subcontract incentives, fees, and profits, for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(ii) The increased or decreased cost to the Government for each of the following groups:

(A) Fixed-price contracts and subcontracts.

(B) Flexibly-priced contracts and subcontracts.

(iii) The total overpayments and underpayments made by the Government during the period of noncompliance.

(4) When requested by the CFAO, identify all CAS-covered contracts and subcontracts.

(h) For any noncompliant practice subject to paragraph (b)(4) of this clause, prepare the DCI proposal as follows:

(1) Calculate the cost impact in accordance with paragraph (i) of this clause.

(2) Show the increase or decrease in price and cost accumulations for each affected CAS-covered contract and subcontract unless the CFAO and Contractor agree to—

(i) Include only those affected CAS-covered contracts and subcontracts having—

(A) Contract and subcontract values exceeding a specified amount when the noncompliance involves estimating costs; and

(B) Incurred costs exceeding a specified amount when the noncompliance involves accumulating costs; and

(ii) Estimate the total increase or decrease in price and cost accumulations for all affected CAS-covered contracts and subcontracts using the results in paragraph (h)(2)(i) of this clause.

(3) Use a format acceptable to the CFAO that, as a minimum, include the information in paragraph (g)(3) of this clause.

(4) When requested by the CFAO, identify all CAS-covered contracts and subcontracts.

(i) For GDM and DCI proposals that are subject to the requirements of paragraph (g) or (h) of this clause, calculate the cost impact as follows:

(1) The cost impact calculation shall include all affected CAS-covered contracts and subcontracts regardless of their status (*i.e.*, open or closed) or the fiscal year in which the costs are incurred (*i.e.*, whether or not the final indirect rates have been established).

(2) For noncompliances that involve estimating costs, determine the increased or decreased cost to the Government for fixed-price contracts and subcontracts as follows:

(i) When the negotiated contract or subcontract price exceeds what the negotiated price would have been had the Contractor used a compliant practice, the difference is increased cost to the Government.

(ii) When the negotiated contract or subcontract price is less than what the negotiated price would have been had the Contractor used a compliant practice, the difference is decreased cost to the Government.

(3) For noncompliances that involve accumulating costs, determine the increased or decreased cost to the Government for

[redacted]

flexibly-priced contracts and subcontracts as follows:

(i) When the costs that were accumulated under the noncompliant practice exceed the costs that would have been accumulated using a compliant practice (from the time the noncompliant practice was first implemented until the date the noncompliant practice was replaced with a compliant practice), the difference is increased cost to the Government.

(ii) When the costs that were accumulated under the noncompliant practice are less than the costs that would have been accumulated using a compliant practice (from the time the noncompliant practice was first implemented until the date the noncompliant practice was replaced with a compliant practice), the difference is decreased cost to the Government.

(4) Calculate the total increase or decrease in contract and subcontracts incentives, fees, and profits associated with the increased or decreased cost to the Government in accordance with 48 CFR 9903.306(c). The associated increase or decrease is based on the difference between the negotiated incentives, fees, and profits and the amounts that would have been negotiated had the Contractor used a compliant practice.

(5) Calculate the increased cost to the Government in the aggregate.

(j) If the Contractor does not submit the information required by paragraph (b) or (c) of this clause within the specified time, or any extension granted by the CFAO, the CFAO may take one or both of the following actions:

(1) Withhold an amount not to exceed 10 percent of each subsequent amount payment to the Contractor's affected CAS-covered contracts, (up to the estimated general dollar magnitude of the cost impact), until such time as the Contractor provides the required information to the CFAO.

(2) Issue a final decision in accordance with FAR 33.211 and unilaterally adjust the contract(s) by the estimated amount of the cost impact.

(k) Agree to—

(1) Contract modifications to reflect adjustments required in accordance with paragraph (a)(4)(ii) or (a)(5) of the clauses at FAR 52.230–2 and 52.230–5; or with paragraph (a)(3)(i) or (a)(4) of the clause at FAR 52.230–3; and

(2) Repay the Government for any aggregate increased cost paid to the Contractor.

(l) For all subcontracts subject to the clauses at FAR 52.230–2, 52.230–3, or 52.230–5—

(1) So state in the body of the subcontract, in the letter of award, or in both (do not use self-deleting clauses);

(2) Include the substance of this clause in all negotiated subcontracts; and

(3) Within 30 days after award of the subcontract, submit the following information to the Contractor's CFAO:

(i) Subcontractor's name and subcontract number.

(ii) Dollar amount and date of award.

(iii) Name of Contractor making the award.

(m) Notify the CFAO in writing of any adjustments required to subcontracts under this contract and agree to an adjustment to this contract price or estimated cost and fee. The Contractor shall—

(1) Provide this notice within 30 days after the Contractor receives the proposed subcontract adjustments; and

(2) Include a proposal for adjusting the higher-tier subcontract or the contract appropriately.

(n) For subcontracts containing the clause or substance of the clause at FAR 52.230–2, FAR 52.230–3, or FAR 52.230–5, require the subcontractor to comply with all Standards in effect on the date of award or of final agreement on price, as shown on the subcontractor's signed Certificate of Current Cost or Pricing Data, whichever is earlier.

(End of clause)

■ 9. Add section 52.230–7 to read as follows:

**52.230–7 Proposal Disclosure—Cost Accounting Practice Changes.**

As prescribed in 30.201–3(c), insert the following provision:

**Proposal Disclosure—Cost Accounting Practice Changes (Apr 2005)**

The offeror shall check ''yes'' below if the contract award will result in a required or unilateral change in cost accounting practice, including unilateral changes requested to be desirable changes.

☐ Yes ☐ No

If the offeror checked ''Yes'' above, the offeror shall—

(1) Prepare the price proposal in response to the solicitation using the changed practice for the period of performance for which the practice will be used; and

(2) Submit a description of the changed cost accounting practice to the Contracting Officer and the Cognizant Federal Agency Official as pricing support for the proposal.

(End of provision)

[FR Doc. 05–4093 Filed 3–8–05; 8:45 am]

BILLING CODE 6820–EP–P

---

**DEPARTMENT OF DEFENSE**

**GENERAL SERVICES ADMINISTRATION**

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**

**48 CFR Parts 44 and 52**

**[FAC 2005–01; FAR Case 2003–024; Item VII]**

**RIN 9000–AK10**

## Federal Acquisition Regulation; Elimination of Certain Subcontract Notification Requirements

**AGENCIES:** Department of Defense (DoD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Interim rule with request for comments.

**SUMMARY:** The Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (the Councils) have agreed to amend the Federal Acquisition Regulation language regarding advance notification requirements. This change is required to implement Section 842 of the National Defense Authorization Act for Fiscal Year 2004, Public Law 108–136, which resulted in revisions to 10 U.S.C. 2306(e).

**DATES:** *Effective Date*: March 9, 2005.

*Comment Date*: Interested parties should submit comments to the FAR Secretariat at the address shown below on or before May 9, 2005 to be considered in the formulation of a final rule.

**ADDRESSES:** Submit comments identified by FAC 2005–01, FAR case 2003–024 by any of the following methods:

- Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments.
- Agency Web Site: *http://www.acqnet.gov/far/ProposedRules/proposed.htm*. Click on the FAR case number to submit comments.
- E-mail: *farcase.2003–024@gsa.gov*. Include FAC 2005–01, FAR case 2003–024 in the subject line of the message.
- Fax: 202–501–4067.
- Mail: General Services Administration, Regulatory Secretariat (VIR), 1800 F Street, NW., Room 4035, ATTN: Laurieann Duarte, Washington, DC 20405.

*Instructions*: Please submit comments only and cite FAC 2005–01, FAR case 2003–024, in all correspondence related to this case. All comments received will be posted without change to *http://www.acqnet.gov/far/ProposedRules/proposed.htm*, including any personal information provided.

**FOR FURTHER INFORMATION CONTACT** The FAR Secretariat at (202) 501–4755, for information pertaining to status or publication schedules. For clarification of content, contact Ms. Rhonda Cundiff, at (202) 501–0044. Please cite FAC 2005–01, FAR case 2003–024.

**SUPPLEMENTARY INFORMATION:**

### A. Background

This rule revises FAR 44.201–2, Advance notification requirements, and amends Alternate I of FAR clause 52.244–2, Subcontracts. This change is required in order to implement Section 842 of the National Defense Authorization Act for Fiscal Year 2004, Public Law 108–136. Section 842

[redacted]

## [CHAPTER 90—OMITTED]

CODIFICATION

Chapter 90, consisting of sections 1471 to 1482, which was added by Pub. L. 95–598, title II, § 241(a), Nov. 6, 1978, 92 Stat. 2668, and which related to district courts and bankruptcy courts, did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

TRANSITION TO NEW COURT SYSTEM

Pub. L. 95–598, title IV, § 409, Nov. 6, 1978, 92 Stat. 2687, as amended by Pub. L. 98–249, § 1(d), Mar. 31, 1984, 98 Stat. 116; Pub. L. 98–271, § 1(d), Apr. 30, 1984, 98 Stat. 163; Pub. L. 98–299, § 1(d), May 25, 1984, 98 Stat. 214; Pub. L. 98–325, § 1(d), June 20, 1984, 98 Stat. 268; Pub. L. 98–353, title I, § 121(d), July 10, 1984, 98 Stat. 346, which provided for transfer to the new court system of cases, and matters and proceedings in cases, under the Bankruptcy Act [former Title 11] pending at the end of Sept. 30, 1983, in the courts of bankruptcy continued under section 404(a) of Pub. L. 95–598, with certain exceptions, and cases and proceedings arising under or related to cases under Title 11 pending at the end of July 9, 1984, and directed that civil actions pending on July 9, 1984, over which a bankruptcy court had jurisdiction on July 9, 1984, not abate, but continuation of such actions not finally determined before Apr. 1, 1985, be removed to a bankruptcy court under this chapter, and that all law books, publications, etc., furnished bankruptcy judges as of July 9, 1984, be transferred to the United States bankruptcy courts under the supervision of the Director of the Administrative Office of the United States Courts, was repealed by Pub. L. 98–353, title I, § 122(a), July 10, 1984, 98 Stat. 343, 346, eff. July 10, 1984.

## CHAPTER 91—UNITED STATES COURT OF FEDERAL CLAIMS


Sec.
1491. Claims against United States generally; actions involving Tennessee Valley Authority.
1492. Congressional reference cases.
[1493. Repealed.]
1494. Accounts of officers, agents or contractors.
1495. Damages for unjust conviction and imprisonment; claim against United States.
1496. Disbursing officers' claims.
1497. Oyster growers' damages from dredging operations.
1498. Patent and copyright cases.
1499. Liquidated damages withheld from contractors under chapter 37 of title 40.
1500. Pendency of claims in other courts.
1501. Pensions.
1502. Treaty cases.
1503. Set-offs.
[1504. Repealed.]
1505. Indian claims.
[1506. Repealed.]
1507. Jurisdiction for certain declaratory judgments.
1508. Jurisdiction for certain partnership proceedings.
1509. No jurisdiction in cases involving refunds of tax shelter promoter and understatement penalties.


HISTORICAL AND REVISION NOTES

1949 ACT

This section inserts in the analysis of chapter 91 of title 28, U.S.C., item 1505, corresponding to new section 1505.

AMENDMENTS

2006—Pub. L. 109–284, § 4(1), Sept. 27, 2006, 120 Stat. 1211, substituted "chapter 37 of title 40" for "Contract Work Hours and Safety Standards Act" in item 1499.

1992—Pub. L. 102–572, title IX, § 902(a)(1), Oct. 29, 1992, 106 Stat. 4516, substituted "UNITED STATES COURT OF FEDERAL CLAIMS" for "UNITED STATES CLAIMS COURT" as chapter heading.

1984—Pub. L. 98–369, div. A, title VII, § 714(g)(3), July 18, 1984, 98 Stat. 962, added item 1509.

1982—Pub. L. 97–248, title IV, § 402(c)(18)(B), Sept. 3, 1982, 96 Stat. 669, added item 1508.

Pub. L. 97–164, title I, § 133(e)(2)(B), (f), (h), (j)(2), Apr. 2, 1982, 96 Stat. 41, substituted "UNITED STATES CLAIMS COURT" for "COURT OF CLAIMS" in chapter heading, substituted "Liquidated damages withheld from contractors under Contract Work Hours and Safety Standards Act" for "Penalties imposed against contractors under eight hour law" in item 1499, and struck out items 1504 "Tort Claims" and 1506 "Transfer to cure defect of jurisdiction".

1976—Pub. L. 94–455, title XIII, § 1306(b)(9)(B), Oct. 4, 1976, 90 Stat. 1720, added item 1507.

1960—Pub. L. 86–770, § 2(b), Sept. 13, 1960, 74 Stat. 912, added item 1506.

Pub. L. 86–726, § 4, Sept. 8, 1960, 74 Stat. 856, substituted "Patent and copyright cases" for "Patent cases" in item 1498.

1954—Act Sept. 3, 1954, ch. 1263, § 43, 68 Stat. 1241, inserted "; actions involving Tennessee Valley Authority" in item 1491 and struck out item 1493 "Departmental reference cases".

1949—Act May 24, 1949, ch. 139, § 86, 63 Stat. 102, added item 1505.

### § 1491. Claims against United States generally; actions involving Tennessee Valley Authority

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6[1] of that Act.

(b)(1) Both the Unites[2] States Court of Federal Claims and the district courts of the United States

[1] See References in Text note below.

[2] So in original. Probably should be "United".

shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

(5) If an interested party who is a member of the private sector commences an action described in paragraph (1) with respect to a public-private competition conducted under Office of Management and Budget Circular A–76 regarding the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A–76, then an interested party described in section 3551(2)(B) of title 31 shall be entitled to intervene in that action.

(6) Jurisdiction over any action described in paragraph (1) arising out of a maritime contract, or a solicitation for a proposed maritime contract, shall be governed by this section and shall not be subject to the jurisdiction of the district courts of the United States under the Suits in Admiralty Act (chapter 309 of title 46) or the Public Vessels Act (chapter 311 of title 46).

(c) Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade, or of any action against, or founded on conduct of, the Tennessee Valley Authority, or to amend or modify the provisions of the Tennessee Valley Authority Act of 1933 with respect to actions by or against the Authority.

(June 25, 1948, ch. 646, 62 Stat. 940; July 28, 1953, ch. 253, §7, 67 Stat. 226; Sept. 3, 1954, ch. 1263, §44(a), (b), 68 Stat. 1241; Pub. L. 91–350, §1(b), July 23, 1970, 84 Stat. 449; Pub. L. 92–415, §1, Aug. 29, 1972, 86 Stat. 652; Pub. L. 95–563, §14(i), Nov. 1, 1978, 92 Stat. 2391; Pub. L. 96–417, title V, §509, Oct. 10, 1980, 94 Stat. 1743; Pub. L. 97–164, title I, §133(a), Apr. 2, 1982, 96 Stat. 39; Pub. L. 102–572, title IX, §§902(a), 907(b)(1), Oct. 29, 1992, 106 Stat. 4516, 4519; Pub. L. 104–320, §12(a), Oct. 19, 1996, 110 Stat. 3874; Pub. L. 110–161, div. D, title VII, §739(c)(2), Dec. 26, 2007, 121 Stat. 2031; Pub. L. 110–181, div. A, title III, §326(c), Jan. 28, 2008, 122 Stat. 63; Pub. L. 110–417, [div. A], title X, §1061(d), Oct. 14, 2008, 122 Stat. 4613; Pub. L. 111–350, §5(g)(7), Jan. 4, 2011, 124 Stat. 3848; Pub. L. 112–81, div. A, title VIII, §861(a), Dec. 31, 2011, 125 Stat. 1521.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §250(1) (Mar. 3, 1911, ch. 231; §145, 36 Stat. 1136).

District courts are given concurrent jurisdiction of certain claims against the United States under section 1346 of this title. (See also reviser's note under that section and section 1621 of this title relating to jurisdiction of the Tax Court.)

The proviso in section 250(1) of title 28, U.S.C., 1940 ed., relating to claims growing out of the Civil War, commonly known as "war claims," and other claims which had been reported adversely before March 3, 1887 by any court, department, or commission authorized to determine them, were omitted as obsolete.

The exception in section 250(1) of title 28, U.S.C., 1940 ed., as to pension claims appears in section 1501 of this title.

Words "in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty, if the United States were suable" were omitted as unnecessary since the Court of Claims manifestly, under this section will determine whether a petition against the United States states a cause of action. In any event, the Court of Claims has no admiralty jurisdiction, but the Suits in Admiralty Act, sections 741–752 of title 46, U.S.C., 1940 ed., Shipping, vests exclusive jurisdiction over suits in admiralty against the United States in the district courts. *Sanday & Co. v. U.S.*, 1932, 76 Ct.Cl. 370.

For additional provisions respecting jurisdiction of the court of claims in war contract settlement cases see section 114b of Title 41, U.S.C., 1940 ed., Public Contracts.

Changes were made in phraseology.

### REFERENCES IN TEXT

Section 6 of the Contract Disputes Act of 1978, referred to in subsec. (a)(2), was classified to section 605 of former Title 41, Public Contracts, and was repealed and restated as subsecs. (a) to (c)(1) and (d) to (h) of section 7103 of Title 41, Public Contracts, by Pub. L. 111–350, §§3, 7(b), Jan. 4, 2011, 124 Stat. 3677, 3855.

The Tennessee Valley Authority Act of 1933, referred to in subsec. (c), is act May 18, 1933, ch. 32, 48 Stat. 58, which is classified generally to chapter 12A (§831 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 831 of Title 16 and Tables.

### AMENDMENTS

2011—Subsec. (a)(2). Pub. L. 111–350 substituted "section 7104(b)(1) of title 41" for "section 10(a)(1) of the Contract Disputes Act of 1978".

Subsec. (b)(6). Pub. L. 112–81 added par. (6).

2008—Subsec. (b)(5). Pub. L. 110–417 struck out par. (5), as added by Pub. L. 110–161, which read as follows: "If a private sector interested party commences an action described in paragraph (1) in the case of a public-private competition conducted under Office of Management and Budget Circular A–76 regarding performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A–76, then an official or person described in section 3551(2)(B) of title 31 shall be entitled to intervene in that action."

Pub. L. 110–181 added par. (5).

2007—Subsec. (b)(5). Pub. L. 110–161 added par. (5).

1996—Subsec. (a)(3). Pub. L. 104–320, §12(a)(2), struck out par. (3) which read as follows: "To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdiction, the court shall give due regard to the interests of national defense and national security."

Subsecs. (b), (c). Pub. L. 104–320, §12(a)(1), (3), added subsec. (b) and redesignated former subsec. (b) as (c).

1992—Subsec. (a)(1). Pub. L. 102–572, § 902(a)(1), substituted "United States Court of Federal Claims" for "United States Claims Court".

Subsec. (a)(2). Pub. L. 102–572, § 907(b)(1), inserted before period at end ", including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act".

Pub. L. 102–572, § 902(a)(2), substituted "Court of Federal Claims" for "Claims Court".

Subsec. (b). Pub. L. 102–572, § 902(a)(1), substituted "United States Court of Federal Claims" for "United States Claims Court".

1982—Subsec. (a)(1). Pub. L. 97–164 designated first two sentences of existing first undesignated paragraph as subsec. (a)(1) and substituted "United States Claims Court" for "Court of Claims".

Subsec. (a)(2). Pub. L. 97–164 designated third, fourth, and fifth sentences of existing first undesignated paragraph as par. (2) and substituted "The Claims Court" for "The Court of Claims" and "arising under section 10(a)(1) of the Contract Disputes Act of 1978" for "arising under the Contract Disputes Act of 1978".

Subsec. (a)(3). Pub. L. 97–164 added par. (3).

Subsec. (b). Pub. L. 97–164 designated existing second undesignated paragraph as subsec. (b) and substituted "United States Claims Court" for "Court of Claims", "conduct of, the Tennessee Valley Authority, or" for "actions of, the Tennessee Valley Authority, nor", "Tennessee Valley Authority Act of 1933" for "Tennessee Valley Authority Act of 1933, as amended,", and "actions by or against the Authority" for "suits by or against the Authority".

1980—Pub. L. 96–417 substituted "Court of Claims of any civil action within the exclusive jurisdiction of the Court of International Trade, or of any action" for "in suits" in second par.

1978—Pub. L. 95–563 provided that the Court of Claims would have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under the Contract Disputes Act of 1978.

1972—Pub. L. 92–415 inserted provisions authorizing the court to issue orders directing restoration to office or position, placement in appropriate duty or retirement status and correction of applicable records and to issue such orders to any United States official and to remand appropriate matters to administrative and executive bodies with proper directions.

1970—Pub. L. 91–350 specified that the term "express or implied contracts with the United States" includes express or implied contracts with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration.

1954—Act Sept. 3, 1954, inserted "; actions involving Tennessee Valley Authority" in section catchline and altered the form of first par. to spell out the general jurisdiction of the Court in paragraph form rather than as clauses of the par.

1953—Act July 28, 1953, substituted "United States Court of Claims" for "Court of Claims" near beginning of section, and inserted last par.

### Effective Date of 2011 Amendment

Pub. L. 112–81, div. A, title VIII, § 861(b), Dec. 31, 2011, 125 Stat. 1521, provided that: "The amendment made by subsection (a) [amending this section] shall apply to any cause of action filed on or after the first day of the first month beginning more than 30 days after the date of the enactment of this Act [Dec. 31, 2011]."

### Effective Date of 2008 Amendment

Pub. L. 110–181, div. A, title III, § 326(d), Jan. 28, 2008, 122 Stat. 63, provided that: "Subparagraph (B) of section 3551(2) of title 31, United States Code (as added by subsection (a)), and paragraph (5) of section 1491(b) of title 28, United States Code (as added by subsection (c)), shall apply to—

"(1) a protest or civil action that challenges final selection of the source of performance of an activity or function of a Federal agency that is made pursuant to a study initiated under Office of Management and Budget Circular A–76 on or after January 1, 2004; and

"(2) any other protest or civil action that relates to a public-private competition initiated under Office of Management and Budget Circular A–76, or to a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A–76, on or after the date of the enactment of this Act [Jan. 28, 2008]."

### Effective Date of 2007 Amendment

Paragraph (5) of subsec. (b) of this section applicable to protests and civil actions that challenge final selections of sources of performance of an activity or function of a Federal agency that are made pursuant to studies initiated under Office of Management and Budget Circular A–76 on or after Jan. 1, 2004; and to any other protests and civil actions that relate to public-private competitions initiated under Office of Management and Budget Circular A–76, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A–76, on or after Dec. 26, 2007, see section 739(c)(3) of Pub. L. 110–161, set out as a note under section 501 of Title 31, Money and Finance.

Amendment by Pub. L. 110–161 applicable with respect to fiscal year 2008 and each succeeding fiscal year, see section 739(e) of Pub. L. 110–161, set out as a note under section 501 of Title 31, Money and Finance.

### Effective Date of 1996 Amendment

Pub. L. 104–320, § 12(b), Oct. 19, 1996, 110 Stat. 3875, provided that: "This section [amending this section and section 3556 of Title 31, Money and Finance, and enacting provisions set out as notes under this section and section 3556 of Title 31] and the amendments made by this section shall take effect on December 31, 1996 and shall apply to all actions filed on or after that date."

### Effective Date of 1992 Amendment

Amendment by section 902(a) of Pub. L. 102–572 effective Oct. 29, 1992, see section 911 of Pub. L. 102–572, set out as a note under section 171 of this title.

Pub. L. 102–572, title IX, § 907(b)(2), Oct. 29, 1992, 106 Stat. 4519, provided that: "The amendment made by paragraph (1) [amending this section] shall be effective with respect to all actions filed before, on, or after the date of the enactment of this Act [Oct. 29, 1992], except for those actions which, before such date of enactment, have been the subject of—

"(A) a final judgment of the United States Claims Court, if the time for appeal of that judgment has expired without an appeal having been filed, or

"(B) a final judgment of the Court of Appeals for the Federal Circuit."

### Effective Date of 1982 Amendment

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

### Effective Date of 1980 Amendment

Amendment by Pub. L. 96–417 effective Nov. 1, 1980, and applicable with respect to civil actions pending on or commenced on or after such date, see section 701(a) of Pub. L. 96–417, set out as a note under section 251 of this title.

### Effective Date of 1978 Amendment

Amendment by Pub. L. 95–563 effective with respect to contracts entered into 120 days after Nov. 1, 1978, and, at the election of the contractor, with respect to any claim

pending at such time before the contracting officer or initiated thereafter, see section 16 of Pub. L. 95–563, Nov. 1, 1978, 92 Stat. 2391, formerly set out as an Effective Date note under section 601 of former Title 41, Public Contracts.

EFFECTIVE DATE OF 1972 AMENDMENT

Pub. L. 92–415, §2, Aug. 29, 1972, 86 Stat. 652, provided that: "This Act [amending this section] shall be applicable to all judicial proceedings pending on or instituted after the date of its enactment [Aug. 29, 1972]."

EFFECTIVE DATE OF 1970 AMENDMENT

Amendment by Pub. L. 91–350 applicable to claims and civil actions dismissed before or pending on July 23, 1970, if the claim or civil action was based upon a transaction, omission, or breach that occurred not more than six years prior to July 23, 1970, notwithstanding a determination or judgment made prior to July 23, 1970, that the United States district courts or the United States Court of Claims did not have jurisdiction to entertain a suit on an express or implied contract with a nonappropriated fund instrumentality of the United States, see section 2 of Pub. L. 91–350, set out as a note under section 1346 of this title.

SAVINGS PROVISION

Pub. L. 104–320, §12(e), Oct. 19, 1996, 110 Stat. 3875, provided that:

"(1) ORDERS.—A termination under subsection (d) [set out below] shall not terminate the effectiveness of orders that have been issued by a court in connection with an action within the jurisdiction of that court on or before December 31, 2000. Such orders shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked by a court of competent jurisdiction or by operation of law.

"(2) PROCEEDINGS AND APPLICATIONS.—(A) a termination under subsection (d) shall not affect the jurisdiction of a court of the United States to continue with any proceeding that is pending before the court on December 31, 2000.

"(B) Orders may be issued in any such proceeding, appeals may be taken therefrom, and payments may be made pursuant to such orders, as if such termination had not occurred. An order issued in any such proceeding shall continue in effect until modified, terminated, superseded, set aside, or revoked by a court of competent jurisdiction or by operation of law.

"(C) Nothing in this paragraph prohibits the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that proceeding could have been discontinued or modified absent such termination."

SUNSET PROVISION

Pub. L. 104–320, §12(d), Oct. 19, 1996, 110 Stat. 3875, provided that: "The jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of title 28, United States Code (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress. The savings provisions in subsection (e) [set out above] shall apply if the bid protest jurisdiction of the district courts of the United States terminates under this subsection."

TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, set out as a note under section 542 of Title 6.

STUDY ON CONCURRENT JURISDICTION

Pub. L. 104–320, §12(c), Oct. 19, 1996, 110 Stat. 3875, required that, no earlier than 2 years after Dec. 31, 1996, the General Accounting Office was to undertake a study regarding the concurrent jurisdiction of the district courts of the United States and the Court of Federal Claims over bid protests to determine whether concurrent jurisdiction was necessary, which study was to be completed no later than Dec. 31, 1999, and was to specifically consider the effect of any proposed change on the ability of small businesses to challenge violations of Federal procurement law.

## § 1492. Congressional reference cases

Any bill, except a bill for a pension, may be referred by either House of Congress to the chief judge of the United States Court of Federal Claims for a report in conformity with section 2509 of this title.

(June 25, 1948, ch. 646, 62 Stat. 941; Pub. L. 89–681, §1, Oct. 15, 1966, 80 Stat. 958; Pub. L. 97–164, title I, §133(b), Apr. 2, 1982, 96 Stat. 40; Pub. L. 102–572, title IX, §902(a)(1), Oct. 29, 1992, 106 Stat. 4516.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §257 (Mar. 3, 1911, ch. 231, §151, 36 Stat. 1138).

This section contains only the jurisdictional provision of section 257 of title 28, U.S.C., 1940 ed. The procedural provisions are incorporated in section 2509 of this title.

Changes were made in phraseology.

AMENDMENTS

1992—Pub. L. 102–572 substituted "United States Court of Federal Claims" for "United States Claims Court".

1982—Pub. L. 97–164 substituted "chief judge of the United States Claims Court" for "chief commissioner of the Court of Claims".

1966—Pub. L. 89–681 substituted provisions allowing any bill, except a bill for a pension, to be referred by either House of Congress to the chief commissioner of the Court of Claims for a report in conformity with section 2509 of this title for provisions giving the Court of Claims jurisdiction to report to either House of Congress on any bill referred by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill was one over which the court had jurisdiction under other Acts of Congress.

EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–572 effective Oct. 29, 1992, see section 911 of Pub. L. 102–572, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

## [§ 1493. Repealed. July 28, 1953, ch. 253, § 8, 67 Stat. 226]

Section, act June 25, 1948, ch. 646, 62 Stat. 941, authorized Court of Claims to give legal advice to heads of executive departments in matters referred to it by the heads, if Court had jurisdiction over the matters.

## § 1494. Accounts of officers, agents or contractors

The United States Court of Federal Claims shall have jurisdiction to determine the amount, if any, due to or from the United States by reason of any unsettled account of any officer or agent of, or contractor with, the United States, or a guarantor, surety or personal representative of any such

(I) Classified information.

(II) Sensitive security information, as defined by section 1520.5 of title 49, Code of Federal Regulations.

(III) Privileged law enforcement information.

(IV) Information obtained or derived from any activity authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.), except that, with respect to such information, subsections (c), (e), (f), (g), and (h) of section 106 (50 U.S.C. 1806), subsections (d), (f), (g), (h), and (i) of section 305 (50 U.S.C. 1825), subsections (c), (e), (f), (g), and (h) of section 405 (50 U.S.C. 1845), and section 706 (50 U.S.C. 1881e) of that Act shall not apply.

(V) Information subject to privilege or protections under any other provision of law.

(iv) UNDER SEAL.—Any information that is part of the administrative record filed ex parte and in camera under clause (iii), or cited by the court in any decision, shall be treated by the court consistent with the provisions of this subparagraph and shall remain under seal and preserved in the records of the court to be made available consistent with the above provisions in the event of further proceedings. In no event shall such information be released to the petitioner or as part of the public record.

(v) RETURN.—After the expiration of the time to seek further review, or the conclusion of further proceedings, the court shall return the administrative record, including any and all copies, to the United States.

(C) EXCLUSIVE REMEDY.—A determination by the court under this subsection shall be the exclusive judicial remedy for any claim described in this section against the United States, any United States department or agency, or any component or official of any such department or agency.

(D) RULE OF CONSTRUCTION.—Nothing in this section shall be construed as limiting, superseding, or preventing the invocation of, any privileges or defenses that are otherwise available at law or in equity to protect against the disclosure of information.

(c) DEFINITION.—In this section, the term "classified information"—

(1) has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.); and

(2) includes—

(A) any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation to require protection against unauthorized disclosure for reasons of national security; and

(B) any restricted data, as defined in section 11 of the Atomic Energy Act of 1954 (42 U.S.C. 2014).

(Added Pub. L. 115–390, title II, §202(a), Dec. 21, 2018, 132 Stat. 5185.)

REFERENCES IN TEXT

The Foreign Intelligence Surveillance Act of 1978, referred to in subsec. (b)(4)(B)(iii)(IV), is Pub. L. 95–511, Oct. 25, 1978, 92 Stat. 1783, which is classified principally to chapter 36 (§1801 et seq.) of Title 50, War and National Defense. For complete classification of this Act to the Code, see Short Title note set out under section 1801 of Title 50 and Tables.

The Classified Information Procedures Act, referred to in subsec. (c)(1), is Pub. L. 96–456, Oct. 15, 1980, 94 Stat. 2025, which is set out in the Appendix to Title 18, Crimes and Criminal Procedure.

EFFECTIVE DATE

Section effective 90 days after Dec. 21, 2018, and applicable to contracts that are awarded before, on, or after that date, see section 202(c) of Pub. L. 115–390, set out as a note under section 1321 of this title.

Title II of Pub. L. 115–390 effective 90 days after Dec. 21, 2018, see section 205 of Pub. L. 115–390, set out as a note under section 1321 of this title.

### § 1328. Termination

This subchapter shall terminate on the date that is 5 years after the date of the enactment of the Federal Acquisition Supply Chain Security Act of 2018.

(Added Pub. L. 115–390, title II, §202(a), Dec. 21, 2018, 132 Stat. 5188.)

REFERENCES IN TEXT

The date of the enactment of the Federal Acquisition Supply Chain Security Act of 2018, referred to in text, is the date of enactment of Pub. L. 115–390, which was approved Dec. 21, 2018.

EFFECTIVE DATE

Section effective 90 days after Dec. 21, 2018, and applicable to contracts that are awarded before, on, or after that date, see section 202(c) of Pub. L. 115–390, set out as a note under section 1321 of this title.

Title II of Pub. L. 115–390 effective 90 days after Dec. 21, 2018, see section 205 of Pub. L. 115–390, set out as a note under section 1321 of this title.

## CHAPTER 15—COST ACCOUNTING STANDARDS

Sec.
1501. Cost Accounting Standards Board.
1502. Cost accounting standards.
1503. Contract price adjustment.
1504. Effect on other standards and regulations.
1505. Examinations.
1506. Authorization of appropriations.

### § 1501. Cost Accounting Standards Board

(a) ORGANIZATION.—The Cost Accounting Standards Board is an independent board in the Office of Federal Procurement Policy.

(b) MEMBERSHIP.—

(1) NUMBER OF MEMBERS, CHAIRMAN, AND APPOINTMENT.—The Board consists of 5 members. One member is the Administrator, who serves as Chairman. The other 4 members, all of whom shall have experience in Federal Government contract cost accounting, are as follows:

(A) 2 representatives of the Federal Government—

(i) one of whom is a representative of the Department of Defense appointed by the Secretary of Defense; and

(ii) one of whom is an officer or employee of the General Services Administration appointed by the Administrator of General Services.

(B) 2 individuals from the private sector, each of whom is appointed by the Administrator, and—

(i) one of whom is a representative of industry; and

(ii) one of whom is particularly knowledgeable about cost accounting problems and systems and, if possible, is a representative of a public accounting firm.

(2) TERM OF OFFICE.—

(A) LENGTH OF TERM.—The term of office of each member, other than the Administrator, is 4 years. The terms are staggered, with the terms of 2 members expiring in the same year, the term of another member expiring the next year, and the term of the last member expiring the year after that.

(B) INDIVIDUAL REQUIRED TO REMAIN WITH APPOINTING AGENCY.—A member appointed under paragraph (1)(A) may not continue to serve after ceasing to be an officer or employee of the agency from which that member was appointed.

(3) VACANCY.—A vacancy on the Board shall be filled in the same manner in which the original appointment was made. A member appointed to fill a vacancy serves for the remainder of the term for which that member's predecessor was appointed.

(c) DUTIES.—The Board shall—

(1) ensure that the cost accounting standards used by Federal contractors rely, to the maximum extent practicable, on commercial standards and accounting practices and systems;

(2) within one year after the date of enactment of this subsection, and on an ongoing basis thereafter, review any cost accounting standards established under section 1502 of this title and conform such standards, where practicable, to Generally Accepted Accounting Principles; and

(3) annually review disputes involving such standards brought to the boards established in section 7105 of this title or Federal courts, and consider whether greater clarity in such standards could avoid such disputes.

(d) MEETINGS.—The Board shall meet not less than once each quarter and shall publish in the Federal Register notice of each meeting and its agenda before such meeting is held.

(e) REPORT.—The Board shall annually submit a report to the congressional defense committees, the Committee on Oversight and Government Reform of the House of Representatives, and the Committee on Homeland Security and Governmental Affairs of the Senate describing the actions taken during the prior year—

(1) to conform the cost accounting standards established under section 1502 of this title with Generally Accepted Accounting Principles; and

(2) to minimize the burden on contractors while protecting the interests of the Federal Government.

(f) SENIOR STAFF.—The Administrator, after consultation with the Board—

(1) without regard to the provisions of title 5 governing appointments in the competitive service—

(A) shall appoint an executive secretary; and

(B) may appoint, or detail pursuant to section 3341 of title 5, two additional staff members; and

(2) may pay those employees without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5 relating to classification and General Schedule pay rates, except that those employees may not receive pay in excess of the maximum rate of basic pay payable for level IV of the Executive Schedule.

(g) OTHER STAFF.—The Administrator may appoint, fix the compensation of, and remove additional employees of the Board under the applicable provisions of title 5.

(h) DETAILED AND TEMPORARY PERSONNEL.—For service on advisory committees and task forces to assist the Board in carrying out its functions and responsibilities—

(1) the Board, with the consent of the head of a Federal agency, may use, without reimbursement, personnel of that agency; and

(2) the Administrator, after consultation with the Board, may procure temporary and intermittent services of personnel under section 3109(b) of title 5.

(i) COMPENSATION.—

(1) OFFICERS AND EMPLOYEES OF THE GOVERNMENT.—Members of the Board who are officers or employees of the Federal Government, and officers and employees of other agencies of the Federal Government who are used under subsection (h)(1), shall not receive additional compensation for services but shall continue to be compensated by the employing department or agency of the officer or employee.

(2) APPOINTEES FROM PRIVATE SECTOR.—Each member of the Board appointed from the private sector shall receive compensation at a rate not to exceed the daily equivalent of the rate for level IV of the Executive Schedule for each day (including travel time) in which the member is engaged in the actual performance of duties vested in the Board.

(3) TEMPORARY AND INTERMITTENT PERSONNEL.—An individual hired under subsection (h)(2) may receive compensation at a rate fixed by the Administrator, but not to exceed the daily equivalent of the rate for level V of the Executive Schedule for each day (including travel time) in which the individual is properly engaged in the actual performance of duties under this chapter.

(4) TRAVEL EXPENSES.—While serving away from home or regular place of business, Board members and other individuals serving on an intermittent basis under this chapter shall be allowed travel expenses in accordance with section 5703 of title 5.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3695; Pub. L. 114–328, div. A, title VIII, § 820(a)(1), (3), Dec. 23, 2016, 130 Stat. 2273, 2274.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 1501(a) ...... | 41:422(a)(1) (1st sentence). | Pub. L. 93–400, § 26(a)–(e), as added Pub. L. 100–679, § 5(a), Nov. 17, 1988, 102 Stat. 4058. |
| 1501(b) ...... | 41:422(a)(1) (last sentence), (2). | |
| 1501(c) ...... | 41:422(b). | |
| 1501(d) ...... | 41:422(c). | |
| 1501(e) ...... | 41:422(d). | |
| 1501(f) ...... | 41:422(e). | |

In subsection (b)(2), the text of 41:422(a)(2)(C) is omitted as obsolete.

In subsection (b)(2)(A), the last sentence is substituted for "of the initial members, two shall be appointed for terms of two years, one shall be appointed for a term of three years, and one shall be appointed for a term of four years" because the initial members have already been appointed.

In subsection (c)(2), the reference to section 5376 of title 5 is substituted for the reference to grade GS–18 of the General Schedule because of section 529 [title I, § 101(c)(1)] of the Treasury, Postal Service, and General Government Appropriations Act, 1991 (Public Law 101–509, 104 Stat. 1442, 5:5376 note).

In subsection (f)(1), the words "Except as otherwise provided in subsection (a) of this section" are omitted because 41:422(a) does not provide any relevant exception.

In subsection (f)(2), the words "private sector" are substituted for "private life" for consistency with subsection (b)(1)(B) of the revised section.

In subsection (f)(3), the words "Executive Schedule" are substituted for "Federal Executive Salary Schedule under section 5316 of title 5" for consistency and to eliminate unnecessary words.

SENATE REVISION AMENDMENT

In subsec. (c)(2), "for level IV of the Executive Schedule" substituted for "under section 5376 of title 5" by S. Amdt. 4726 (111th Cong.). See 156 Cong. Rec. 18682 (2010).

REFERENCES IN TEXT

The date of enactment of this subsection, referred to in subsec. (c)(2), is the date of enactment of Pub. L. 114–328, which was approved Dec. 23, 2016.

Level IV of the Executive Schedule, referred to in subsec. (f)(2), is set out under section 5315 of Title 5, Government Organization and Employees.

AMENDMENTS

2016—Subsec. (b)(1)(B)(ii). Pub. L. 114–328, § 820(a)(1)(A), inserted "and, if possible, is a representative of a public accounting firm" after "systems".

Subsecs. (c) to (e). Pub. L. 114–328, § 820(a)(1)(C), added subsecs. (c) to (e). Former subsecs. (c) to (e) redesignated (f) to (h), respectively.

Subsec. (f). Pub. L. 114–328, § 820(a)(1)(B), (D), redesignated subsec. (c) as (f) and amended it generally. Prior to amendment, text read as follows: "The Administrator, after consultation with the Board, may—

"(1) appoint an executive secretary and 2 additional staff members without regard to the provisions of title 5 governing appointments in the competitive service; and

"(2) pay those employees without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5 relating to classification and General Schedule pay rates, except that those employees may not receive pay in excess of the maximum rate of basic pay payable for level IV of the Executive Schedule."

Subsecs. (g) to (i). Pub. L. 114–328, § 820(a)(1)(B), redesignated subsecs. (d) to (f) as (g) to (i), respectively.

Subsec. (i)(1). Pub. L. 114–328, § 820(a)(3)(A), substituted "subsection (h)(1)" for "subsection (e)(1)".

Subsec. (i)(3). Pub. L. 114–328, § 820(a)(3)(B), substituted "subsection (h)(2)" for "subsection (e)(2)".

EFFECTIVE DATE OF 2016 AMENDMENT

Amendment by Pub. L. 114–328 effective on Oct. 1, 2018, see section 820(d) of Pub. L. 114–328, set out as an Effective Date note under section 190 of Title 10, Armed Forces.

## § 1502. Cost accounting standards

(a) AUTHORITY.—

(1) COST ACCOUNTING STANDARDS BOARD.—The Cost Accounting Standards Board has exclusive authority to prescribe, amend, and rescind cost accounting standards, and interpretations of the standards, designed to achieve uniformity and consistency in the cost accounting standards governing measurement, assignment, and allocation of costs to contracts with the Federal Government.

(2) ADMINISTRATOR FOR FEDERAL PROCUREMENT POLICY.—The Administrator, after consultation with the Board, shall prescribe rules and procedures governing actions of the Board under this chapter. The rules and procedures shall require that any action to prescribe, amend, or rescind a standard or interpretation be approved by majority vote of the Board.

(b) MANDATORY USE OF STANDARDS.—

(1) SUBCONTRACT.—

(A) DEFINITION.—In this paragraph, the term "subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of a contractor or subcontractor.

(B) WHEN STANDARDS ARE TO BE USED.—Cost accounting standards prescribed under this chapter are mandatory for use by all executive agencies and by contractors and subcontractors in estimating, accumulating, and reporting costs in connection with the pricing and administration of, and settlement of disputes concerning, all negotiated prime contract and subcontract procurements with the Federal Government in excess of the amount set forth in section 2306a(a)(1)(A)(i) of title 10 as the amount is adjusted in accordance with applicable requirements of law.

(C) NONAPPLICATION OF STANDARDS.—Subparagraph (B) does not apply to—

(i) a contract or subcontract for the acquisition of a commercial item;

(ii) a contract or subcontract where the price negotiated is based on a price set by law or regulation;

(iii) a firm, fixed-price contract or subcontract awarded on the basis of adequate price competition without submission of certified cost or pricing data; or

(iv) a contract or subcontract with a value of less than $7,500,000 if, when the contract or subcontract is entered into, the segment of the contractor or subcontractor that will perform the work has not been awarded at least one contract or subcontract with a value of more than $7,500,000 that is covered by the standards.

(2) EXEMPTIONS AND WAIVERS BY BOARD.—The Board may—

(A) exempt classes of contractors and subcontractors from the requirements of this chapter; and

(B) establish procedures for the waiver of the requirements of this chapter for individual contracts and subcontracts.

(3) WAIVER BY HEAD OF EXECUTIVE AGENCY.—

(A) IN GENERAL.—The head of an executive agency may waive the applicability of the cost accounting standards for a contract or subcontract with a value of less than $100,000,000 if that official determines in writing that the segment of the contractor or subcontractor that will perform the work—

(i) is primarily engaged in the sale of commercial items; and

(ii) would not otherwise be subject to the cost accounting standards under this section.

(B) IN EXCEPTIONAL CIRCUMSTANCES.—The head of an executive agency may waive the applicability of the cost accounting standards for a contract or subcontract under exceptional circumstances when necessary to meet the needs of the agency. A determination to waive the applicability of the standards under this subparagraph shall be set forth in writing and shall include a statement of the circumstances justifying the waiver.

(C) RESTRICTION ON DELEGATION OF AUTHORITY.—The head of an executive agency may not delegate the authority under subparagraph (A) or (B) to an official in the executive agency below the senior policymaking level in the executive agency.

(D) CONTENTS OF FEDERAL ACQUISITION REGULATION.—The Federal Acquisition Regulation shall include—

(i) criteria for selecting an official to be delegated authority to grant waivers under subparagraph (A) or (B); and

(ii) the specific circumstances under which the waiver may be granted.

(E) REPORT.—The head of each executive agency shall report the waivers granted under subparagraphs (A) and (B) for that agency to the Board on an annual basis.

(c) REQUIRED BOARD ACTION FOR PRESCRIBING STANDARDS AND INTERPRETATIONS.—Before prescribing cost accounting standards and interpretations, the Board shall—

(1) take into account, after consultation and discussions with the Comptroller General, professional accounting organizations, contractors, and other interested parties—

(A) the probable costs of implementation, including any inflationary effects, compared to the probable benefits;

(B) the advantages, disadvantages, and improvements anticipated in the pricing and administration of, and settlement of disputes concerning, contracts; and

(C) the scope of, and alternatives available to, the action proposed to be taken;

(2) prepare and publish a report in the Federal Register on the issues reviewed under paragraph (1);

(3)(A) publish an advanced notice of proposed rulemaking in the Federal Register to solicit comments on the report prepared under paragraph (2);

(B) provide all parties affected at least 60 days after publication to submit their views and comments; and

(C) during the 60-day period, consult with the Comptroller General and consider any recommendation the Comptroller General may make; and

(4) publish a notice of proposed rulemaking in the Federal Register and provide all parties affected at least 60 days after publication to submit their views and comments.

(d) EFFECTIVE DATES.—Rules, regulations, cost accounting standards, and modifications thereof prescribed or amended under this chapter shall have the full force and effect of law, and shall become effective within 120 days after publication in the Federal Register in final form, unless the Board determines that a longer period is necessary. The Board shall determine implementation dates for contractors and subcontractors. The dates may not be later than the beginning of the second fiscal year of the contractor or subcontractor after the standard becomes effective.

(e) ACCOMPANYING MATERIAL.—Rules, regulations, cost accounting standards, and modifications thereof prescribed or amended under this chapter shall be accompanied by prefatory comments and by illustrations, if necessary.

(f) IMPLEMENTING REGULATIONS.—The Board shall prescribe regulations for the implementation of cost accounting standards prescribed or interpreted under this section. The regulations shall be incorporated into the Federal Acquisition Regulation and shall require contractors and subcontractors as a condition of contracting with the Federal Government to—

(1) disclose in writing their cost accounting practices, including methods of distinguishing direct costs from indirect costs and the basis used for allocating indirect costs; and

(2) agree to a contract price adjustment, with interest, for any increased costs paid to the contractor or subcontractor by the Federal Government because of a change in the contractor's or subcontractor's cost accounting practices or a failure by the contractor or subcontractor to comply with applicable cost accounting standards.

(g) NONAPPLICABILITY OF CERTAIN SECTIONS OF TITLE 5.—Functions exercised under this chapter are not subject to sections 551, 553 to 559, and 701 to 706 of title 5.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3696; Pub. L. 114–328, div. A, title VIII, § 820(a)(2), Dec. 23, 2016, 130 Stat. 2274; Pub. L. 115–232, div. A, title VIII, § 836(b)(1), Aug. 13, 2018, 132 Stat. 1860.)

AMENDMENT OF SUBSECTION (b)

*Pub. L. 115–232, div. A, title VIII, § 836(b)(1), (h), Aug. 13, 2018, 132 Stat. 1860, 1874, provided that, effective Jan. 1, 2020, subject to a savings provision, subsection (b) of this section is amended as follows:*

*(1) in paragraph (1)(A), by striking "commercial items" and inserting "commercial products or commercial services";*

*(2) in paragraph (1)(C)(i), by striking "commercial item" and inserting "commercial product or commercial service"; and*

*(3) in paragraph (3)(A)(i), by striking "commercial items" and inserting "commercial products or commercial services".*

*See 2018 Amendment notes below.*

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 1502(a) ...... | 41:422(f)(1), (3). | Pub. L. 93–400, § 26(f), as added Pub. L. 100–679, § 5(a), Nov. 17, 1988, 102 Stat. 4060; Pub. L. 103–355, title II, § 2453, title VIII, § 8301(d), Oct. 13, 1994, 108 Stat. 3326, 3397; Pub. L. 104–106, title XLII, § 4205, title XLIII, § 4321(h)(4), Feb. 10, 1996, 110 Stat. 656, 675; Pub. L 106–65, title VIII, § 802(a), (b), Oct. 5, 1999, 113 Stat. 701; Pub. L 109–163, div. A, title VIII, § 822, Jan. 6, 2006, 119 Stat. 3386. |
| 1502(b)(1) ... | 41:422(f)(2), (4). | |
| 1502(b)(2) ... | 41:422(f)(4). | |
| 1502(b)(3) ... | 41:422(f)(5). | |

HISTORICAL AND REVISION NOTES—Continued

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 1502(c) ...... | 41:422(g)(1). | Pub. L. 93–400, § 26(g), (h)(1), as added Pub. L. 100–679, § 5(a), Nov. 17, 1988, 102 Stat. 4061. |
| 1502(d) ...... | 41:422(g)(2) (1st, 2d sentences). | |
| 1502(e) ...... | 41:422(g)(2) (last sentence). | |
| 1502(f) ...... | 41:422(h)(1). | |
| 1502(g) ...... | 41:422(g)(3). | |

In subsection (a)(1), the word "make" is omitted as being included in "prescribe".

In subsection (b)(2)(A), the word "categories" is omitted as being included in "classes".

In subsection (b)(3)(A)(ii), the words "as in effect on or after the effective date of this paragraph" are omitted as obsolete.

AMENDMENTS

2018—Subsec. (b)(1)(A). Pub. L. 115–232, § 836(b)(1)(A), substituted "commercial products or commercial services" for "commercial items".

Subsec. (b)(1)(C)(i). Pub. L. 115–232, § 836(b)(1)(B), substituted "commercial product or commercial service" for "commercial item".

Subsec. (b)(3)(A)(i). Pub. L. 115–232, § 836(b)(1)(C), substituted "commercial products or commercial services" for "commercial items".

2016—Subsec. (b)(3)(A). Pub. L. 114–328 substituted "$100,000,000" for "$15,000,000" in introductory provisions.

EFFECTIVE DATE OF 2018 AMENDMENT

Amendment by Pub. L. 115–232 effective Jan. 1, 2020, subject to a savings provision, see section 836(h) of Pub. L. 115–232, set out as an Effective Date of 2018 Amendment; Savings Provision note under section 453b of Title 6, Domestic Security.

EFFECTIVE DATE OF 2016 AMENDMENT

Amendment by Pub. L. 114–328 effective on Oct. 1, 2018, see section 820(d) of Pub. L. 114–328, set out as an Effective Date note under section 190 of Title 10, Armed Forces.

EFFECTIVE DATE OF AMENDMENT BY PUB. L. 106–65; REGULATIONS; IMPLEMENTATION; CONSTRUCTION

Pub. L. 106–65, div. A, title VIII, § 802(c)–(e), (g)–(i), Oct. 5, 1999, 113 Stat. 701, 702, provided that:

"(c) REGULATION ON TYPES OF CAS COVERAGE.—(1) The Administrator for Federal Procurement Policy shall revise the rules and procedures prescribed pursuant to section 26(f) of the Office of Federal Procurement Policy Act ([former] 41 U.S.C. 422(f)) [now 41 U.S.C. 1502(a), (b)] to the extent necessary to increase the thresholds established in section 9903.201–2 of title 48 of the Code of Federal Regulations from $25,000,000 to $50,000,000.

"(2) Paragraph (1) requires only a change of the statement of a threshold condition in the regulation referred to by section number in that paragraph, and shall not be construed as—

"(A) a ratification or expression of approval of—

"(i) any aspect of the regulation; or

"(ii) the manner in which section 26 of the Office of Federal Procurement Policy Act [now 41 U.S.C. 1501 et seq.] is administered through the regulation; or

"(B) a requirement to apply the regulation.

"(d) IMPLEMENTATION.—The Administrator for Federal Procurement Policy shall ensure that this section [see Tables for classification] and the amendments made by this section are implemented in a manner that ensures that the Federal Government can recover costs, as appropriate, in a case in which noncompliance with cost accounting standards, or a change in the cost accounting system of a contractor segment or subcontractor segment that is not determined to be desirable by the Federal Government, results in a shift of costs from contracts that are not covered by the cost accounting standards to contracts that are covered by the cost accounting standards.

"(e) IMPLEMENTATION OF REQUIREMENTS FOR REVISION OF REGULATIONS.—(1) Final regulations required by subsection (c) shall be issued not later than 180 days after the date of the enactment of this Act [Oct. 5, 1999].

"(2) Subsection (c) shall cease to be effective one year after the date on which final regulations issued in accordance with that subsection take effect.

"(g) INAPPLICABILITY OF STANDARDS TO CERTAIN CONTRACTS.—The cost accounting standards issued pursuant to section 26(f) of the Office of Federal Procurement Policy Act ([former] 41 U.S.C. 422(f)) [now 41 U.S.C. 1502(a), (b)], as amended by this section, shall not apply during fiscal year 2000 with respect to a contract entered into under the authority provided in chapter 89 of title 5, United States Code (relating to health benefits for Federal employees).

"(h) CONSTRUCTION REGARDING CERTAIN NOT-FOR-PROFIT ENTITIES.—The amendments made by subsections (a) and (b) [see Tables for classification] shall not be construed as modifying or superseding, nor as intended to impair or restrict, the applicability of the cost accounting standards described in section 26(f) of the Office of Federal Procurement Policy Act ([former] 41 U.S.C. 422(f)) [now 41 U.S.C. 1502(a), (b)] to—

"(1) any educational institution or federally funded research and development center that is associated with an educational institution in accordance with Office of Management and Budget Circular A–21, as in effect on January 1, 1999; or

"(2) any contract with a nonprofit entity that provides research and development and related products or services to the Department of Defense.

"(i) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) [see Tables for classification] shall take effect 180 days after the date of enactment of this Act [Oct. 5, 1999], and shall apply with respect to—

"(1) contracts that are entered into on or after such effective date; and

"(2) determinations made on or after such effective date regarding whether a segment of a contractor or subcontractor is subject to the cost accounting standards under section 26(f) of the Office of Federal Procurement Policy Act ([former] 41 U.S.C. 422(f)) [now 41 U.S.C. 1502(a), (b)], regardless of whether the contracts on which such determinations are made were entered into before, on, or after such date."

### § 1503. Contract price adjustment

(a) DISAGREEMENT CONSTITUTES A DISPUTE.—If the Federal Government and a contractor or subcontractor fail to agree on a contract price adjustment, including whether the contractor or subcontractor has complied with the applicable cost accounting standards, the disagreement will constitute a dispute under chapter 71 of this title.

(b) AMOUNT OF ADJUSTMENT.—A contract price adjustment undertaken under section 1502(f)(2) of this title shall be made, where applicable, on relevant contracts between the Federal Government and the contractor that are subject to the cost accounting standards so as to protect the Federal Government from payment, in the aggregate, of increased costs, as defined by the Cost Accounting Standards Board. The Federal Government may not recover costs greater than the aggregate increased cost to the Federal Government, as defined by the Board, on the relevant contracts subject to the price adjustment unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Federal Government.

(c) INTEREST.—The interest rate applicable to a contract price adjustment is the annual rate of interest established under section 6621 of the Internal Revenue Code of 1986 (26 U.S.C. 6621) for the period. Interest accrues from the time payments of the increased costs were made to the contractor or subcontractor to the time the Federal Government receives full compensation for the price adjustment.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3699.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 1503(a) | 41:422(h)(2). | Pub. L. 93–400, § 26(h)(2)–(4), as added Pub. L. 100–679, § 5(a), Nov. 17, 1988, 102 Stat. 4062. |
| 1503(b) | 41:422(h)(3). | |
| 1503(c) | 41:422(h)(4). | |

### § 1504. Effect on other standards and regulations

(a) PREVIOUSLY EXISTING STANDARDS.—All cost accounting standards, waivers, exemptions, interpretations, modifications, rules, and regulations prescribed by the Cost Accounting Standards Board under section 719 of the Defense Production Act of 1950 (50 U.S.C. App. 2168)— [1]

(1) remain in effect until amended, superseded, or rescinded by the Board under this chapter; and

(2) are subject to the provisions of this division in the same manner as if prescribed by the Board under this division.

(b) INCONSISTENT AGENCY REGULATIONS.—To ensure that a regulation or proposed regulation of an executive agency is not inconsistent with a cost accounting standard prescribed or amended under this chapter, the Administrator, under the authority in sections 1121, 1122(a) to (c)(1), 1125, 1126, 1130, 1131, and 2305 of this title, shall rescind or deny the promulgation of the inconsistent regulation or proposed regulation and take other appropriate action authorized under sections 1121, 1122(a) to (c)(1), 1125, 1126, 1130, 1131, and 2305.

(c) COSTS NOT SUBJECT TO DIFFERENT STANDARDS.—Costs that are the subject of cost accounting standards prescribed under this chapter are not subject to regulations established by another executive agency that differ from those standards with respect to the measurement, assignment, and allocation of those costs.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3699.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 1504(a) | 41:422(j)(1), (2). | Pub. L. 93–400, § 26(j), as added Pub. L. 100–679, § 5(a), Nov. 17, 1988, 102 Stat. 4062. |
| 1504(b) | 41:422(j)(3). | |
| 1504(c) | 41:422(j)(4). | |

REFERENCES IN TEXT

Section 719 of the Defense Production Act of 1950, referred to in subsec. (a), is section 719 of act Sept. 8, 1950, ch. 932, title VII, as added Pub. L. 91–379, title I, § 103, Aug. 15, 1970, 84 Stat. 796, which was classified to section 2168 of the former Appendix to Title 50, War and National Defense, prior to repeal by Pub. L. 100–679, § 5(b), Nov. 17, 1988, 102 Stat. 4063.

[1] See References in Text note below.

### § 1505. Examinations

To determine whether a contractor or subcontractor has complied with cost accounting standards prescribed under this chapter and has followed consistently the contractor's or subcontractor's disclosed cost accounting practices, an authorized representative of the head of the agency concerned, of the offices of inspector general established under the Inspector General Act of 1978 (5 U.S.C. App.), or of the Comptroller General shall have the right to examine and copy documents, papers, or records of the contractor or subcontractor relating to compliance with the standards.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3700.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 1505 | 41:422(k). | Pub. L. 93–400, § 26(k), as added Pub. L. 100–679, § 5(a), Nov. 17, 1988, 102 Stat. 4062. |

REFERENCES IN TEXT

The Inspector General Act of 1978, referred to in text, is Pub. L. 95–452, Oct. 12, 1978, 92 Stat. 1101, which is set out in the Appendix to Title 5, Government Organization and Employees.

### § 1506. Authorization of appropriations

Necessary amounts may be appropriated to carry out this chapter.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3700.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 1506 | 41:422(*l*). | Pub. L. 93–400, § 26(*l*), as added Pub. L. 100–679, § 5(a), Nov. 17, 1988, 102 Stat. 4063. |

## CHAPTER 17—AGENCY RESPONSIBILITIES AND PROCEDURES

Sec.
1701. Cooperation with the Administrator.
1702. Chief Acquisition Officers and senior procurement executives.
1703. Acquisition workforce.
1704. Planning and policy-making for acquisition workforce.
1705. Advocates for competition.
1706. Personnel evaluation.
1707. Publication of proposed regulations.
1708. Procurement notice.
1709. Contracting functions performed by Federal personnel.
1710. Public-private competition required before conversion to contractor performance.
1711. Value engineering.
1712. Record requirements.
1713. Procurement data.

### § 1701. Cooperation with the Administrator

On the request of the Administrator, each executive agency shall—

(1) make its services, personnel, and facilities available to the Office of Federal Procurement Policy to the greatest practicable extent for the performance of functions under this division; and

of 1938 (29 U.S.C. 207(e))" are substituted for "the regular rate under the Fair Labor Standards Act by provisions of section 7(d) thereof" for clarity, to correct the reference to "the Fair Labor Standards Act" in accordance with section 1 of the Fair Labor Standards Act of 1938 (29:201), which provided the short title for the Act, and to correct the reference to "section 7(d) thereof" in accordance with section 204(d)(1) of the Fair Labor Standards Amendments of 1966 (Public Law 89–601, 80 Stat. 836), which amended the Fair Labor Standards Act of 1938 by redesignating section 7(d) as 7(e).

In subsection (f), the words "paragraphs (1) and (2) of section 2", which appear in section 10 of the Service Contract Act of 1965, as added by section 5 of Public Law 92–473 (86 Stat. 790), are treated as a reference to paragraphs (1) and (2) of section 2(a) of the Service Contract Act of 1965 to reflect the probable intent of Congress. The words "which are entered into during the applicable fiscal year", 41:358(1)–(4), and the words "On and after July 1, 1976" are omitted as obsolete.

## Subtitle III—Contract Disputes


| Chapter | | Sec. |
|---|---|---|
| 71. | Contract Disputes | 7101 |


### CHAPTER 71—CONTRACT DISPUTES


Sec.
7101. Definitions.
7102. Applicability of chapter.
7103. Decision by contracting officer.
7104. Contractor's right of appeal from decision by contracting officer.
7105. Agency boards.
7106. Agency board procedures for accelerated and small claims.
7107. Judicial review of agency board decisions.
7108. Payment of claims.
7109. Interest.


### § 7101. Definitions

In this chapter:

(1) ADMINISTRATOR.—The term "Administrator" means the Administrator for Federal Procurement Policy appointed pursuant to section 1102 of this title.

(2) AGENCY BOARD OR AGENCY BOARD OF CONTRACT APPEALS.—The term "agency board" or "agency board of contract appeals" means—

(A) the Armed Services Board;

(B) the Civilian Board;

(C) the board of contract appeals of the Tennessee Valley Authority; or

(D) the Postal Service Board established under section 7105(d)(1) of this title.

(3) AGENCY HEAD.—The term "agency head" means the head and any assistant head of an executive agency. The term may include the chief official of a principal division of an executive agency if the head of the executive agency so designates that chief official.

(4) ARMED SERVICES BOARD.—The term "Armed Services Board" means the Armed Services Board of Contract Appeals established under section 7105(a)(1) of this title.

(5) CIVILIAN BOARD.—The term "Civilian Board" means the Civilian Board of Contract Appeals established under section 7105(b)(1) of this title.

(6) CONTRACTING OFFICER.—The term "contracting officer"—

(A) means an individual who, by appointment in accordance with applicable regulations, has the authority to make and administer contracts and to make determinations and findings with respect to contracts; and

(B) includes an authorized representative of the contracting officer, acting within the limits of the representative's authority.

(7) CONTRACTOR.—The term "contractor" means a party to a Federal Government contract other than the Federal Government.

(8) EXECUTIVE AGENCY.—The term "executive agency" means—

(A) an executive department as defined in section 101 of title 5;

(B) a military department as defined in section 102 of title 5;

(C) an independent establishment as defined in section 104 of title 5, except that the term does not include the Government Accountability Office; and

(D) a wholly owned Government corporation as defined in section 9101(3) of title 31.

(9) MISREPRESENTATION OF FACT.—The term "misrepresentation of fact" means a false statement of substantive fact, or conduct that leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3816.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 7101 ......... | 41:601. | Pub. L. 95–563, § 2, Nov. 1, 1978, 92 Stat. 2383; Pub. L. 104–106, div. D, title XLIII, § 4322(b)(5), Feb. 10, 1996, 110 Stat. 677; Pub. L. 109–163, div. A, title VIII, § 847(d)(1), Jan. 6, 2006, 119 Stat. 3393. |

In paragraph (8)(C), the words "Government Accountability Office" are substituted for "General Accounting Office" because of section 8(b) of the GAO Human Capital Reform Act of 2004 (Public Law 108–271, 118 Stat. 814, 31 U.S.C. 702 note).

In paragraph (8)(D), the words "section 9101(3) of title 31" are substituted for "section 846 of title 31" because of section 4(b) of Public Law 97–258 (31 U.S.C. note prec. 101).

### § 7102. Applicability of chapter

(a) EXECUTIVE AGENCY CONTRACTS.—Unless otherwise specifically provided in this chapter, this chapter applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of title 28) made by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair, or maintenance of real property; or

(4) the disposal of personal property.

(b) TENNESSEE VALLEY AUTHORITY CONTRACTS.—

(1) IN GENERAL.—With respect to contracts of the Tennessee Valley Authority, this chapter applies only to contracts containing a clause that requires contract disputes to be resolved through an agency administrative process.

(2) EXCLUSION.—Notwithstanding any other provision of this chapter, this chapter does not apply to a contract of the Tennessee Valley Authority for the sale of fertilizer or electric pow-

er or related to the conduct or operation of the electric power system.

(c) FOREIGN GOVERNMENT OR INTERNATIONAL ORGANIZATION CONTRACTS.—If an agency head determines that applying this chapter would not be in the public interest, this chapter does not apply to a contract with a foreign government, an agency of a foreign government, an international organization, or a subsidiary body of an international organization.

(d) MARITIME CONTRACTS.—Appeals under section 7107(a) of this title and actions brought under sections 7104(b) and 7107(b) to (f) of this title, arising out of maritime contracts, are governed by chapter 309 or 311 of title 46, as applicable, to the extent that those chapters are not inconsistent with this chapter.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3817.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 7102(a)–(c) .. | 41:602. | Pub. L. 95–563, §§ 3, 4, Nov. 1, 1978, 92 Stat. 2383. |
| 7102(d) ...... | 41:603. | |

In subsection (c), the words "an agency head" are substituted for "the head of the agency" for consistency with the defined term "agency head" in section 7101 of the revised title.

In subsection (d), the words "chapter 309 or 311 of title 46" are substituted for "the Act of March 9, 1920, as amended (41 Stat. 525, as amended; 46 U.S.C. 741–752) or the Act of March 3, 1925, as amended (43 Stat. 1112, as amended; 46 U.S.C. 781–790)" in section 4 of the Contract Disputes Act of 1978 (Public Law 95–563, 92 Stat. 2384) because of section 18(c) of Public Law 109–304 (46 U.S.C. note prec. 101).

## § 7103. Decision by contracting officer

(a) CLAIMS GENERALLY.—

(1) SUBMISSION OF CONTRACTOR'S CLAIMS TO CONTRACTING OFFICER.—Each claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision.

(2) CONTRACTOR'S CLAIMS IN WRITING.—Each claim by a contractor against the Federal Government relating to a contract shall be in writing.

(3) CONTRACTING OFFICER TO DECIDE FEDERAL GOVERNMENT'S CLAIMS.—Each claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer.

(4) TIME FOR SUBMITTING CLAIMS.—

(A) IN GENERAL.—Each claim by a contractor against the Federal Government relating to a contract and each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim.

(B) EXCEPTION.—Subparagraph (A) of this paragraph does not apply to a claim by the Federal Government against a contractor that is based on a claim by the contractor involving fraud.

(5) APPLICABILITY.—The authority of this subsection and subsections (c)(1), (d), and (e) does not extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation that another Federal agency is specifically authorized to administer, settle, or determine.

(b) CERTIFICATION OF CLAIMS.—

(1) REQUIREMENT GENERALLY.—For claims of more than $100,000 made by a contractor, the contractor shall certify that—

(A) the claim is made in good faith;

(B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;

(C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and

(D) the certifier is authorized to certify the claim on behalf of the contractor.

(2) WHO MAY EXECUTE CERTIFICATION.—The certification required by paragraph (1) may be executed by an individual authorized to bind the contractor with respect to the claim.

(3) FAILURE TO CERTIFY OR DEFECTIVE CERTIFICATION.—A contracting officer is not obligated to render a final decision on a claim of more than $100,000 that is not certified in accordance with paragraph (1) if, within 60 days after receipt of the claim, the contracting officer notifies the contractor in writing of the reasons why any attempted certification was found to be defective. A defect in the certification of a claim does not deprive a court or an agency board of jurisdiction over the claim. Prior to the entry of a final judgment by a court or a decision by an agency board, the court or agency board shall require a defective certification to be corrected.

(c) FRAUDULENT CLAIMS.—

(1) NO AUTHORITY TO SETTLE.—This section does not authorize an agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.

(2) LIABILITY OF CONTRACTOR.—If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim. Liability under this paragraph shall be determined within 6 years of the commission of the misrepresentation of fact or fraud.

(d) ISSUANCE OF DECISION.—The contracting officer shall issue a decision in writing and shall mail or otherwise furnish a copy of the decision to the contractor.

(e) CONTENTS OF DECISION.—The contracting officer's decision shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided in this chapter. Specific findings of fact are not required. If made, specific findings of fact are not binding in any subsequent proceeding.

(f) TIME FOR ISSUANCE OF DECISION.—

(1) CLAIM OF $100,000 OR LESS.—A contracting officer shall issue a decision on any submitted claim of $100,000 or less within 60 days from the contracting officer's receipt of a written request from the contractor that a decision be rendered within that period.

(2) CLAIM OF MORE THAN $100,000.—A contracting officer shall, within 60 days of receipt of a submitted certified claim over $100,000—

(A) issue a decision; or

(B) notify the contractor of the time within which a decision will be issued.

(3) GENERAL REQUIREMENT OF REASONABLENESS.—The decision of a contracting officer on submitted claims shall be issued within a reasonable time, in accordance with regulations prescribed by the agency, taking into account such factors as the size and complexity of the claim and the adequacy of information in support of the claim provided by the contractor.

(4) REQUESTING TRIBUNAL TO DIRECT ISSUANCE WITHIN SPECIFIED TIME PERIOD.—A contractor may request the tribunal concerned to direct a contracting officer to issue a decision in a specified period of time, as determined by the tribunal concerned, in the event of undue delay on the part of the contracting officer.

(5) FAILURE TO ISSUE DECISION WITHIN REQUIRED TIME PERIOD.—Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal or action on the claim as otherwise provided in this chapter. However, the tribunal concerned may, at its option, stay the proceedings of the appeal or action to obtain a decision by the contracting officer.

(g) FINALITY OF DECISION UNLESS APPEALED.—The contracting officer's decision on a claim is final and conclusive and is not subject to review by any forum, tribunal, or Federal Government agency, unless an appeal or action is timely commenced as authorized by this chapter. This chapter does not prohibit an executive agency from including a clause in a Federal Government contract requiring that, pending final decision of an appeal, action, or final settlement, a contractor shall proceed diligently with performance of the contract in accordance with the contracting officer's decision.

(h) ALTERNATIVE MEANS OF DISPUTE RESOLUTION.—

(1) IN GENERAL.—Notwithstanding any other provision of this chapter, a contractor and a contracting officer may use any alternative means of dispute resolution under subchapter IV of chapter 5 of title 5, or other mutually agreeable procedures, for resolving claims. All provisions of subchapter IV of chapter 5 of title 5 apply to alternative means of dispute resolution under this subsection.

(2) CERTIFICATION OF CLAIM.—The contractor shall certify the claim when required to do so under subsection (b)(1) or other law.

(3) REJECTING REQUEST FOR ALTERNATIVE DISPUTE RESOLUTION.—

(A) CONTRACTING OFFICER.—A contracting officer who rejects a contractor's request for alternative dispute resolution proceedings shall provide the contractor with a written explanation, citing one or more of the conditions in section 572(b) of title 5 or other specific reasons that alternative dispute resolution procedures are inappropriate.

(B) CONTRACTOR.—A contractor that rejects an agency's request for alternative dispute resolution proceedings shall inform the agency in writing of the contractor's specific reasons for rejecting the request.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3817.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 7103(a)(1) ... | 41:605(a) (1st sentence related to submission). | Pub. L. 95–563, §§ 5, 6(a) (1st, 2d, 5th–last sentences), (b), (c)(3), (5), Nov. 1, 1978, 92 Stat. 2384, 2385. |
| 7103(a)(2) ... | 41:605(a) (1st sentence related to writing requirement). | |
| 7103(a)(3) ... | 41:605(a) (2d sentence). | |
| 7103(a)(4)(A) | 41:605(a) (3d sentence). | Pub. L. 95–563, § 6(a) (3d, 4th sentences), Nov. 1, 1978, as added Pub. L. 103–355, title II, § 2351(a)(1), Oct. 13, 1994, 108 Stat. 3322, amended Pub. L. 104–106, div. D, title XLIII, § 4321(a)(6), Feb. 10, 1996, 110 Stat. 671. |
| 7103(a)(4)(B) | 41:605(a) (4th sentence). | |
| 7103(a)(5) ... | 41:605(a) (8th sentence). | |
| 7103(b)(1) ... | 41:605(c)(1) (last sentence). | Pub. L. 95–563, § 6(c)(1) (last sentence), Nov. 1, 1978, 92 Stat. 2385; Pub. L. 102–572, title IX, § 907(a)(1)(A), Oct. 29, 1992, 106 Stat. 4518; Pub. L. 103–355, title II, § 2351(b), Oct. 13, 1994, 108 Stat. 3322. |
| 7103(b)(2) ... | 41:605(c)(7). | Pub. L. 95–563, § 6(c)(6), (7), as added Pub. L. 102–572, title IX, § 907(a)(1)(B), Oct. 29, 1992, 106 Stat. 4518. |
| 7103(b)(3) ... | 41:605(c)(6). | |
| 7103(c)(1) ... | 41:605(a) (last sentence). | |
| 7103(c)(2) ... | 41:604. | |
| 7103(d) ...... | 41:605(a) (5th sentence). | |
| 7103(e) ...... | 41:605(a) (6th, 7th sentences). | |
| 7103(f)(1) ... | 41:605(c)(1) (1st sentence). | Pub. L. 95–563, § 6(c)(1) (1st sentence), (2), Nov. 1, 1978, 92 Stat. 2385; Pub. L. 103–355, title II, § 2351(b), Oct. 13, 1994, 108 Stat. 3322. |
| 7103(f)(2) ... | 41:605(c)(2). | |
| 7103(f)(3) ... | 41:605(c)(3). | |
| 7103(f)(4) ... | 41:605(c)(4). | Pub. L. 95–563, § 6(c)(4), Nov. 1, 1978, 92 Stat. 2385; Pub. L. 103–355, title II, § 2351(e), Oct. 13, 1994, 108 Stat. 3322. |
| 7103(f)(5) ... | 41:605(c)(5). | |
| 7103(g) ...... | 41:605(b). | |
| 7103(h)(1) ... | 41:605(d) (1st, last sentences). | Pub. L. 95–563, § 6(d) (1st, last sentences), as added Pub. L. 101–552, § 6(a), Nov. 15, 1990, 104 Stat. 2745, 2746; Pub. L. 104–106, div. D, title XLIII, § 4322(b)(6), Feb. 10, 1996, 110 Stat. 677; Pub. L. 105–85, div. A, title X, § 1073(g)(3), Nov. 18, 1997, 111 Stat. 1906. |
| 7103(h)(2) ... | 41:605(d) (2d sentence). | Pub. L. 95–563, § 6(d) (2d sentence), as added Pub. L. 101–552, § 6(a), Nov. 15, 1990, 104 Stat. 2745; Pub. L. 104–320, § 6(1), Oct. 19, 1996, 110 Stat. 3871. |
| 7103(h)(3)(A) | 41:605(e) (1st sentence). | Pub. L. 95–563, § 6(e), as added Pub. L. 101–552, § 6(a), Nov. 15, 1990, 104 Stat. 2746; Pub. L. 103–355, title II, § 2352, Oct. 13, 1994, 108 Stat. 3322; Pub. L. 104–106, div. D, title XLIII, §§ 4321(a)(7), 4322(b)(6), Feb. 10, 1996, 110 Stat. 671, 677; Pub. L. 104–320, § 6(2), Oct. 19, 1996, 110 Stat. 3871; Pub. L. 105–85, div. A, title X, § 1073(g)(3), Nov. 18, 1997, 111 Stat. 1906. |
| 7103(h)(3)(B) | 41:605(e) (last sentence). | |

In subsection (b)(1)(D) and (2), the word "duly" is omitted as unnecessary.

In subsection (b)(3), the words "of contract appeals" are omitted as unnecessary because of the definition of "agency board" in section 7101 of the revised title.

In subsection (c)(2), the words "this subsection", which appear in section 5 of the Contract Disputes Act of 1978

(Pub. L. 95–563, 92 Stat. 2384), and which were probably intended to mean "this section", are translated as "this paragraph" in accordance with the probable intent of Congress.

In subsection (f)(5), the words "the commencement of" are omitted as unnecessary. The words "of the appeal or action" are substituted for "in the event an appeal or suit is so commenced in the absence of a prior decision by the contracting officer" to eliminate unnecessary words.

## § 7104. Contractor's right of appeal from decision by contracting officer

(a) APPEAL TO AGENCY BOARD.—A contractor, within 90 days from the date of receipt of a contracting officer's decision under section 7103 of this title, may appeal the decision to an agency board as provided in section 7105 of this title.

(b) BRINGING AN ACTION DE NOVO IN FEDERAL COURT.—

(1) IN GENERAL.—Except as provided in paragraph (2), and in lieu of appealing the decision of a contracting officer under section 7103 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

(2) TENNESSEE VALLEY AUTHORITY.—In the case of an action against the Tennessee Valley Authority, the contractor may only bring an action directly on the claim in a district court of the United States pursuant to section 1337 of title 28, notwithstanding any contract provision, regulation, or rule of law to the contrary.

(3) TIME FOR FILING.—A contractor shall file any action under paragraph (1) or (2) within 12 months from the date of receipt of a contracting officer's decision under section 7103 of this title.

(4) DE NOVO.—An action under paragraph (1) or (2) shall proceed de novo in accordance with the rules of the appropriate court.

(Pub. L. 111–350, § 3, Jan. 4, 2011, 124 Stat. 3820.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 7104(a) ...... | 41:606. | Pub. L. 95–563, § 7, Nov. 1, 1978, 92 Stat. 2385. |
| 7104(b) ...... | 41:609(a). | Pub. L. 95–563, § 10(a), Nov. 1, 1978, 92 Stat. 2388; Pub. L. 97–164, title I, § 161(10), Apr. 2, 1982, 96 Stat. 49. |

In subsection (a), the words "of contract appeals" are omitted as unnecessary because of the definition of "agency board" in section 7101 of the revised title.

In subsection (b)(1), the words "United States Court of Federal Claims" are substituted for "United States Claims Court" because of section 902(b)(1) of the Federal Courts Administration Act of 1992 (Pub. L. 102–572, 106 Stat. 4516, 28 U.S.C. 171 note).

## § 7105. Agency boards

(a) ARMED SERVICES BOARD.—

(1) ESTABLISHMENT.—An Armed Services Board of Contract Appeals may be established within the Department of Defense when the Secretary of Defense, after consultation with the Administrator, determines from a workload study that the volume of contract claims justifies the establishment of a full-time agency board of at least 3 members who shall have no other inconsistent duties. Workload studies will be updated at least once every 3 years and submitted to the Administrator.

(2) APPOINTMENT OF MEMBERS AND COMPENSATION.—Members of the Armed Services Board shall be selected and appointed in the same manner as administrative law judges appointed pursuant to section 3105 of title 5, with an additional requirement that members must have had at least 5 years of experience in public contract law. The Secretary of Defense shall designate the chairman and vice chairman of the Armed Services Board from among the appointed members. Compensation for the chairman, vice chairman, and other members shall be determined under section 5372a of title 5.

(b) CIVILIAN BOARD.—

(1) ESTABLISHMENT.—There is established in the General Services Administration the Civilian Board of Contract Appeals.

(2) MEMBERSHIP.—

(A) ELIGIBILITY.—The Civilian Board consists of members appointed by the Administrator of General Services (in consultation with the Administrator for Federal Procurement Policy) from a register of applicants maintained by the Administrator of General Services, in accordance with rules issued by the Administrator of General Services (in consultation with the Administrator for Federal Procurement Policy) for establishing and maintaining a register of eligible applicants and selecting Civilian Board members. The Administrator of General Services shall appoint a member without regard to political affiliation and solely on the basis of the professional qualifications required to perform the duties and responsibilities of a Civilian Board member.

(B) APPOINTMENT OF MEMBERS AND COMPENSATION.—Members of the Civilian Board shall be selected and appointed to serve in the same manner as administrative law judges appointed pursuant to section 3105 of title 5, with an additional requirement that members must have had at least 5 years experience in public contract law. Compensation for the members shall be determined under section 5372a of title 5.

(3) REMOVAL.—Members of the Civilian Board are subject to removal in the same manner as administrative law judges, as provided in section 7521 of title 5.

(4) FUNCTIONS.—

(A) IN GENERAL.—The Civilian Board has jurisdiction as provided by subsection (e)(1)(B).

(B) ADDITIONAL JURISDICTION.—With the concurrence of the Federal agencies affected, the Civilian Board may assume—

(i) jurisdiction over any additional category of laws or disputes over which an agency board of contract appeals established pursuant to section 8 of the Contract Disputes Act exercised jurisdiction before January 6, 2007; and

(ii) any other function the agency board performed before January 6, 2007, on behalf of those agencies.

(c) TENNESSEE VALLEY AUTHORITY BOARD.—

(1) ESTABLISHMENT.—The Board of Directors of the Tennessee Valley Authority may estab-

authority for the various D&F's is as shown in the applicable FAR part.

## PART 2—DEFINITIONS OF WORDS AND TERMS

Sec.
2.000 Scope of part.

Subpart 2.1—Definitions

2.101 Definitions.

Subpart 2.2—Definitions Clause

2.201 Contract clause.

AUTHORITY: 40 U.S.C. 121(c); 10 U.S.C. chapter 137; and 51 U.S.C. 20113.

SOURCE: 48 FR 42107, Sept. 19, 1983, unless otherwise noted.

**2.000 Scope of part.**

(a) This part—

(1) Defines words and terms that are frequently used in the FAR;

(2) Provides cross-references to other definitions in the FAR of the same word or term; and

(3) Provides for the incorporation of these definitions in solicitations and contracts by reference.

(b) Other parts, subparts, and sections of this regulation (48 CFR chapter 1) may define other words or terms and those definitions only apply to the part, subpart, or section where the word or term is defined.

[66 FR 2118, Jan. 10, 2001, as amended at 78 FR 6191, Jan. 29, 2013]

### Subpart 2.1—Definitions

**2.101 Definitions.**

(a) A word or a term, defined in this section, has the same meaning throughout this regulation (48 CFR chapter 1), unless—

(1) The context in which the word or term is used clearly requires a different meaning; or

(2) Another FAR part, subpart, or section provides a different definition for the particular part or portion of the part.

(b) If a word or term that is defined in this section is defined differently in another part, subpart, or section of this regulation (48 CFR chapter 1), the definition in—

(1) This section includes a cross-reference to the other definitions; and

(2) That part, subpart, or section applies to the word or term when used in that part, subpart, or section.

*Acquisition* means the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated. Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract.

*Acquisition planning* means the process by which the efforts of all personnel responsible for an acquisition are coordinated and integrated through a comprehensive plan for fulfilling the agency need in a timely manner and at a reasonable cost. It includes developing the overall strategy for managing the acquisition.

*Activity Address Code (AAC)* means a distinct six-position code consisting of a combination of alpha and/or numeric characters assigned to identify specific agency offices, units, activities, or organizations by the General Services Administration for civilian agencies and by the Department of Defense for defense agencies.

*Adequate evidence* means information sufficient to support the reasonable belief that a particular act or omission has occurred.

*Advisory and assistance services* means those services provided under contract by nongovernmental sources to support or improve: organizational policy development; decision-making; management and administration; program and/or project management and administration; or R&D activities. It can also mean the furnishing of professional advice or assistance rendered to improve

the effectiveness of Federal management processes or procedures (including those of an engineering and technical nature). In rendering the foregoing services, outputs may take the form of information, advice, opinions, alternatives, analyses, evaluations, recommendations, training and the day-to-day aid of support personnel needed for the successful performance of ongoing Federal operations. All advisory and assistance services are classified in one of the following definitional subdivisions:

(1) Management and professional support services, *i.e.*, contractual services that provide assistance, advice or training for the efficient and effective management and operation of organizations, activities (including management and support services for R&D activities), or systems. These services are normally closely related to the basic responsibilities and mission of the agency originating the requirement for the acquisition of services by contract. Included are efforts that support or contribute to improved organization of program management, logistics management, project monitoring and reporting, data collection, budgeting, accounting, performance auditing, and administrative technical support for conferences and training programs.

(2) Studies, analyses and evaluations, *i.e.*, contracted services that provide organized, analytical assessments/evaluations in support of policy development, decision-making, management, or administration. Included are studies in support of R&D activities. Also included are acquisitions of models, methodologies, and related software supporting studies, analyses or evaluations.

(3) Engineering and technical services, *i.e.*, contractual services used to support the program office during the acquisition cycle by providing such services as systems engineering and technical direction (see 9.505–1(b)) to ensure the effective operation and maintenance of a weapon system or major system as defined in OMB Circular No. A–109 or to provide direct support of a weapon system that is essential to research, development, production, operation or maintenance of the system.

*Affiliates* means associated business concerns or individuals if, directly or indirectly either one controls or can control the other; or third party controls or can control both, except as follows:

(1) For use in subpart 9.4, see the definition at 9.403.

(2) For use of affiliates in size determinations, see the definition of "small business concern" in this section.

*Agency head* or *head of the agency* means the Secretary, Attorney General, Administrator, Governor, Chairperson, or other chief official of an executive agency, unless otherwise indicated, including any deputy or assistant chief official of an executive agency.

*Alternate* means a substantive variation of a basic provision or clause prescribed for use in a defined circumstance. It adds wording to, deletes wording from, or substitutes specified wording for a portion of the basic provision or clause. The alternate version of a provision or clause is the basic provision or clause as changed by the addition, deletion, or substitution (see 52.105(a)).

*Architect-engineer services,* as defined in 40 U.S.C. 1102, means—

(1) Professional services of an architectural or engineering nature, as defined by State law, if applicable, that are required to be performed or approved by a person licensed, registered, or certified to provide those services;

(2) Professional services of an architectural or engineering nature performed by contract that are associated with research, planning, development, design, construction, alteration, or repair of real property; and

(3) Those other professional services of an architectural or engineering nature, or incidental services, that members of the architectural and engineering professions (and individuals in their employ) may logically or justifiably perform, including studies, investigations, surveying and mapping, tests, evaluations, consultations, comprehensive planning, program management, conceptual designs, plans and specifications, value engineering, construction phase services, soils engineering, drawing reviews, preparation

of operating and maintenance manuals, and other related services.

*Assignment of claims* means the transfer or making over by the contractor to a bank, trust company, or other financing institution, as security for a loan to the contractor, of its right to be paid by the Government for contract performance.

*Assisted acquisition* means a type of interagency acquisition where a servicing agency performs acquisition activities on a requesting agency's behalf, such as awarding and administering a contract, task order, or delivery order.

*Basic research* means that research directed toward increasing knowledge in science. The primary aim of basic research is a fuller knowledge or understanding of the subject under study, rather than any practical application of that knowledge.

*Best value* means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement.

*Bid sample* means a product sample required to be submitted by an offeror to show characteristics of the offered products that cannot adequately be described by specifications, purchase descriptions, or the solicitation (e.g., balance, facility of use, or pattern).

*Biobased product* means a product determined by the U.S. Department of Agriculture to be a commercial or industrial product (other than food or feed) that is composed, in whole or in significant part, of biological products, including renewable domestic agricultural materialsand forestry materials.

*Broad agency announcement* means a general announcement of an agency's research interest including criteria for selecting proposals and soliciting the participation of all offerors capable of satisfying the Government's needs (see 6.102(d)(2)).

*Building or work* means construction activity as distinguished from manufacturing, furnishing of materials, or servicing and maintenance work. The terms include, without limitation, buildings, structures, and improvements of all types, such as bridges, dams, plants, highways, parkways, streets, subways, tunnels, sewers, mains, power lines, pumping stations, heavy generators, railways, airports, terminals, docks, piers, wharves, ways, lighthouses, buoys, jetties, breakwaters, levees, canals, dredging, shoring, rehabilitation and reactivation of plants, scaffolding, drilling, blasting, excavating, clearing, and landscaping. The manufacture or furnishing of materials, articles, supplies, or equipment (whether or not a Federal or State agency acquires title to such materials, articles, supplies, or equipment during the course of the manufacture or furnishing, or owns the materials from which they are manufactured or furnished) is not "building" or "work" within the meaning of this definition unless conducted in connection with and at the site of such building or work as is described in the foregoing sentence, or under the United States Housing Act of 1937 and the Housing Act of 1949 in the construction or development of the project.

*Bundling*—

(1) Means a subset of consolidation that combines two or more requirements for supplies or services, previously provided or performed under separate smaller contracts (see paragraph (2) of this definition), into a solicitation for a single contract, a multiple-award contract, or a task or delivery order that is likely to be unsuitable for award to a small business concern (even if it is suitable for award to a small business with a Small Business Teaming Arrangement) due to—

(i) The diversity, size, or specialized nature of the elements of the performance specified;

(ii) The aggregate dollar value of the anticipated award;

(iii) The geographical dispersion of the contract performance sites; or

(iv) Any combination of the factors described in paragraphs (1)(i), (ii), and (iii) of this definition.

(2) "Separate smaller contract" as used in this definition, means a contract that has been performed by one or more small business concerns or that was suitable for award to one or more small business concerns.

(3) This definition does not apply to a contract that will be awarded and performed entirely outside of the United States.

*Business unit* means any segment of an organization, or an entire business organization that is not divided into segments.

*Certified cost or pricing data* means "cost or pricing data" that were required to be submitted in accordance with FAR 15.403–4 and 15.403–5 and have been certified, or are required to be certified, in accordance with 15.406–2. This certification states that, to the best of the person's knowledge and belief, the cost or pricing data are accurate, complete, and current as of a date certain before contract award. Cost or pricing data are required to be certified in certain procurements (10 U.S.C. 2306a and 41 U.S.C. chapter 35).

*Change-of-name agreement* means a legal instrument executed by the contractor and the Government that recognizes the legal change of name of the contractor without disturbing the original contractual rights and obligations of the parties.

*Change order* means a written order, signed by the contracting officer, directing the contractor to make a change that the Changes clause authorizes the contracting officer to order without the contractor's consent.

*Chief Acquisition Officer* means an executive level acquisition official responsible for agency performance of acquisition activities and acquisition programs created pursuant to 41 U.S.C. 1702.

*Chief of mission* means the principal officer in charge of a diplomatic mission of the United States or of a United States office abroad which is designated by the Secretary of State as diplomatic in nature, including any individual assigned under section 502(c) of the Foreign Service Act of 1980 (Public Law 96–465) to be temporarily in charge of such a mission or office.

*Claim* means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under 41 U.S.C. chapter 71, Contract Disputes, until certified as required by the statute. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

*Classified acquisition* means an acquisition in which offerors must have access to classified information to properly submit an offer or quotation, to understand the performance requirements, or to perform the contract.

*Classified contract* means any contract in which the contractor or its employees must have access to classified information during contract performance. A contract may be a classified contract even though the contract document itself is unclassified.

*Classified information* means any knowledge that can be communicated or any documentary material, regardless of its physical form or characteristics, that—

(1)(i) Is owned by, is produced by or for, or is under the control of the United States Government; or

(ii) Has been classified by the Department of Energy as privately generated restricted data following the procedures in 10 CFR 1045.21; and

(2) Must be protected against unauthorized disclosure according to Executive Order 12958, Classified National Security Information, April 17, 1995, or classified in accordance with the Atomic Energy Act of 1954.

*Cognizant Federal agency* means the Federal agency that, on behalf of all Federal agencies, is responsible for establishing final indirect cost rates and forward pricing rates, if applicable, and administering cost accounting standards for all contracts in a business unit.

*Combatant commander* means the commander of a unified or specified combatant command established in accordance with 10 U.S.C. 161.

*Commercial and Government Entity (CAGE) code* means—

(1) An identifier assigned to entities located in the United States or its outlying areas by the Defense Logistics

(i) When the costs that were accumulated under the noncompliant practice exceed the costs that would have been accumulated using a compliant practice (from the time the noncompliant practice was first implemented until the date the noncompliant practice was replaced with a compliant practice), the difference is increased cost to the Government.

(ii) When the costs that were accumulated under the noncompliant practice are less than the costs that would have been accumulated using a compliant practice (from the time the noncompliant practice was first implemented until the date the noncompliant practice was replaced with a compliant practice) the difference is decreased cost to the Government;

(5) Calculate the total increase or decrease in contract and subcontract incentives, fees, and profits associated with the increased or decreased costs to the Government in accordance with 48 CFR 9903.306(c). The associated increase or decrease is based on the difference between the negotiated incentives, fees, and profits and the amounts that would have been negotiated had the contractor used a compliant practice;

(6) Determine the cost impact of each noncompliance that affects both cost estimating and cost accumulation by combining the cost impacts in paragraphs (h)(3), (h)(4), and (h)(5) of this section; and

(7) Calculate the increased cost to the Government in the aggregate.

(i) *Remedies.* If the contractor does not correct the noncompliance or submit the proposal required in paragraph (d) or (f) of this section within the specified time, or any extension granted by the CFAO, the CFAO shall follow the procedures at 30.604(i).

[70 FR 11753, Mar. 9, 2005, as amended at 73 FR 10967, Feb. 28, 2008]

### 30.606 Resolving cost impacts.

(a) *General.* (1) The CFAO shall coordinate with the affected contracting officers before negotiating and resolving the cost impact when the estimated cost impact on any of their contracts is at least $100,000. However, the CFAO has the sole authority for negotiating and resolving the cost impact.

(2) The CFAO may resolve a cost impact attributed to a change in cost accounting practice or a noncompliance by adjusting a single contract, several but not all contracts, all contracts, or any other suitable method.

(3) In resolving the cost impact, the CFAO—

(i) Shall not combine the cost impacts of any of the following:

(A) A required change and a unilateral change.

(B) A required change and a noncompliance.

(C) A desirable change and a unilateral change.

(D) A desirable change and a noncompliance.

(ii) Shall not combine the cost impacts of any of the following unless all of the cost impacts are increased costs to Government:

(A) One or more unilateral changes.

(B) One or more noncompliances.

(C) Unilateral changes and noncompliances; and

(iii) May consider the cost impacts of a unilateral change affecting two or more segments to be a single change if—

(A) The change affects the flow of costs between segments; or

(B) Implements a common cost accounting practice for two or more segments.

(4) For desirable changes, the CFAO should consider the estimated cost impact of associated management actions on contract costs in resolving the cost impact.

(b) *Negotiations.* The CFAO shall—

(1) Negotiate and resolve the cost impact on behalf of all Government agencies; and

(2) At the conclusion of negotiations, prepare a negotiation memorandum and send copies to the auditor and affected contracting officers.

(c) *Contract adjustments.* (1) The CFAO may adjust some or all contracts with a material cost impact, subject to the provisions in paragraphs (c)(2) through (c)(6) of this section.

(2) In selecting the contract or contracts to be adjusted, the CFAO should assure, to the maximum extent practical and subject to the provisions in paragraphs (c)(3) through (c)(6) of this section, that the adjustments reflect a

*pro rata* share of the cost impact based on the ratio of the cost impact of each Executive agency to the total cost impact.

(3) For unilateral changes and noncompliances, the CFAO shall—

(i) To the maximum extent practical, not adjust the price upward for fixed-price contracts;

(ii) If contract adjustments are made, preclude payment of aggregate increased costs by taking one or both of the following actions:

(A) Reduce the contract price on fixed-price contracts.

(B) Disallow costs on flexibly-priced contracts; and

(iii) The CFAO may, in consultation with the affected contracting officers, increase or decrease individual contract prices, including contract cost ceilings or target costs on flexibly-priced contracts. In such cases, the CFAO shall limit any upward contract price adjustments on affected contracts to the amount of downward price adjustments to other affected contracts, *i.e.*, the aggregate price of all contracts affected by a unilateral change shall not be increased (48 CFR 9903.201–6(b)).

(4) For noncompliances that involve estimating costs, the CFAO—

(i) Shall, to the extent practical, not adjust the price upward for fixed-price contracts;

(ii) Shall, if contract adjustments are made, preclude payment of aggregate increased costs by reducing the contract price on fixed-price contracts;

(iii) May, in consultation with the affected contracting officers, increase or decrease individual contract prices, including costs ceilings or target costs on flexibly-priced contracts. In such cases, the CFAO shall limit any upward contract price adjustments to affected contracts to the amount of downward price adjustments to other affected contracts, *i.e.*, the aggregate price of all contracts affected by a noncompliance that involves estimating costs shall not be increased (48 CFR 9903.201–6(d));

(iv) Shall require the contractor to correct the noncompliance, *i.e.*, ensure that compliant cost accounting practices will now be utilized to estimate proposed contract costs; and

(v) Shall require the contractor to adjust any invoices that were paid based on noncompliant contract prices to reflect the adjusted contract prices, after any contract price adjustments are made to resolve the noncompliance.

(5) For noncompliances that involve cost accumulation, the CFAO—

(i) Shall require the contractor to—

(A) Correct noncompliant contract cost accumulations in the contractor's cost accounting records for affected contracts to reflect compliant contract cost accumulations; and

(B) Adjust interim payment requests (public vouchers and/or progress payments) and final vouchers to reflect the difference between the costs paid using the noncompliant practice and the costs that should have been paid using the compliant practice; or

(ii) Shall adjust contract prices. In adjusting contract prices, the CFAO shall preclude payment of aggregate increased costs by disallowing costs on flexibly-priced contracts.

(A) The CFAO may, in consultation with the affected contracting officers, increase or decrease individual contract prices, including costs ceilings or target costs on flexibly-priced contracts. In such cases, the CFAO shall limit any upward contract price adjustments to affected contracts to the amount of downward price adjustments to other affected contracts, *i.e.*, the aggregate price of all contracts affected by a noncompliance that involves cost accumulation shall not be increased (48 CFR 9903.201–6(d)).

(B) Shall require the contractor to—

(*1*) Correct contract cost accumulations in the contractor's cost accounting records to reflect the contract price adjustments; and

(*2*) Adjust interim payment requests (public vouchers and/or progress payments) and final vouchers to reflect the contract price adjustments.

(6) When contract adjustments are made, the CFAO shall—

(i) Execute the bilateral modifications if the CFAO and contractor agree on the amount of the cost impact and the adjustments (see 42.302(a)(11)(iv)); or

(ii) When the CFAO and contractor do not agree on the amount of the cost

impact or the contract adjustments, issue a final decision in accordance with 33.211 and unilaterally adjust the contract(s).

(d) *Alternate methods.* (1) The CFAO may use an alternate method instead of adjusting contracts to resolve the cost impact, provided the Government will not pay more, in the aggregate, than would be paid if the CFAO did not use the alternate method and the contracting parties agree on the use of that alternate method.

(2) The CFAO may not use an alternate method for contracts when application of the alternate method to contracts would result in—

(i) An under recovery of monies by the Government (*e.g.*, due to cost overruns); or

(ii) Distortions of incentive provisions and relationships between target costs, ceiling costs, and actual costs for incentive type contracts.

(3) When using an alternate method that excludes the costs from an indirect cost pool, the CFAO shall—

(i) Apply such exclusion only to the determination of final indirect cost rates (*see* 42.705); and

(ii) Adjust the exclusion to reflect the Government participation rate for flexibly-priced contracts and subcontracts. For example, if there are aggregate increased costs to the Government of $100,000, and the indirect cost pool where the adjustment is to be effected has a Government participation rate of 50 percent for flexibly-priced contracts and subcontracts, the contractor shall exclude $200,000 from the indirect cost pool ($100,000/50% = $200,000).

**30.607 Subcontract administration.**

When a negotiated CAS price adjustment or a determination of noncompliance is required at the subcontract level, the CFAO for the subcontractor shall furnish a copy of the negotiation memorandum or the determination to the CFAO for the contractor of the next higher-tier subcontractor. The CFAO of the contractor or the next higher-tier subcontractor shall not change the determination of the CFAO for the lower-tier subcontractor. If the subcontractor refuses to submit a GDM or DCI proposal, remedies are made at the prime contractor level.

# PART 31—CONTRACT COST PRINCIPLES AND PROCEDURES

Sec.


31.000 Scope of part.
31.001 Definitions.
31.002 Availability of accounting guide.


## Subpart 31.1—Applicability


31.100 Scope of subpart.
31.101 Objectives.
31.102 Fixed-price contracts.
31.103 Contracts with commercial organizations.
31.104 Contracts with educational institutions.
31.105 Construction and architect-engineer contracts.
31.106 [Reserved]
31.107 Contracts with State, local, and federally recognized Indian tribal governments.
31.108 Contracts with nonprofit organizations.
31.109 Advance agreements.
31.110 Indirect cost rate certification and penalties on unallowable costs.


## Subpart 31.2—Contracts With Commercial Organizations


31.201 General.
31.201-1 Composition of total cost.
31.201-2 Determining allowability.
31.201-3 Determining reasonableness.
31.201-4 Determining allocability.
31.201-5 Credits.
31.201-6 Accounting for unallowable costs.
31.201-7 Construction and architect-engineer contracts.
31.202 Direct costs.
31.203 Indirect costs.
31.204 Application of principles and procedures.
31.205 Selected costs.
31.205-1 Public relations and advertising costs.
31.205-2 [Reserved]
31.205-3 Bad debts.
31.205-4 Bonding costs.
31.205-5 [Reserved]
31.205-6 Compensation for personal services.
31.205-7 Contingencies.
31.205-8 Contributions or donations.
31.205-9 [Reserved]
31.205-10 Cost of money.
31.205-11 Depreciation.
31.205-12 Economic planning costs.
31.205-13 Employee morale, health, welfare, food service, and dormitory costs and credits.
31.205-14 Entertainment costs.